**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>FIRSTBANK PUERTO RICO and FIRST BANCORP,<br><br>    Defendants. | **INDIVIDUAL AND CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>Case No. |

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Jane Doe files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. § 1591, *et seq.*—the Trafficking Victim Protection Act ("TVPA")—and for statutory claims under New York City law. The suit arises from Defendants FirstBank Puerto Rico and First BanCorp (collectively, "FirstBank") participating in and financially benefitting from Jeffrey Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom. Doe brings this suit following mediation talks, which began in November 2025, between the parties that ended without resolution and pursuant to the parties' tolling agreement, as negotiated under New York law. Doe makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### PRELIMINARY STATEMENT

1. FirstBank was Epstein's longest banking partner, a relationship that spanned decades, from 1998 to the present, and was integral in helping him fuel his international sex

1

trafficking operation. As a result of FirstBank's close multi-decade relationship with Epstein, FirstBank acquired a plethora of information regarding Epstein's sex trafficking operation, information that could have put Epstein in prison years earlier if FirstBank had simply properly reported what it knew to authorities. Instead, it chose profit to the detriment of hundreds of victims.

2.    Recently, the U.S. Government's investigation into Epstein's operation uncovered "actionable information on more than $1 billion worth of transactions that flowed in and out of Epstein's accounts"[1] at large financial institutions. "[O]ne of the documents in the Treasury Department's Epstein file indicates that between 2003–2019, there were more than 4,725 wire transfers totaling $1.08 billion involving Jeffrey Epstein and his associates, including Darren Indyke, Harry Beller, Richard Kahn and Erika Kellerhals."[2] These transactions included "wire transfers from wealthy figures over the sales of artwork, fees paid to Epstein, and payments to several women."[3] Investigation has revealed "hundreds of millions in payments to Epstein from Wall Street financiers."[4]

3.    FirstBank provided banking services in connection with Epstein and his sex-trafficking organization from at least 1998 through 2020. It knowingly provided the financial support and the veneer of institutional legitimacy for Epstein and his co-conspirators to fuel their

---

[1] *See, e.g.*, U.S. Senate Committee on Finance, *Letter to Attorney General Bondi from Senator Wyden* (July 21, 2025), https://www.finance.senate.gov/imo/media/doc/wyden_letter_to_doj_-_follow_the_money_on_jeffrey_epstein_7-21-25pdf.pdf/ ("July 2025 Wyden Letter"), at 2.

[2] *Id*. at 1.

[3] Alex Woodword, *Top Democrat demands Trump's IRS investigate Epstein bank records in sprawling probe: 'Follow the money'*, THE INDEPENDENT (Jul. 31, 2025), https://www.the-independent.com/news/world/americas/us-politics/epstein-bank-records-ron-wyden-leon-black-b2799888.html.

[4] July 2025 Wyden Letter, at 1.

international sex-trafficking organization under the guise of non-criminal business activities.  In exchange for that crucial financial support, FirstBank knowingly and intentionally benefited and received things of value from Epstein and his co-conspirators.  And because the Bank failed to timely file suspicious activity reports ("SARs") as to any of these transactions, it failed to alert law enforcement as to Epstein's crimes before it was far too late.

4.    Despite widespread public knowledge of and attention to Epstein's sex trafficking, FirstBank continued to provide financial support, assistance, and facilitation to Epstein's sex trafficking even after Epstein's second arrest. For example, FirstBank maintained and/or opened more than 30 accounts for Epstein and his known entities and agents from 1998 to at least 2020. These include:[5]

| Account Holder | Account Number & Type | Authorized Signature | Opened & Closed Date (status) |
|---|---|---|---|
| J EPSTEIN VIRGIN ISLANDS FOUNDATION INC T/A ENHANCED EDUCATION | ▉▉▉▉ COMMERCIAL CHECKING | JEFFREY EPSTEIN JEFFREY A SCHANTZ | 09/07/00 CREDITS ONLY ALLOWED |
| FINANCIAL TRUST COMPANY INC | ▉▉▉▉ COMMERCIAL CHECKING | JEFFREY EPSTEIN DARREN K INDYKE | 2/5/2002 7/11/2013 |
| FINANCIAL TRUST COMPANY INC | ▉▉▉▉ COMMERCIAL CHECKING | JEFFREY EPSTEIN CECILE R DE-JONGH | 5/1/2001 7/2/2013 |
| FINANCIAL TRUST COMPANY INC | ▉▉▉▉ COMMERCIAL CHECKING | DARREN K INDYKE JEFFREY EPSTEIN | 2/3/2010 6/4/2013 |
| LCP COMPANY LLC | ▉▉▉▉ COMMERCIAL CHECKING | MILES ALEXANDER HARRY BELLER JEFFREY EPSTEIN | 12/20/2002 5/10/2013 |
| ISLAND GROUNDS INC | ▉▉▉▉ COMMERCIAL CHECKING | MILES S ALEXANDER JEFFREY EPSTEIN HARRY BELLER LANCE A CALLOWAY | 8/29/2006 7/25/2014 |

---

[5] EFTA01252357. On November 19, 2025, Congress passed the Epstein Files Transparency Act ("EFTA"), requiring that the DOJ publicly release all unclassified records, documents, communications, and investigative materials that relate to the investigation and prosecution of Epstein. In response, the DOJ released tens of thousands of records from late 2025 to early 2026. All references to EFTA documents can be found in the Epstein Library, https://www.justice.gov/epstein.

| Company | Account Type | Signers | Dates/Status |
|---|---|---|---|
| IGO COMPANY LLC | COMMERCIAL CHECKING | JEFFREY EPSTEIN<br>JEANNE BRENNAN-WIEBRACHT | 02/02/07<br>CREDITS ONLY ALLOWED |
| JEEPERS INC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN | 02/02/07<br>12/31/19 |
| LAFAYETTE CONTRACTORS LLC | COMMERCIAL CHECKING | JEFFREY EPSTEIN<br>JEANNE BRENNAN-WIEBRACHT<br>HARRY BELLER<br>DARREN K INDYKE | 2/5/2007<br>5/14/2013 |
| F T REAL ESTATE INC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN<br>HARRY BELLER | 05/23/07<br>NORMAL |
| THOMAS WORLD AIR LLC | COMMERCIAL CHECKING | JEFFREY EPSTEIN<br>HARRY BELLER<br>JEANNE BRENNAN-WIEBRACHT | 11/03/11<br>12/31/19 |
| MICHELLE'S TRANSPORTATION CO LLC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN<br>HARRY BELLER | 09/14/07<br>CREDITS ONLY ALLOWED |
| SOUTHERN COUNTRY INTERNATIONAL LTD | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN | 01/02/15<br>NORMAL |
| GRATITUDE AMERICA, LTD | COMMERCIAL CHECKING | JEFFREY E EPSTEIN<br>DARREN K INDYKE | 02/26/15<br>NORMAL |
| GREAT ST JIM, LLC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN | 09/08/16<br>CREDITS ONLY ALLOWED |
| NAUTILUS, INC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN | 05/04/12<br>CREDITS ONLY ALLOWED |
| MAPLE, INC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN | 05/04/12<br>NORMAL |

4

| | | | |
|---|---|---|---|
| CYPRESS, INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | DARREN K INDYKE<br>JEFFREY EPSTEIN | 05/07/12<br>NORMAL |
| LAUREL, INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | DARREN K INDYKE<br>JEFFREY EPSTEIN | 05/07/12<br>NORMAL |
| SOUTHERN TRUST COMPANY INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | JEFFREY E EPSTEIN<br>DARREN K INDYKE<br>JEANNE BRENNAN-<br>WIEBRACHT | 12/7/2012<br>10/18/2019 |
| SOUTHERN TRUST COMPANY INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | DARREN K INDYKE<br>CECILE DEJONGH<br>JEANNE BRENNAN-<br>WIEBRACHT<br>JEFFREY EPSTEIN | 02/22/13<br>CREDITS ONLY<br>ALLOWED |
| LITTLE ST JAMES LLC<br>C/O FINANCIAL TRUST CO INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | JEFFREY EPSTEIN<br>HARRY BELLER<br>GHISLAINE N MAXWELL | 10/22/98<br>CREDITS ONLY<br>ALLOWED |
| LITTLE ST JAMES LLC<br>C/O FINANCIAL TRUST CO INC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | Information not available | 7/16/1998<br>8/3/2012 |
| LITTLE ST JAMES LLC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | Information not available | 1/22/2004<br>8/3/2012 |
| FSF LLC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | JEFFREY EPSTEIN | 10/31/08<br>12/31/19 |
| LSJE LLC | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | DARREN K INDYKE<br>JEFFREY EPSTEIN<br>HARRY BELLER<br>JEANNE BRENNAN-<br>WIEBRACHT | 12/29/11<br>NORMAL |
| LSJE LLC<br>OPERATING ACCT | ▮▮▮▮▮▮▮<br>*COMMERCIAL CHECKING* | DARREN K INDYKE<br>JEFFREY EPSTEIN<br>HARRY BELLER<br>JEANNE BRENNAN-<br>WIEBRACHT | 01/23/12<br>03/04/20 |

| | | | |
|---|---|---|---|
| FREEDOM AIR PETROLEUM LLC | COMMERCIAL CHECKING | DARREN K INDYKE<br>JEFFREY EPSTEIN<br>HARRY BELLER<br>JEANNE BRENNAN-WIEBRACHT | 02/10/12<br>CREDITS ONLY ALLOWED |
| ISLAND GROUNDS INC | 12 MONTHS V.I. CERTIFICATE | JEFFREY EPSTEIN<br>DARREN K INDYKE | 2/2/2010<br>10/24/2013 |
| THOMAS WORLD AIR LLC | 12 MONTHS V.I. CERTIFICATE | JEFFREY EPSTEIN<br>JEANNE BRENNAN-WIEBRACHT | 03/11/16<br>FROZEN |
| ISLAND GROUNDS INC | 12 MONTHS V.I. CERTIFICATE | JEFFREY EPSTEIN | 8/6/2010<br>8/12/2013 |
| POPLAR, INC | COMMERCIAL CHECKING | JEFFREY E EPSTEIN<br>DARREN K INDYKE | 9/19/2016<br>10/31/2016 |
| JEFFREY E EPSTEIN | INDIVIDUAL CHECKING | JEFFREY EPSTEIN | 11/9/2000<br>10/8/2019 |
| JEFFREY EPSTEIN | CREDIT CARD | JEFFREY EPSTEIN | 05/08/2014 |

5.     FirstBank continued to bank Epstein and his known entities even after other banks closed their accounts with him, so that many of the funds from accounts that were closed could be safely parked at FirstBank and the sex-trafficking operation never had to slow down.

6.     Even after Epstein's second arrest, additional funds were transferred to FirstBank which continued to bank Epstein-related accounts, including those for his Estate, through the present.

7.     FirstBank also made millions in cash transfers to and from Epstein and his entities' accounts—transfers that were made to support and fund Epstein's sex-trafficking venture and for which there was no apparent business or lawful purpose. Throughout all this, FirstBank knowingly and intentionally failed to timely file the SARs it was legally required to file until it was far too late to do any good, and even then, only filed SARs as cover for its years of complicity in Epstein's illegal operation.

8.     FirstBank even served as a banking reference for Epstein in connection with Epstein's own efforts to charter and capitalize a private banking entity through which his

trafficking finances could be further obscured.

9.      FirstBank knowingly and intentionally benefited from the assistance and support it provided to Epstein, including from fees and referrals.

10.     Many details of FirstBank's knowing assistance and facilitation of Epstein's sex trafficking remain unknown.

## JURISDICTION, VENUE, AND TIMELINESS

11.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Jane Doe—individually and on behalf of the other Class Members—proceeds under the federal TVPA statute, 18 U.S.C. § 1589 through § 1595.

12.     The Court also has supplemental jurisdiction over the state law claim recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District. Epstein, his co-conspirators, and FirstBank all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe and members of the Class in this District.

14.     FirstBank's purposeful availment of this District is independently confirmed by an extensive set of New York-directed contacts arising from and in connection with the conduct alleged in this Complaint. Those contacts include, without limitation: (a) the parties' tolling agreement, which is governed by New York law and which FirstBank executed with the express understanding that any subsequent action would be filed in this District; (b) FirstBank's

correspondent and clearing relationships with New York-based financial institutions, including Citibank, through which the Epstein-related wire transfers at issue here were routed; (c) wire instructions sent to and received from New York-based counterparties on behalf of Epstein and his entities; (d) electronic communications between FirstBank personnel and the Epstein organization's New York-based principals and agents, including Darren Indyke, Richard Kahn, Harry Beller, Lesley Groff, Bella Klein, Eric Gany, and Erica Kellerhals; and (e) the maintenance of accounts and the processing of transactions for entities operating in or with contacts to this District. These contacts are not isolated; they are the ordinary stuff of the relationship FirstBank chose to maintain with Epstein over more than two decades.

15. This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1) because it is filed within ten years after the cause of action arose.

16. Also, any statute of limitations applicable to Jane Doe's and the putative Class' claims, if any, is tolled due to FirstBank's affirmative concealment of the underlying facts, including affirmative misrepresentations that created the false impression that FirstBank had no meaningful role in, or knowledge of, Epstein's sex-trafficking enterprise, and pursuant to an agreement between the parties in this case to toll any statute of limitations while mediation talks are pending. Those talks ended without resolution, and Jane Doe and the putative Classes bring these claims pursuant to the parties' tolling agreement.

## PARTIES

17. Plaintiff Jane Doe is a citizen of Florida and was at all relevant times a resident of and domiciled in the State of New York.

18. Jane Doe is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

19. Jane Doe is also at serious risk of retaliatory harm because the case, especially

recently, has garnered worldwide media attention wherein victims have been maliciously targeted by online trolls as well as by individuals seeking to expose the identities of Epstein victims for malicious purposes.

20.     Jane Doe's safety, right to privacy, and security outweigh the public interest in her identification and any prejudice to Defendant by allowing her to proceed anonymously.

21.     Defendant First BanCorp is a full-service provider of financial services in Puerto Rico, the United States and the U.S. and British Virgin Islands, and is the publicly traded financial holding company of its subsidiary, FirstBank Puerto Rico.

22.     Defendant FirstBank Puerto Rico, is a global financial institution headquartered in San Juan, Puerto Rico, and operating in this District. FirstBank Puerto Rico is a wholly-owned subsidiary of Defendant First BanCorp. FirstBank Puerto Rico engaged and corresponded with banks in New York to send and receive wire transfers internationally.

23.     FirstBank is responsible, under United States law and otherwise, for the acts of their officers, directors, employees, and agents, including the acts described in this Complaint. The acts alleged were committed by FirstBank's officers, directors, employees, and agents within the scope of their employment and with the intention, at least in part, to benefit FirstBank.

## BACKGROUND

24.     Jeffrey Epstein's sex-trafficking venture was a sophisticated operation that ensnared vulnerable young females to ensure Epstein could receive three "massages" or orgasms a day, often from three different girls or women a day.[6]

25.     Once in Epstein's control, each victim was taught and understood that she must be completely compliant with every demand Epstein had for her; otherwise, she would certainly

---

[6] *See Giuffre v. Maxwell*, Case No. 1:15-cv-07433 (S.D.N.Y. Jan. 5, 2024), Dkt. 1327-7.

suffer serious reputational, financial, and psychological harm. By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Jane Doe and the other members of the Class.

26. The Epstein sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young women. The venture was able to expand as its relationship with complicit financial institutions like FirstBank grew.

27. Epstein's sex-trafficking venture was not possible without the assistance and complicity of financial institutions—specifically, banks—which provided special treatment to Jeffrey Epstein, his co-conspirators, and the sex-trafficking venture, thereby ensuring its continued operation of the enterprise and the continued sexual abuse and sex trafficking of young women and girls. But for this financial support, Epstein's sex-trafficking scheme could not have existed and flourished.

28. To access the financial services needed to maintain his active sexual abuse of young women, it was essential that the financial institution where he banked be complicit in his operation and permit more frequent withdrawals of unusually large amounts of cash from his accounts and other Epstein-related accounts without following anti-money laundering and reporting laws.

**THE TRAFFICKING VICTIMS' PROTECTION ACT**

29. The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

30. The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

10

(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

31.    The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (e.g., violation of 18 U.S.C. §§ 1591–94) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

32.    Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a).

## FACTUAL ALLEGATIONS

**A.    The Epstein Sex-Trafficking Venture**

33.    Beginning in the early 1990s and continuing through the summer of 2019, Jeffrey

11

Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591–95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them. For example:

(a) Epstein and his co-conspirators threatened that physical, financial, and reputational harm would come to victims if they did not comply with his demands that they perform commercial sex acts;

(b) Epstein and his co-conspirators falsely and fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands, promises that Epstein did not or never intended to fulfill;

(c) Epstein and his co-conspirators held Epstein out as a philanthropist who enjoyed helping talented women and who was connected to the highest levels of nearly any industry, including modeling, acting, politics, business, education, with connections to top United States Universities, including but not limited to, Fashion Institute of Technology, Columbia University, Harvard College, Baruch College, and New York University, with the desire and ability to advance the career of anyone he chose. Through his network of associates, Epstein and his co-conspirators targeted young and vulnerable women and girls, promising them money, employment, immigration status, education, housing and other valuable items, in order to separate the young woman from her family, and often her country, before sexually trafficking and abusing each of the young women after making clear he could, and would, destroy them if they did not comply with his sexual demands.

(d) Epstein and his co-conspirators threatened to deprive victims of living accommodation,

12

food, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

34.    In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, making false promises to victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, his New Mexico ranch, and his island in the U.S. Virgin Islands, among other locations.

35.    Among other things, Epstein sexually abused his many victims and caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including money, promises of educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.

36.    As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened and otherwise made it known that harm would come to victims if they did not comply with his demands to perform commercial sex acts.

37.    As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises, most of which were never, and were never intended to be, fulfilled, were a quid pro quo for the sex acts that occurred.

38.    As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the assault or as a "finder's fee" for bringing other young women. Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his

often poor and underprivileged victims, and making each feel indebted to him to justify his demand for sexual compliance. Epstein used this material support to maintain victims' dependence, including by threatening to withhold basic necessities like food for non-compliance with his demands.

40. Epstein employed numerous coercive tactics to cause young women to engage in commercial sex and to remain compliant as long as he and his co-conspirators wanted, including but not limited to: holding victims' immigration status hostage, maintaining a list of expenses he paid for each victim that he and his co-conspirators would make known would need to be repaid if she were to ever leave or turn on Epstein, degrading victims such as calling them "fat" or "lazy" or "ungrateful," placing victims on scales to weigh them in front of other victims who he would encourage to join in the humiliation, and forcing victims into degrading sexual encounters with other men or women.

40. In 2001, a criminal investigation was opened by the Palm Beach police department detailing, among other things, that Epstein was paying young women with no massage experience for sexually charged massages and that Ghislaine Maxwell was prowling Florida universities looking for new women to bring to Epstein.

41. In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion. During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2423 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statute §§ 796.07 and 796.03, against dozens of young women. FirstBank was banking Epstein at this

14

time and continued to do so after his arrest.

42.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008. Epstein also entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his known and unknown co-conspirators) for violations of the TVPA and other sex offenses in Florida. When the U.S. Attorney's Office entered into that non-prosecution agreement with Epstein, it had not received reports from FirstBank about Epstein, nor did FirstBank provide any other assistance in the investigation.

43.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his penchant for sex abuse and trafficking of young females.  For instance, it was reported that up until the time of his Florida arrest, Epstein had been sexually abusing *three to four young females per day*; it was a full-time job for him.

44.     The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

45.     At all times relevant to this Complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as an "organization." Epstein was continuously at the hub of this sex-trafficking organization, which operated throughout the times indicated in this Complaint.

46.     The Epstein organization used its in-house attorney, Darren Indyke, for services related to Epstein's trafficking operation and other illegal activities, which allowed inter-

organization communications to be protected from discovery by the attorney-client privilege. Any time Epstein needed legitimate legal work performed, including defending his criminal investigations and defending all civil lawsuits, he hired legitimate high-end legal teams and firms.

47. Likewise, while Epstein hired outside accounting firms to service him and his corporate taxes, he utilized a company providing exclusive accounting and in-house financial services for Epstein—Harry Beller, Eric Gany and eventually Richard Kahn and HBRK—to pay victims, withdraw and hold large amounts of cash for hush money payments and illegal payments to sex trafficking victims, create shell companies and maintain accounts for the purpose of causing sex trafficking victims to remain entrapped by the organization and to otherwise develop false schemes to protect the operation and control the victims. "HBRK" stands for "Harry Beller Richard Kahn," referring to its founding members and longtime Epstein associates and accountants, Harry Beller and Richard Kahn. Kahn serviced the taxes of numerous Epstein victims and devised schemes to entrap them and often had to communicate with financial institutions on behalf of victims (including Jane Doe and other trafficking victims which should have raised other red flags).

48. Epstein also used Erika Kellerhals, a U.S. Virgin Islands tax attorney, for services related to Epstein's trafficking operation, including organizing shell entities, acting as trustee for trusts that directly paid Epstein's victims, and managing real estate transfers and transactions for one of Epstein's islands, Great St. James Island, and Epstein's New York Mansion located at 9 East 71st Street.

49. On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. § 1591, in part

due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street. *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-490 (S.D.N.Y.).

50.    On July 6, 2019, Jeffrey Epstein was arrested pursuant to the New York Indictment. Despite this, FirstBank continued to provide Epstein with banking services.

51.    On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where he was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

52.    In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Ghislaine Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-330 (S.D.N.Y.).

53.    On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in painstaking detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

54.    As of July 6, 2020, a Consent Order entered by the NY Department of Financial Services ("DFS") found that: "Epstein [] had a well-publicized reputation related to the trafficking and abuse of young women" as "[a]llegations against him began appearing in the press as early as March 2005 with the accusation that he paid a 14-year old girl for a 'massage.'"[7] As DFS went on

---

[7] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

to report: "between 2005 and 2013, press reports outlined the allegations underlying the plea agreement [] to varying degrees," including that Epstein "was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Mr. Epstein's private jets."[8]

55.     The July 6 Consent Order also penalized Deutsche Bank $150 million and was entered in favor of the DFS finding violations against Deutsche Bank for violations of Anti-Money-Laundering ("AML") laws. The Order detailed criminal activity committed by Epstein's top loyalists, Darren Indyke and Richard Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out suspicious financial actions in furtherance of Epstein's sex-trafficking operation. Epstein, again including through Indyke and Kahn, was carrying out suspicious financial transactions in furtherance of Epstein's sex trafficking to FirstBank as well as Deutsche Bank.

56.     As noted by the Senate Committee on Finance, Indyke and Kahn were employed by Jeffrey Epstein for decades.[9] "In their capacities as Epstein's in-house attorney and accountant, Indyke and Kahn controlled the movement of funds through Epstein's bank accounts and oversaw virtually every aspect of the financial infrastructure that paid for Epstein's sex trafficking activities."[10] Moreover, Kahn provided knowingly false information to U.S. immigration officials

---

[8] *Id.* at 6.

[9] U.S. Senate Committee on Finance, *December 17, 2025 Letter to Attorney General Bondi and FBI Director Patel from Senators Wyden, Blumenthal, Van Hollen, Klobuchar, and Whitehouse* (Dec. 17, 2025) https://www.finance.senate.gov/imo/media/doc/letter_to_doj-fbi_from_us_senators_on_darren_indyke_and_richard_kahn_12-17-25pdf.pdf ("December 2025 Wyden Letter"), at 1.

[10] *Id.*

18

to help Epstein's victims remain in the United States.[11]

57.     The Senate Committee on Finance explained that "at Epstein's direction, Indyke and Kahn structured hundreds of Epstein's bank accounts, created and administered dozens of corporate entities, regularly made large cash withdrawals on Epstein's behalf and authorized thousands of suspicious wire transfers."[12] "According to bank records recently unsealed in federal court, Indyke and Kahn had signatory authority or power of attorney over Epstein's bank accounts and were the subject of numerous suspicious activity reports ("SARs") filed with the U.S. Treasury Department."[13]

58.     "[I]t was Kahn, the trusted accountant, and Indyke, the loyal lawyer, who kept the engine running for years with their financial and legal maneuvers."[14] Kahn managed the expenses, and Indyke structured withdrawals of cash "in amounts that didn't trigger federal reporting."[15]

**B.     The U.S. Virgin Islands Context: Epstein's Domicile and FirstBank's USVI Footprint.**

59.     Throughout the relevant period, Jeffrey Epstein was domiciled in the United States Virgin Islands. He owned and resided on Little Saint James, and later also Great Saint James, two islands lying off the coast of St. Thomas. He maintained a USVI driver's license, registered to vote in the USVI, paid USVI income tax, and was registered with the USVI Sex Offender Registry as

---

[11] *Id.*
[12] *Id.*

[13] *Id.*

[14] Khadeeja Safdar & Joe Palazzolo, *The CPA and the Lawyer Who Served Jeffrey Epstein–and Control His Fortune and Secrets*, WALL ST. J. (Nov. 22, 2025, at 9:00 p.m. ET), https://www.wsj.com/us-news/epstein-accountant-lawyer-control-estate-0d31070b.

[15] *Id.*

a Tier I offender beginning in 2011. His designation as a USVI domiciliary was a matter of public record, and his USVI residence was the subject of substantial contemporaneous press coverage in both USVI and mainland outlets.

60.     FirstBank maintains, and at all relevant times maintained, substantial operations in the United States Virgin Islands. FirstBank's USVI footprint includes retail branches, a commercial banking presence, and the personnel necessary to know—through both ordinary commercial channels and the institution's own AML diligence—the most prominent USVI-domiciled customer in the institution's catchment area. The information available to FirstBank's USVI operations about Jeffrey Epstein included his sex-offender registration, his ownership of Little and Great Saint James, the on-island activity at those properties, and the contemporaneous USVI press coverage of his criminal status and associates.

61.     On January 15, 2020, the Attorney General of the United States Virgin Islands filed *Government of the United States Virgin Islands v. Epstein*, Civ. Case No. ST-20-CV-14 (V.I. Super. Ct.), a sweeping civil enforcement action under the Criminally Influenced and Corrupt Organizations Act (the USVI's RICO analog), alleging that Epstein and his network had used USVI-based entities to recruit, transport, and traffic young women and girls. The USVI enforcement action produced extensive public filings and ultimately a settlement of more than $105 million. The conduct catalogued in the USVI complaint—Epstein's use of USVI-based entities to obscure trafficking activity, his payment of recruiters, his maintenance of a private aviation operation that flew victims to and from the islands, and the role of his entities and personnel in supporting that operation—is the same conduct FirstBank facilitated through its USVI and Puerto Rico banking operations.

62.     In addition, the Epstein-related FirstBank accounts identified to date include

20

accounts held in the names of entities organized under USVI law or maintained for USVI-purpose activity, including (without limitation) Southern Trust Company and Southern Financial LLC. The activity in those accounts—round-dollar transfers, intra-network transactions, cash withdrawals, and payments to women—was the activity that the USVI AG's enforcement action separately identified as the financial mechanics of the trafficking operation. FirstBank's role in providing the banking infrastructure for those USVI-based entities is the direct subject of this Complaint.

**C.    FirstBank Knew, Should Have Known, and Recklessly Disregarded Epstein's Sex Crimes and Sex-Trafficking Venture.**

**1. FirstBank's Know-Your-Customer and Anti-Money-Laundering Obligations Required Independent and Ongoing Investigation of Epstein and Each Entity He Banked.**

63.    As a federally regulated financial institution operating in the United States and the U.S. Virgin Islands, FirstBank was bound—both legally and as a matter of standard industry practice—by the Know-Your-Customer ("KYC") and Anti-Money-Laundering requirements set forth in the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the USA PATRIOT Act, and implementing regulations of FinCEN and the federal banking regulators. Those obligations were not perfunctory paperwork. They required FirstBank to know, at all times and as a continuing duty, who its customer Jeffrey Epstein actually was, how he generated his wealth, what his businesses did, how his accounts and entities related to one another, who his counterparties were, and whether his activity was consistent with the customer FirstBank knew him to be.

64.    FirstBank's KYC and AML obligations applied at three distinct stages of every customer relationship, and at every stage as to Epstein. First, at onboarding, FirstBank was required to form a documented understanding of the customer's identity, source of wealth, source of funds, line of business, expected transaction patterns, and risk profile, and to confirm the customer's representations against publicly available information. Second, on an ongoing basis, FirstBank was required to monitor account activity against that profile, to reassess risk in light of

21

new information, and to investigate and resolve discrepancies as they arose. Third, and critically, at the entity level, FirstBank was required to perform an independent KYC evaluation of every legal entity opened in the customer's name—what the company does, what business activity supports it, how it relates to the customer's other entities, why the customer would be its owner or signatory, and what transactions would be typical for that entity.

65. Each new entity is its own KYC undertaking, and a transfer of funds among entities owned or controlled by the same individual is itself a recognized red flag for layering—one of the three classic stages of money laundering. Where the related entities cannot independently justify their existence, where their accounts transact predominantly or exclusively with the customer's other accounts, and where the customer cannot explain what each company does, the inference that the entity structure exists to obscure rather than to conduct legitimate business is the conclusion a competent compliance function is required to draw.

66. The framework was articulated in plain terms in the Office of the Comptroller of the Currency's consent order against Deutsche Bank, *In re Deutsche Bank Trust Company Americas* (OCC AA-EC-2020-44, July 7, 2020), and the related FinCEN enforcement actions arising from Deutsche Bank's handling of accounts for Jeffrey Epstein. Deutsche Bank was found to have engaged in "unsafe and unsound" practices in connection with its Epstein relationship and to have processed transactions on behalf of [Epstein] that exhibited substantial indicia of suspicious activity, including payments to individuals who were publicly alleged to have been co-conspirators in sexual abuse of young women by Epstein, "settlements payments totaling over $7 million to law firms, as well as dozens of payments to law firms totaling over $6 million for what appear to have been the legal expenses of Mr. Epstein and his co-conspirators,"[16] and payments

---

[16] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020),

to Russian models, payments for women's school tuition, hotel and rent expenses, and (consistent with public allegations of prior wrongdoing) payments directly to numerous women with Eastern European surnames. The same red flags identified by federal regulators as actionable at Deutsche Bank were present at FirstBank.

67.    Among the recognized red flags that bank compliance personnel are trained to identify—and that FirstBank's compliance personnel were trained to identify—are: (a) round-dollar transfers without an evident commercial purpose; (b) transfers among related-entity accounts owned by the same individual that appear designed to layer or obscure the source or use of funds; (c) accounts that transact exclusively or predominantly with the customer's other accounts; (d) entities whose stated purpose cannot be reconciled with the activity in their accounts; (e) entities that exist on paper but cannot describe their operations, employees, or business model; (f) recurring large cash withdrawals; (g) payments to individuals consistent with patterns of trafficking, exploitation, or hush-money; (h) negative news and adverse media reports identifying the customer with criminal activity; and (i) the closure of the customer's accounts at other financial institutions for suspicious activity reasons. The presence of any one of these red flags is sufficient to require enhanced due diligence; the presence of multiple red flags requires escalation, the filing of a SAR, and—where the activity cannot be reconciled with a legitimate purpose—customer exit.

68.    "Negative news" and "adverse media" are industry terms of art in the AML compliance field. They refer to publicly available information—press reports, court filings, law-enforcement actions, sex-offender registry entries, regulatory actions, and similar materials—that place the customer in proximity to criminal conduct. The identification, escalation, and resolution of negative news is a core, non-discretionary compliance function. FirstBank's AML personnel

---

https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf., at 10.

23

were trained in, and were obligated to perform, negative-news screening as a continuing matter throughout the Epstein relationship.

## 2. What FirstBank's Know-Your-Customer Inquiry Should Have Revealed About Jeffrey Epstein.

69.     Although Epstein cultivated an air of mystery about his wealth and business in the public-facing press, he could not invoke that mystery against his bank. The whole premise of KYC is that the bank gets behind the public posture and learns who the customer actually is. The customer is entitled to no privacy from his own bank's compliance function. FirstBank had both the right and the affirmative obligation to know exactly how Epstein made his money, how he spent it, what his day-to-day business was, how his entities were structured, and how it all fit together. What FirstBank's KYC inquiry into Jeffrey Epstein revealed (or should have revealed) was the following:

70.     Epstein held no professional credentials of any kind that would explain the wealth flowing through his accounts. He had no advanced degree. He held no professional license—no securities license, no banking license, no fiduciary license, no investment-adviser registration, and no public-accountancy license. He held no faculty appointment, no formal investment role at any third-party firm, and no operating role at any company other than the ones he opened in his own name and that of his entities.

71.     Epstein was a college dropout. He attended Cooper Union and then New York University without completing a degree at either institution.

72.     In the early 1970s, Epstein was hired as a teacher of mathematics and physics at the Dalton School in Manhattan despite lacking the educational credentials normally required for the position. He was terminated by Dalton in 1976.

73.     Epstein was then hired by Bear Stearns. He was terminated by Bear Stearns in 1981.

24

The Securities and Exchange Commission took his deposition that same year in connection with a Regulation D violation—a fact reported in the 2003 Vanity Fair article that was readily available to any FirstBank compliance officer performing routine due diligence.[17]

74.    Following Bear Stearns, Epstein had effectively one client whose retention of him produced any meaningful, traceable income stream: Leslie Wexner, the founder of The Limited and Victoria's Secret. The services Epstein performed for Wexner were never publicly explained and were the subject of widespread press skepticism for decades. Wexner terminated the relationship in 2007.

75.    From 2007 forward, Epstein had no clients, no employer, no licensed financial activities, and no externally identifiable source of fresh income. He nonetheless continued to receive, hold, and transfer vast sums of money through accounts at FirstBank and the small number of other institutions that had not yet closed his accounts. The arithmetic of those facts—no income source, but continued large-scale account activity—was, standing alone, a textbook AML red flag.

76.    During the period of his continued FirstBank relationship, Epstein spent his days, by the contemporaneous record of the Palm Beach Police Department, sexually abusing three to four young women per day in his Palm Beach mansion. That activity did not generate income. It required substantial outflows for victim payments, recruiter "finder's fees," housing, travel, and the salaries of co-conspirators. The cash and transfer demands of that activity match precisely the pattern of cash withdrawals, payments to women, and intra-entity transfers that FirstBank in fact processed for Epstein over many years.

77.    From 2008 onward, Epstein was a registered sex offender. He was required to

---

[17]    Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOorJLRLWCYV6hvHqP-GM4mf12p3ev-QdIfPSpK9KkitCfRrJjDqv.

register in every jurisdiction in which he maintained a residence—including in the United States Virgin Islands, where he was domiciled and owned Little Saint James and Great Saint James, and where FirstBank maintained substantial operations. The USVI sex-offender registry was, and is, publicly available. A FirstBank compliance officer performing the negative-news and adverse-media screening required by the institution's own AML program could have learned, with a single lookup, that the customer to whom FirstBank was extending banking services was a domicile-of-record registered sex offender within FirstBank's own footprint.

78.    Dozens of civil lawsuits filed between 2008 and 2019 publicly catalogued Epstein's continued sex trafficking. Among them were the Crime Victims' Rights Act suit, *Doe v. United States*, Civ. Case No. 9:08-cv-80736 (S.D. Fla.), which sought to overturn the federal non-prosecution agreement and which produced extensive public filings detailing Epstein's continued offenses; defamation litigation brought by Virginia Roberts Giuffre against Ghislaine Maxwell, in which Giuffre alleged that Epstein had trafficked her for sex with named third parties; and dozens of individual suits by named victims alleging trafficking, recruitment, and abuse. Each of those lawsuits was indexed in publicly available court databases and was the subject of contemporaneous press coverage.

79.    Public reporting in major American and international outlets repeatedly linked Epstein with co-conspirators including Jean-Luc Brunel, a modeling-agency operator later separately charged with the rape of minors and whose modeling operation was a documented recruiting channel for Epstein. Reporting in the Virgin Islands press and in New York, London, and European outlets named Epstein, Maxwell, and their network in connection with the trafficking of underage girls. Epstein's own Wikipedia entry, available to any compliance officer with an internet connection, recited each of these facts.

26

80.     By the time of his 2019 federal arrest, multiple of Epstein's other banking relationships had been terminated for suspicious-activity reasons. JPMorgan Chase exited the relationship in 2013 after years of internal escalation. Deutsche Bank exited in 2018, citing Epstein-related concerns and ultimately paying federal regulators and victims to resolve claims arising from the relationship. Each of those terminations was, or with reasonable diligence could have been, known to FirstBank: federal information-sharing channels among financial institutions established under Section 314(b) of the USA PATRIOT Act exist for precisely this purpose, and the closure of customer accounts at other financial institutions for suspicious-activity reasons is a red flag of the highest order. FirstBank's continued banking of Epstein after each successive termination by a peer institution—including the post-second-arrest period—is independently inculpatory.

81.     Compounding the inference of FirstBank's actual knowledge: in 2014, FirstBank itself served as a banking reference for Epstein in connection with Epstein's own efforts to charter and capitalize a private banking entity through which his trafficking finances could be further obscured. A reference of that kind is not a routine ministerial act; it requires, by industry practice, the issuing bank to vouch for the customer's standing, character, and conduct of the relationship. FirstBank vouched for Epstein at a time when its own internal monitoring records reflected the very red flags the institution was bound by law to act upon.

82.     The KYC inference available to FirstBank from those facts was straightforward and inescapable. Epstein was not a legitimate financier. He had no license, no degrees, no employer, no clients, no identifiable income-generating activity, and no business profile capable of justifying the volume of dollars moving through his FirstBank accounts. He was, however, a publicly known, registered, daily sex offender whose criminal activity was a recognized cash- and transfer-intensive

27

enterprise. The only commercial activity consistent with his account activity was the activity for which he was publicly known: sex trafficking. The only function FirstBank could plausibly have been performing for him was the function it did in fact perform—providing the financial infrastructure on which Epstein's trafficking operation depended.

83.     FirstBank's own AML program would have surfaced the very red flags catalogued above. FirstBank's continued provision of banking services to Epstein, his entities, his co-conspirators, and his estate—through the date of the filing of this Complaint—reflects not a failure of compliance but a deliberate election by the institution to bank a customer whose criminal activity it understood, in exchange for the fees and balances the relationship generated.

84.     Epstein's sex-trafficking venture was publicly and widely known. For decades, several high-profile investigations, dozens of lawsuits, and thousands of articles covered Epstein's crimes. Despite having access to and knowledge of these public sources, FirstBank knowingly and intentionally disregarded this damning information in the name of financial gain.

85.     In 2001, a criminal investigation was opened by the Palm Beach police department detailing, among other things, that Epstein was paying young women with no massage experience for sexually charged massages and that Ghislaine Maxwell was prowling Florida universities looking for new women to bring to Epstein.[18]

86.     On October 28, 2002, Landon Thomas published, "Jeffrey Epstein: International Moneyman of Mystery" in New York Magazine.[19] This article was widely circulated and available

---

[18] James Hill, *Years before Epstein came under investigation in Palm Beach, local police got tip about Maxwell*, ABC NEWS (Dec. 23, 2025), https://abcnews.com/US/years-epstein-investigation-palm-beach-local-police-tip/story?id=128668408.

[19] Landon Thomas, Jr., *Jeffrey Epstein: International Moneyman of Mystery: "Terrific guy," Donald Trump booms from a speakerphone. "He's a lot of fun to be with."*, N.Y. MAG. (Oct. 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

to any financial institutions conducting diligence checks on Epstein when deciding whether to open or maintain accounts with him, and emphasized the need to scrutinize the source of Epstein's funds and whether these incoming and outgoing payments could reasonably have any valid business purpose.

87.    On March 1, 2003, Vicky Ward published, "The Talented Mr. Epstein" in Vanity Fair, revealing Epstein's deep rooted ties to Ghislaine Maxwell, the fact that he dropped out of college and acted as a school teacher before being hired at Baer Sterns, and the fact that his deposition was taken by the SEC in 1981 for committing a Regulation D violation.[20] The article also documented Epstein's ties to convicted criminal Steven Hoffenberg and his unusual relationship with Leslie Wexner, the founder of Victoria's Secret. The article raised serious questions about Epstein's credibility, sources of wealth, business practices, and associations, and publicly exposed numerous red flags that would all be most important to any financial institution obligated to conduct due diligence on Epstein.

88.    News surrounding Jeffrey Epstein was not just limited to American publications either. Media outlets around the world, including in the Virgin Islands where Jeffrey Epstein was domiciled, also reported on Jeffrey Epstein and his business dealings and personal relationships.[21]

89.    In 2005, the Palm Beach Police Department began investigating Jeffrey Epstein for sexually abusing children.

---

[20]    Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303?srsltid=AfmBOoqec1Twtdt-Bq8Oo14_-nlf02nRGON9rgbBU2YMrGtzZiivv1m_.

[21]    Source Staff, *N.Y. Power Broker Wants Local Connection*, ST. THOMAS SOURCE (Mar. 11, 2003), https://stthomassource.com/content/2003/03/11/ny-power-broker-wants-local-connection-1/.

90.　On July 23, 2006, Jeffrey Epstein was arrested.[22]

91.　In 2006, Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old. There were hundreds of pages of publicly-released police reports revealing that Epstein was a serial sexual abuser and trafficker, including detailed reports making it clear that his operation depended on his accessing nearly unlimited cash to use as payments to his victims who were then paid more cash to bring him more victims. The money trail into the Epstein-related accounts made plain that Epstein was engaging in crimes and the recipients of his money exposed the type of crimes. The police reports generated in that investigation were made public and spread rampantly across the internet, beginning with TheSmokingGun.com.[23]

92.　In 2006, local Palm Beach news outlets began covering the Epstein investigation which resulted in dozens of early articles about Epstein's arrest and the allegations of sexual abuse being published and circulated online.[24]

93.　Details of the investigation reached the Virgin Islands and highlighted Epstein's connection to then-candidate, Governor John De Jongh, and his wife, Cecile De Jongh who worked personally for Jeffrey Epstein.[25]

---

[22] *Probable Cause Affidavit,* Palm Beach Police Dep't (July 25, 2006), available at https://abcnews.go.com/images/WNT/Palm_Beach_Records_Epstein.pdf.

[23] Staff Writer, *Billionaire in Palm Beach Sex Scandal*, THE SMOKING GUN (July 26, 2006), https://thesmokinggun.com/documents/sex/billionaire-palm-beach-sex-scandal.

[24] *See e.g.*, Staff Writer, *After long probe, billionaire faces solicitation charge*, THE PALM BEACH POST (Oct. 3. 2019), https://www.palmbeachpost.com/story/news/2006/07/27/after-long-probe-billionaire-faces-solicitation-charge/2623078007/.

[25] Source Staff, *An Unsurprising 'October Surprise,'* ST. THOMAS SOURCE (Oct. 24, 2006), https://stthomassource.com/content/2006/10/24/unsurprising-october-surprise/; Judith L. Bourne, *Avis Story Was "Truthful and Relevant,"* ST. THOMAS SOURCE (Nov. 1, 2006),

94.     By August 14, 2006, the Epstein saga had become more wide-spread and nationally known as one article by the New York Post titled, "Mystery Mogul's Teen Sex Secret Bared in Probe" makes clear.[26]

95.     On September 24, 2007, Jeffrey Epstein entered into a Non-Prosecution Agreement ("NPA") with the Southern District of Florida.

96.     On October 6, 2007, Page Six of the New York Post published an article linking Jean-Luc Brunel and MC2 Models to Jeffrey Epstein.[27] Additionally, as the 2020 Consent Order states, "press reports during this time noted allegations that Mr. Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought 'young girls . . . often from Eastern Europe' to the U.S. on Epstein's private jets."[28] The modeling agency was MC2.

97.     An October 15, 2007 Page Six article also reported that "lawyers for Manhattan billionaire investor Jeffrey Epstein . . . are bracing for a slew of lawsuits from as many as 40 young women."[29]

98.     By 2007, because Epstein was so publicly exposed as a sex trafficker and abuser,

---

https://stthomassource.com/content/2006/11/01/avis-story-was-truthful-and-relevant-329/.

[26] Dan Mangan, *Mystery Mogul's Teen-Sex Secret Bared in Probe*, N.Y. POST (Aug. 14, 2006), https://nypost.com/2006/08/14/mystery-moguls-teen-sex-secret-bared-in-probe/.

[27] PageSix.com Staff, *Model Shop Denies Epstein Tie*, PAGE SIX (Oct. 6, 2007), https://pagesix.com/2007/10/06/model-shop-denies-epstein-tie/.

[28] New York State Department of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (July 6, 2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

[29] PageSix.com Staff, *Sex Case 'Victims' Lining Up*, PAGE SIX (Oct. 15, 2007, at 9:00 am ET), https://pagesix.com/2007/10/15/sex-case-victims-lining-up/.

Epstein's primary financial supporter, Les Wexner, abandoned him and terminated his support after being Epstein's closest friend and money source for decades.

99.    On June 30, 2008, Jeffrey Epstein pled guilty to solicitation of prostitution and procuring a minor for prostitution in state court in Florida.  As a result of his guilty plea, Epstein was required to publicly register as a sex-offender which became publicly available to anyone anywhere.[30]

100.    On July 3, 2008, a young woman who proceeded under the pseudonym Jane Doe sued the US Attorney's Office in the Southern District of Florida, Case No. 08-CV-80736, for violations of the Crime Victims' Rights Act under 18 USC § 3771.

101.    Shortly thereafter, Epstein's NPA with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge with the litigation. Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.[31]

102.    Epstein's legal team also garnered significant publicity between 2006 and 2008, not only because of their well-known names, but also the unusual number of them. Epstein hired Alan Dershowitz, Roy Black, Ken Starr, Jay Lefkowitz, Guy Lewis, Michael Tien, Lily Ann Sanchez, Gerald Lefcourt, Guy Fronstein, and Jack Goldberger. All of these lawyers were now on Epstein's payroll and millions of dollars were being paid to these attorneys to pay for his legal

---

[30] Landon Thomas Jr., *Financier Starts Sentence in Prostitution Case*, N.Y. TIMES (July 1, 2008), https://www.nytimes.com/2008/07/01/business/01epstein.html.

[31] Staff Writer, *Epstein secret pact with Feds reveals "highly unusual" terms*, PALM BEACH POST (Oct. 4, 2019, 9:23 am ET), https://www.palmbeachpost.com/story/news/2009/06/10/epstein-secret-pact-with-feds-reveals-ldquohighly-unusualrdquo-terms/2616074007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113728d00----v113728d--42--b--42--&gca-ft=245&gca-ds=sophi.

defense. In addition to attorneys' fees, Epstein spent thousands of dollars on gifts for his legal team, including a $71,000 Lexus that he purchased as a gift to Dershowitz.[32] From public reports, members of this defense team were engaged in a public media campaign aimed at discrediting Epstein's minor victims and minimizing his alleged crimes.[33]

103.    By May 2007, the FBI was prepared and had plans to arrest Epstein at a beauty pageant in the U.S. Virgin Islands that he was judging.[34]

104.    As this point in time in 2008, Jeffrey Epstein was a registered sex offender accused of paying victims, witnesses, and co-conspirators hush money to cover up sexual abuse in which he was engaged on a daily basis in each jurisdiction where he was located on any given day. With indisputable publicly available knowledge that Epstein was a sexual offender who was using his wealth to run a sexual abuse and trafficking operation, and reports that Epstein was abusing women every single day, indicating that the abuse was his business, any responsible bank providing only routine banking services would have reported Epstein to authorities and cut ties with him.[35]

---

[32]    Julie K. Brown (@jkbjournalist) , X (Sep 11, 2025 at 9:04 p.m.), https://x.com/jkbjournalist/status/1966246608875683974?lang=en.

[33] Jane Musgrave, *Victims seeking sex offender's millions see painful pasts used against them*, THE PALM BEACH POST (Mar. 31, 2012, at 3:38 pm ET), https://www.palmbeachpost.com/story/news/crime/2010/01/24/victims-seeking-sex-offenders/7280436007/; Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' Edwards prosecuting sex abuse cases*, PALM BEACH DAILY NEWS (Apr. 1, 2012, at 8:11 am ET), https://www.palmbeachdailynews.com/story/news/2012/04/01/claim-epstein-filed-lawsuit-to/9670470007/.

[34] Tom Winter & Sarah Fitzpatrick, *FBI wanted to arrest Epstein at Virgin Islands beauty pageant months before plea deal cut*, NBC NEWS (Nov. 13, 2020, at 5:31 pm EST), https://www.nbcnews.com/politics/justice-department/fbi-wanted-arrest-epstein-virgin-islands-beauty-pageant-1-year-n1247788.

[35] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, THE DAILY BEAST (July 17. 2025, at 6:55 am ET), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

105.    Court proceedings against the government involving the challenge to Epstein's NPA also continued beyond 2008 and attracted significant media attention. Indeed, for years between 2008 and 2015, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Darren Indyke, Richard Kahn, and Ghislaine Maxwell. [36]

106.    In addition to public reporting surrounding the Crime Victims' Rights Act case, dozens of civil lawsuits were publicly filed and heavily litigated against Jeffrey Epstein, detailing his sexual abuse and trafficking, which all received significant media attention.

107.    One such case was *Jane Doe 102 v. Jeffrey Epstein*, which was filed by Virginia Roberts Giuffre in May 2009. Her Complaint detailed that Epstein had trafficked her nationally and internationally, including by trafficking her to other men, and that he owned a home in the U.S. Virgin Islands, where Giuffre saw photographs of naked, underage girls. Because the allegations extended beyond Epstein himself and involved broader sex-trafficking conduct, the lawsuit garnered significant media attention. [37]

108.    Epstein was deposed in a number of those civil lawsuits, which again was covered

---

[36] Vicky Ward, *Jeffrey and Ghislaine: Notes on New York's Oddest Alliance*, VANITY FAIR (Mar. 8, 2011), https://www.vanityfair.com/news/2011/03/notes-on-new-yorks-oddest-couple-jeffrey-epstein-and-ghislaine-maxwell; *Authorities have questions about how financier Jeffrey Epstein donates his money*, BUSINESS INSIDER (Mar. 5, 2015, at 8:05 pm GMT), https://www.businessinsider.com/authorities-have-questions-about-how-financier-jeffrey-epstein-donates-his-money-2015-3.

[37] Michele Dargan, *Jeffrey Epstein address book 'Holy Grail' of famous names*, PALM BEACH DAILY NEWS (Mar. 11, 2011, at 11:56 pm ET), https://www.palmbeachdailynews.com/story/news/2011/03/12/jeffrey-epstein-address-book-holy/6643962007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z114401d00----v114401d--44--b--44--&gca-ft=142&gca-ds=sophi; Paul Lewis & Jon Swaine, *Jeffrey Epstein: inside the decade of scandal entangling Prince Andrew*, THE GUARDIAN (Jan. 10, 2015, at 8:14 am ET), https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew.

widely by the press because of Epstein's invocation of his Fifth Amendment rights.[38]

109.    In 2009, Epstein's sexually abusive behaviors again made headlines when during a deposition he was asked a question about the shape of his genitalia. Epstein abruptly ended the deposition and left the room, but the clip has been re-circulated all over the internet ever since.[39]

110.    In December 2009, it was reported that Jeffrey Epstein settled the *Jane Doe 102* lawsuit where once again, allegations regarding Epstein's sexual abuse of minors and trafficking were made publicly available. The article also noted that Epstein had settled at least two other civil lawsuits but still faced more than a dozen from other women who claimed he sexually abused them as minors.[40]

111.    In January 2010, after Epstein's plea deal, an ex-Epstein employee was arrested for trying to sell information that included a rolodex of Epstein and Maxwell contacts. News articles indicated that this information would have been a "tipping point" in the probe of Epstein as it

---

[38] Susan Spencer-Wendel, *Suit Accuses Jailed Tycoon of Sex Crime*, THE PALM BEACH POST (Apr. 21, 2009); Michele Dargan, *Victim: Unseal Epstein document*, PALM BEACH DAILY NEWS (July 16, 2009); Michele Dargan, *No Monitoring Device for Epstein*, PALM BEACH DAILY NEWS (July 23, 2009); Jane Musgrave, *Victims seeking sex offender's millions see painful pasts used against them*, THE PALM BEACH POST (Mar. 31, 2012, at 3:38 pm ET); Michele Dargan, *Lawyer: Epstein Made Admissions on Tape*, PALM BEACH DAILY NEWS (Apr. 29, 2010); Michele Dargan, *Judge Receives Epstein Tape*, PALM BEACH DAILY NEWS (May 5, 2010); Jane Musgrave, *Sex Offender Agrees to Disclose Net Worth, but Wants it a Secret*, THE PALM BEACH POST (May 7, 2010); Jane Musgrave, *Epstein A Billionaire His Attorneys Reveal*, THE PALM BEACH POST (May 14, 2010); Michele Dargan, *Judge Orders N.Y. Paper To Give Up Epstein Tape*, PALM BEACH DAILY NEWS (May 27, 2010); Michele Dargan, *Judge: Ex-Epstein worker has 10 days to produce journal*, PALM BEACH DAILY NEWS (June 3, 2010); Michele Dargan, *Claim: Epstein filed lawsuit to 'intimidate' victims' attorney*, PALM BEACH DAILY NEWS (Oct. 16, 2010).

[39] *Jeffrey Epstein Egg Shaped Penis Deposition*, THE DAILY BEAST (May 4, 2010, at 10:30 am ET), https://www.thedailybeast.com/jeffrey-epstein-egg-shaped-penis-deposition/.

[40] *Billionaire Jeffrey Epstein shells out more money in latest sex abuse lawsuit*, NEW YORK DAILY NEWS (Apr. 9, 2018, at 7:01 pm ET), https://www.nydailynews.com/2009/12/19/billionaire-jeffrey-epstein-shells-out-more-money-in-latest-sex-abuse-lawsuit/.

contained "hundreds of additional victims and their phone numbers from diverse geographic locations including New York, New Mexico, and Paris."[41] The former employee, Alfredo Rodriguez, admitted to having knowledge that Epstein was having sex with underage girls, and that he had personally seen naked girls who looked like minors in Epstein's pool, as well as pornographic images of young girls on Epstein's computer.[42]

112.    In July 2010, Conchita Sarnoff from the Daily Beast wrote in an article titled "Jeffrey Epstein, Pedophile Billionaire, and His Sex Den," "[p]erhaps most disturbing, in terms of possible sex trafficking, was Epstein's relationship with Jean Luc Brunel, owner of the MC2 modeling agency."[43]

113.    A second article by Sarnoff covered the Department of Justice's investigation into Epstein for child trafficking. The article stated, "[f]ederal investigators continue to investigate Epstein's activities, to see whether there is evidence of child trafficking—a far more serious charge than the two in his non-prosecution agreement, the arrangement between Epstein and the Department of Justice allowing him to plead guilty to lower-level state crimes."[44] Further, "an

---

[41] Susan Spencer-Wendel, *Ex-Epstein worker faces obstruction charges*, PALM BEACH POST (Jan. 24, 2010), https://www.palmbeachpost.com/story/news/crime/2010/01/25/ex-epstein-worker-faces-obstruction/7489374007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z113401e009550v113401d--38--b--38--&gca-ft=162&gca-ds=sophi.

[42] Jane Musgrave, *Epstein's journal's findings could resurrect abuse case*, PALM BEACH POST (Mar. 20, 2010), https://www.palmbeachpost.com/story/news/2010/03/20/epstein-journal-s-findings-could/7488518007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116601e009450v116601d--73--b--73--&gca-ft=154&gca-ds=sophi.

[43] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, THE DAILY BEAST (July 17. 2025, at 6:55 am ET), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[44] Conchita Sarnoff, *Jeffrey Epstein Investigated for Child Trafficking*, THE DAILY BEAST (July 29, 2010), https://www.thedailybeast.com/jeffrey-epstein-investigated-for-child-trafficking/.

alleged victim said that Epstein, Maxwell, Brunel, Rodriguez, and [victim] 'deliberately engaged in a pattern of racketeering that involved luring minor children through MC2, mostly girls under the age of 17, to engage in sexual play for money.' (Which would amount to trafficking.)."[45]

114.    In a third article, Sarnoff summarized the claims against Epstein and a history of sex crimes.[46] Sarnoff reported: "In March 2005, [the West Palm Beach Police Department], acting on a complaint from the Florida parents of a 14-year-old girl, launched an investigation that would eventually uncover a pattern of predatory behavior stretching back years and spanning several continents, knowingly enabled by Epstein's associates and employees."[47]

115.    In October 2010, Michele Dargan from the Palm Beach Daily News wrote in article titled, "Suit links Epstein to modeling agency," that publicly linked Epstein and Brunel's use of MC2 to bring in women from all over the world and promise them modeling contracts.[48]

116.    In January 2011, Epstein's attorneys attempted to get his sex offender registry status changed and requested that he be afforded Level 1 sex-offender status in New York. The Court rejected his request, labeling him a Level 3 sex-offender, the highest possible risk level. This finding was widely publicized, and culminated in Epstein's permanent registration as a high-risk sex offender in the state of New York in November 2011. As the New York Post reported in February 2011, this meant "according to the state, Epstein is at 'high risk' to repeat his offense and

---

[45] Conchita Sarnoff, *Jeffrey Epstein, Pedophile Billionaire, and His Sex Den*, THE DAILY BEAST (July 17. 2025, at 6:55 am ET), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den/.

[46] Conchita Sarnoff, *Jeffrey Epstein, Billionaire Pedophile, Goes Free*, THE DAILY BEAST (July 17, 2010), https://www.thedailybeast.com/jeffrey-epstein-billionaire-pedophile-goes-free/.

[47] *Id.*

[48] Michele Dargan, *Suit links Epstein to modeling agency*, PALM BEACH DAILY NEWS (Oct. 16, 2010).

poses 'a threat to public safety.'" [49]

117.    In March 2011, Sharon Churcher published a series of articles in the Daily Mail that brought even greater international attention to Epstein's sex-trafficking of Virginia Roberts Giuffre, including that she had been trafficked by Epstein and Ghislaine Maxwell to Prince Andrew. [50] These stories sparked international media attention on Jeffrey Epstein and his sexual crimes.

118.    In May 2011, Baltic News Services brought even further international attention to Epstein and Brunel's relationship, including that Brunel "known for his pedophile tendencies" judged a modeling contest in Latvia. The article further went on to detail Brunel's connections to Epstein, who had already served a jail term in the United States for child sex offenses, and indicated that "the FBI is currently probing Brunel for supplying Epstein with underage girls." [51]

119.    In 2014, more information related to Epstein's plea deal came to light after victims won a precedent-setting appeals court ruling that entitled them to see all the documents from

---

[49] Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a sex offender, not a predator*, NEW YORK POST (Feb. 25, 2011, at 5:00 am ET), https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/ (reporting that "a New York judge ruled at a hearing last month that the moneyman is the most dangerous kind of sex offender: a Level 3").

[50] Sharon Churcher, *Prince Andrew and the 17-year-old girl his sex offender friend flew to Britain to meet him*, THE DAILY MAIL (Mar. 2, 2011, at 8:02 am ET), https://www.dailymail.co.uk/news/article-1361039/Prince-Andrew-girl-17-sex-offender-friend-flew-Britain-meet-him.html; Sharon Churcher, *Epstein's Girl Friday 'fixer': Dead tycoon's daughter Ghislaine Maxwell and the girls she hired for paedophile's stable*, THE DAILY MAIL (Mar. 7, 2011, at 5:23 am ET), https://www.dailymail.co.uk/news/article-1363444/Jeffrey-Epstein-Robert-Maxwells-daughter-Ghislaine-hired-girls-paedophile.html; Sharon Churcher & Chelsea White, *The Prince, a paedophile and the sex slave teen*, THE DAILY TELEGRAPH (Mar. 1, 2011, at 12:00 am ET), https://www.dailytelegraph.com.au/the-prince-a-paedophile-and-the-sex-slave-teen/news-story/8cdeee961a486febf459eafe00a7f710.

[51] *Alleged Pedophile from US judges modeling contest in Latvia*, BALTIC NEWS SERVICE (May 2, 2011).

Epstein's plea bargain, and continued to highlight facts including Epstein's use of money to commit his crimes.[52]

120.    Moreover, Jeffrey Epstein's influential and political ties, including to individuals like President Bill Clinton and Prince Andrew, continued to surface as well.[53]

121.    It was also in 2015 that authorities began to ask questions about Jeffrey Epstein's USVI-based charities and whether they should be considered exempt from New York law.[54]

122.    On September 21, 2015, Virginia Roberts Giuffre sued Ghislaine Maxwell for defamation in the Southern District of New York, again publicly laying out the mechanics of Jeffrey Epstein's sex-trafficking operation. The lawsuit received extensive media coverage and was litigated for years.[55]

---

[52] Curt Anderson, *Rich man's accusers press to reopen sex abuse case*, KSL (June 3, 2014), https://www.ksl.com/article/news/us/rich-mans-accusers-press-to-reopen-sex-abuse-case/30157721; *5 things to know about law in rich man's sex case*, THE SAN DIEGO UNION-TRIBUNE (June 3, 2014, at 2:38 pm PST), https://www.sandiegouniontribune.com/2014/06/03/5-things-to-know-about-law-in-rich-mans-sex-case/.

[53] Timothy Williams, *Alan Dershowitz Denies Suit's Allegations of Sex with a Minor*, NY TIMES (Jan. 6, 2015), https://www.nytimes.com/2015/01/07/us/alan-dershowitz-denies-allegations-of-sex-with-minor.html; *see* James Hill, *Prince Andrew sued in federal court for alleged sexual abuse*, ABC NEWS (Aug. 9, 2021), https://abcnews.com/US/alleged-epstein-victim-sues-prince-andrew-sexual-abuse/story?id=79367126.

[54] *Authorities have questions about how financier Jeffrey Epstein donates his money*, BUSINESS INSIDER (Mar. 5, 2015, at 8:05 pm GMT), https://www.businessinsider.com/authorities-have-questions-about-how-financier-jeffrey-epstein-donates-his-money-2015-3.

[55] Caroline Davies, *Court papers put daughter of Robert Maxwell at centre of 'sex slave' claims*, THE GUARDIAN (Jan. 4, 2015, 3:39 pm ET). https://www.theguardian.com/us-news/2015/jan/04/court-papers-robert-maxwell-daughter-sex-slave-claims-prince-andrew; Lia Eustachewich, *Alleged Epstein madam forced to hand over 17 years of documents*, PAGE SIX (Mar. 17, 2016, at 10:55 pm ET), https://pagesix.com/2016/03/17/alleged-epstein-madam-forced-to-hand-over-17-years-of-documents/; Josh Gerstein, *Suit over billionaire's underage sex abuse settles*, POLITICO (May 24, 2017, at 6:10 pm ET), https://www.politico.com/blogs/under-the-radar/2017/05/24/jeffrey-epstein-sex-abuse-lawsuit-238793.

123.    On April 18, 2016, author Conchita Sarnoff, who "despite bribes to stay silent, risked her life to expose the brutal reality of human trafficking and the Jeffrey E. Epstein case," published the book *TrafficKing*.[56]

124.    On October 10, 2016, bestselling author James Patterson released *Filthy Rich: The Jeffrey Epstein Story*, a New York Times bestseller self-described as "A Powerful Billionaire, the Sex Scandal that Undid Him, and all the Justice that Money can Buy: The Shocking True Story of Jeffrey Epstein." Among other things, the book detailed Epstein's relationship with Jean-Luc Brunel, including that Epstein provided financial support to MC2; that Epstein and Brunel "used the agency to bring underage girls from foreign countries into the United States by promising them modeling contracts"; and that "[t]hese girls were then housed in condominiums belonging to Epstein" and then charged rent, "presumably to live as underage prostitutes in the condos."

125.    On January 26, 2017, Jane Doe 43 sued Jeffrey Epstein for sex-trafficking in the Southern District of New York, publicly detailing the inner workings of Epstein's sex-trafficking operation. *See Jane Doe 43 v. Epstein et al.*, Case No. 17-cv-00616-JGK (S.D.N.Y.). There was again extensive media coverage of this lawsuit.[57]

126.    In November 28, 2018, the *Miami Herald* published a series titled, "Perversion of Justice," which revisited the heinous details of the sexual abuses that Epstein serially committed against high school children in Palm Beach in the early 2000s and prompted international

---

[56] *See Conchita Sarnoff*, CONCHITA SARNOFF, https://www.conchitasarnoff.com/.

[57] Martin Gould, *Pedophile Jeffrey Epstein is accused of luring an underage girl into his elaborate sex trafficking enterprise under the guise of using his wealth and connections to get her into a prestige NYC college*, DAILY MAIL (Jan. 27, 2017, at 9:26 am ET), https://www.dailymail.co.uk/news/article-4164082/Pedophile-Jeffrey-Epstein-accused-new-sex-traffick-case.html.

outrage.[58]

127.    On July 6, 2019, Jeffrey Epstein was again arrested in New York on federal sex-trafficking charges. On July 25, 2019, Jeffrey Epstein committed suicide in his Manhattan jail cell.

128.    In December 2021, Ghislaine Maxwell, was convicted of federal sex-trafficking charges.

129.    Throughout all of this, FirstBank continued to provide banking services, including large cash transfers to Epstein and his entities and agents without seeking explanations and without any known or apparent lawful or business purpose and without filing the required SARs.

**D.    FirstBank Knew Epstein and his entities were represented by agents, including Erica Kellerhals, Darren Indyke, and Richard Kahn.**

130.    Erica Kellerhals served as a primary day-to-day point of contact between the Epstein organization and FirstBank. Kellerhals communicated regularly with FirstBank personnel regarding account openings, wire instructions, beneficial-ownership representations, and other transactional matters. Kellerhals's contemporaneous correspondence with FirstBank, including correspondence produced through the Epstein Estate disclosures, reflects the operational pattern by which the Epstein organization opened and operated accounts at FirstBank—a pattern in which the customer-facing communications were routed through trusted Epstein-organization personnel rather than through Epstein himself, and in which the represented purposes of accounts and transactions were not subjected to meaningful verification by FirstBank.

131.    The Epstein-organization personnel who communicated with FirstBank in connection with the accounts at issue included, at a minimum: Darren Indyke (in-house counsel);

---

[58] Julie K. Brown, *How a future Trump Cabinet member gave a serial abuser the deal of a lifetime*, MIAMI HERALD (Feb. 13, 2026, at 11:02 am ET), https://www.miamiherald.com/news/local/article220097825.html/.

Richard Kahn (accountant); Harry Beller (accountant and HBRK principal); Lesley Groff (Epstein's longtime executive assistant and signatory on multiple entities); Bella Klein (assistant and signatory); Eric Gany; and Erica Kellerhals. Each of these individuals was a recurring point of contact for FirstBank personnel on account-related matters, and each was, by virtue of role and tenure, in a position to convey to FirstBank the information necessary for FirstBank to know — and to act upon — the nature of the conduct it was facilitating.

132.    FirstBank had actual knowledge that Indyke and Kahn served as Epstein's representatives.

133.    FirstBank had actual knowledge that Kahn was one of Epstein's representatives because of Kahn's conduct and association with other Epstein accounts, including Financial Trust Company, Inc., FT Real Estate, Inc., and Southern Trust Company, Inc.

134.    Indyke was a signatory for several of Epstein's accounts, including his accounts at FirstBank.

135.    In 2008, Indyke publicly appeared as one of Epstein's attorneys in the criminal case against Epstein.

136.    During that time, press reports, including the Miami Herald, identified Epstein's legal team as including Indyke.

137.    Additional public press reports and corporate filings identified Indyke and Kahn as officers of several of Epstein's entities. Corporate filings indicate that one of, and frequently both, Indyke and Kahn were involved in the creation and/or management of several of Epstein's sham entities, including: C.O.U.Q. Foundation (the Florida Science Foundation); Gratitude America Ltd.; the J. Epstein Virgin Islands Foundation; FT Real Estate Inc.; Hyperion Air, Inc.; Jeepers, Inc.; Mort, Inc.; and Zorro Development Corporation. None of these sham entities had any real

business purpose other than facilitating sex trafficking.

138.    Indyke and Kahn were also officers of the corporate entities that held the real estate on which Epstein abused countless victims, including:

(a) Nautilus, Inc., is the corporate entity that owned Epstein's private island "Little St. James" in the U.S. Virgin Islands, where countless of Epstein's victims were transported, harbored, and abused. Indyke and Kahn were the secretary and treasurer of Nautilus, Inc., respectively.

(b) Poplar, Inc., a corporate entity that had signatory authority over Great St. Jim, LLC, which held title to another set of properties that Epstein owned in the U.S. Virgin Islands, which were the islands closest to Little St. James. Indyke and Kahn were the secretary and treasurer of Poplar, Inc., respectively. Kellerhals as the sole member of Great Saint Jim, LLC, transferred ownership interest of Great St. James Island to Poplar Inc.[59]

(c) Cypress Inc., is a corporate entity that owned the property 49 Zorro Ranch Road in Stanley, New Mexico, which is the Epstein New Mexico property at which he transported, harbored, and abused countless victims. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc.

(d) Maple, Inc., a corporate entity that owned the property at 9 East 71st Street in New York—Epstein's New York townhome at which he transported, harbored, and abused countless victims. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.

---

[59] EFTA01082441.

(e) Laurel, Inc., is a corporate entity that owned the property at 358 Brillo Way in Palm Beach, Florida—Epstein's Palm Beach mansion at which he transported, harbored, and abused countless victims. Thus, Laurel, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.

139.    Indyke and Kahn were also the Secretary/Director and Treasurer/Director of Southern Trust Company, Inc. Epstein used Southern Trust Company to open many of his bank accounts with his banking institutions, including FirstBank, which Indyke and Kahn also controlled.

140.    FirstBank had actual and constructive notice that the Financial Trust Company, later known as the Southern Trust Company,[60] was linked to Epstein.

141.    Indeed, the Financial Trust Company had been publicly linked to Epstein since at least 2002, when the company and Epstein brought a suit against Citibank in the Virgin Islands. *See Financial Trust Co., Inc. v. CITIBANK NA*, 268 F. Supp. 2d 561 (D.V.I. 2003).

142.    In July 2007, Bloomberg reported on Epstein, as a "money man of mystery," indicating that Epstein owned a "Virgin Islands-based money-management firm, Financial Trust Company."[61]

143.    Also, in July 2007, the New York Times reported that the Epstein's "Virgin Islands-

---

[60] Matthew Goldstein, *Jeffrey Epstein Raked In $200 Million After Legal and Financial Crises*, N.Y. TIMES (Oct. 3, 2019), https://www.nytimes.com/2019/10/03/business/jeffrey-epstein-southern-trust.html (explaining that the Southern Financial Trust is a wholly owned subsidiary of the Financial Trust Company that Epstein established in 2011, and in 2013, it replaced the latter as Epstein's money managing arm).

[61] Matthew Goldstein, *Bear Stearns' Collateral Damage*, BLOOMBERG (Jul. 11, 2007), https://www.bloomberg.com/news/articles/2007-07-11/bear-stearns-collateral-damagebusinessweek-business-news-stock-market-and-financial-advice

based money-management firm, Financial Trust Company, is listed in a filing with the Securities and Exchange Commission as a stakeholder in Bear Stearns's High-Grade Structured Credit Strategies Enhanced Leverage Fund, which became much easier to refer to in recent weeks as 'Bear Stearns' collapsing hedge fund."[62]

144.    Given Indyke, Kahn, and Kellerhals's extensive involvement across Epstein's various entities, even minimal due diligence would have revealed that Indyke, Kahn, and Kellerhals were acting on behalf of Epstein.

145.    FirstBank's records independently confirm the relationship. FirstBank opened and maintained accounts for multiple Epstein-related entities for which Indyke and Kahn served as officers or signatories, including Nautilus, Inc., Cypress, Inc., Laurel, Inc., Maple, Inc., Southern Trust Company, Inc. and FT Real Estate, Inc., placing Indyke and Kahn's roles as Epstein's agents squarely within FirstBank's own customer due diligence files.

146.    FirstBank knew that every time it communicated or provided financial services or information to Kellerhals, Kahn, Indyke, Klein, Beller, Gany, or Groff, the Bank was serving their principal, Epstein.

**E.    Consistent With Epstein's Uniform Pattern and Practice, Jane Doe Was Forced to Engage in Commercial Sex Acts with Epstein by Means of Force, Fraud, and Coercion.**

147.    The degree of Epstein's control and coercion might have differed from victim to victim, but the core elements remained the same: he made promises of a career, education and a better life to lure in his victim; he told them he was the only one who could provide whatever he was offering; and he then paid for their travel, provided housing, arranged medical care, and provided services including money that made his victims feel indebted to him and unable to escape.

---

[62] Dealbook, *More Bad News for Jeff Epstein*, N.Y. TIMES (Jul. 11, 2007), https://archive.is/kTd1n#selection-1019.41-1027.161

He would them demand gratitude, pretend to care and that he was helping, while at the same time demanding that she engage in sex acts in whatever way he wanted, whenever he wanted, however he wanted, with no questions asked whatsoever, unless she wanted to be completely destroyed by him financially, reputationally, and otherwise.

148.    Jane Doe was the typical Epstein victim, vulnerable, ambitious, and trusting.

149.    Jane Doe was living in Russia when she met Jeffrey Epstein in 2011.

150.    Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe.  Epstein and his co-conspirators constantly reminded Jane Doe how powerful and important Epstein was.

151.    The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and other life necessities would be denied victims if they failed to obey and remain completely compliant with his every demand; (5) each Epstein victim had to communicate with him in an upbeat manner, never complaining, and always demonstrating gratitude for everything; (6) Epstein was the master of every aspect of a victim's life that he wanted to control, with no questions asked, including who she could date, where she could go, what she could wear, what haircut to have, and she had to report back to him on any activity she engaged in  and (7) Epstein could take away Jane Doe's and other victims' life necessities such as shelter, housing, career, immigration status, reputation and anything else she cared about if she or they failed to perform

46

those acts.

152.    Jane Doe was vulnerable to being victimized by Epstein, as was typical of his targets.  His sex-trafficking venture targeted vulnerable young women and Jane Doe was soon indoctrinated and unable to extricate herself.  Jane Doe was sexually abused and trafficked by Epstein for several years.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, and other important people, were aware of the sex abuse, Jane Doe was coerced into a cult-like life controlled and manipulated by Epstein and others employed by Epstein to do his bidding.

153.    Over the ensuing years, from 2011 through 2019, Epstein sexually abused Jane Doe on at least 100 occasions, including but not limited to, forcibly touching her, forcibly raping her, and forcing her to engage in sexual acts with other women for his own depraved sexual gratification.

154.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Jane Doe to engage in commercial sex acts.

155.    Epstein recruited Jane Doe to cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones and means of interstate transportation (such as aircraft that he owned or controlled).

156.    Epstein transported Jane Doe from New York to other places, including the United States Virgin Islands, to cause her to engage in commercial sex acts.

157.    Jane Doe wanted to escape from the Epstein sex-trafficking venture, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, or coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

158.    Jeffrey Epstein controlled Jane Doe financially, emotionally, and psychologically.

He used his knowledge of Jane Doe's aspirations, fears and problems to manipulate her until she was completely controlled by and dependent upon him.

159.   Like he did his other victims, Epstein made promises of a career, education, and better life, and he told Jane Doe that he was the only one who could provide it. He then paid for her travel, provided her housing, arranged for her medical attention, and provided finances that made her feel indebted to him and unable to escape. He then reminded her to show gratitude and pretended to be providing legitimate assistance to enhance her future, while at the same time demanding that she engage in sex with him at his sole discretion while threatening to destroy her financially, reputationally, and otherwise unless she complied without question.

160.   From 2011 through 2019, Jane Doe was paid repeatedly by Jeffrey Epstein in furtherance of his sex trafficking operation.

161.   Epstein and his co-conspirators continued to coerce Jane Doe in various ways, including by holding control over her immigration status over her head, until her ultimate escape when Jeffrey Epstein died.

162.   Epstein and his co-conspirators continued to coerce Jane Doe to engage in commercial sex with Epstein, through the use of Epstein's force, fraud, and coercion, through 2019.

**F.     FirstBank's Role in the Sex-Trafficking Venture**

**1. Banking laws and regulations exist to prevent funding of criminal ventures.**

163.   FirstBank's required compliance with banking laws, regulations, and due diligence provided it with actual, and constructive knowledge, of Epstein's sex-trafficking venture, a venture in which the bank participated and from which it financially benefitted.

164.   The Federal Bank Secrecy Act ("BSA") requires financial institutions to have

adequate anti-money laundering ("AML") policies and systems in place. New York state law also requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

165.    Indeed, Section 326.8 of the BSA establishes requirements for all covered institutions, including FirstBank, to implement an effective and reasonably designed AML program as a system of internal control to assure ongoing risk management and compliance.[63] These safeguards include policies, procedures, and processes aimed at mitigating the risks associated with offering financial services to customers.

166.    All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

167.    As the 2020 Consent Order against Deutsche Bank stated, "Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified. Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions."[64]

---

[63] 12 C.F.R. § 326.8.

[64] New York State Department of Financial Services, Consent Order Under New York Banking

168.    According to FinCEN, the customer due diligence rules requires that financial institutions, like FirstBank, establish and maintain written policies and procedures that are reasonably designed to: (1) identify and verify the identity of customers; (2) understand the nature and purpose of customer relationships to develop customer risk profiles; and (3) conduct ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information.[65] This due diligence is necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities.

169.    As part of preventing criminal activity, Know Your Customer ("KYC") and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship.

170.    Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

171.    In addition, banks must adopt and implement Customer Due Diligence ("CDD")

---

Law    §§    39    and    44,    at    3    (July    6,    2020), https://www.dfs.ny.gov/system/files/documents/2020/07/ea20200706_deutsche_bank_consent_order.pdf.

[65] *Id.*

for all customers, particularly those that present a higher risk of criminal activity or money laundering. The objective of CDD is to enable the bank to understand the nature and purpose of a customer relationships, which may include understanding the types of transactions in which a customer is likely to engage. CDD information typically collected by financial institutions includes the intended use of the account, expected transaction types/volumes/amounts/geography, business or entity type details including ownership structure, source of wealth, information about a business customer's customers, and other information.

172.    As part of the KYC process, financial institutions must also identify and verify the identity of the beneficial owners of legal entity customers when a new account is opened. This includes establishing and maintaining written procedures reasonably designed to identify and verify the identities of beneficial owners of legal entity customers, establishing written procedures to maintain and update beneficial ownership information, and verifying beneficial ownership information as part of ongoing monitoring.

173.    To uncover potential risks, financial institutions, like FirstBank, must assess information about the customers, sanctions lists published by governments, as well as public and private data sources, on an ongoing basis.

174.    Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate with the AML risks posed by the client, including reviewing account activity to determine whether such activity is consistent with what would be expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

175.    Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may

be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

176.    Another critical aspect of the AML regime are SARs. Financial institutions are required to report known or suspected criminal offenses or transactions that they suspect involve money laundering or other crimes, like sex trafficking.

177.    Typical suspicious activity monitoring systems are comprised of several components, including: (1) the identification or alert of unusual activity (such as employee identification, law enforcement inquiries, other referrals, and transaction surveillance monitoring system output); (2) managing alerts; (3) SAR decision making; (4) SAR completion and filing; and (5) monitoring  SARs on continuing activity.

178.    Generally, a transaction is suspicious and merits the filing of a SAR if a bank "knows, suspects, or has reason to suspect" the transaction: (1) involves funds derived from illegal activities, or is conducted to conceal monies derived from illegal activities; (2) is designed to evade the reporting requirements of the BSA or related regulations; or (3) has no business or apparent lawful purpose or is not the sort in which the customer normally would be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction.

179.    Suspicious activities include but are not limited to: (1) wire transfers that are unexplained, repetitive, unusually large, shows unusual patterns or have no apparent business purpose consistent with the business activities of that account or business; (2) wire transfers made in small amounts in an apparent effort to avoid triggering identification or reporting requirements; and (3) payments made by third party check or money transfer from a source that has no apparent

connection to the customer.[66]

180.    Suspicious activity monitoring and reporting does not exist in a vacuum. Financial institutions incorporate KYC and CDD information when monitoring a customer's activity. For example, if a customer was identified as a Politically Exposed Person ("PEP"), then the institution would tailor the monitoring to the unique risks posed by PEPs, such as corruption.[67] Similarly, if a bank customer was previously convicted of soliciting a minor for prostitution,[68] the bank would tailor their monitoring to the risks posed by that specific customer for human trafficking. Finally, financial institutions incorporate customer risk ratings into the frequency and level of scrutiny of customer transactions. For example, private banking[69] is typically considered a high-risk[70] customer relationship by banks.

---

[66] FINRA, *FINRA Provides Guidance to Firms Regarding Suspicious Activity Monitoring and Reporting Obligations, Regulatory Notice 19-18*,  (May 6, 2019), https://www.finra.org/rules-guidance/notices/19-18.

[67] Federal Financial Institutions Examiners Council ("FFIEC"), *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing – Politically Exposed Persons Examination and Testing Procedures* (last visited June 24, 2026), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20_ep; *see also* FFIEC, *BSA/AML Manual: Risks Associated With Money Laundering and Terrorist Financing – Politically Exposed Persons* (last visited June 24, 2026), https://bsaaml.ffiec.gov/manual/RisksAssociatedWithMoneyLaunderingAndTerroristFinancing/20/.

[68] U.S. Department of State, *Tracking Suspicious Financial Activity to Address Human Trafficking* (June 2018), https://www.state.gov/wp-content/uploads/2019/02/283793.pdf.

[69] FATF, *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation*, Interpretive Note to Recommendation 10 (Customer Due Diligence) (updated October 2025), at 71, *available at*   https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf.

[70] FFIEC, *BSA/AML Manual: Assessing Compliance with BSA Regulatory Requirements – Customer Due Diligence – Overview* (last visited June 24, 2026), https://bsaaml.ffiec.gov/manual/AssessingComplianceWithBSARegulatoryRequirements/02.

181. Regulators, non-governmental organizations, government agencies, international bodies, and private sector groups published notices and advisories to help financial institutions recognize transactional and behavioral red flags of money laundering, and for specific crimes, including human trafficking, to incorporate them into their monitoring programs.

182. Human trafficking red flags have been extensively documented. Examples include: Financial Action Task Force ("FATF")'s 2011 Report "Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants," 2014 FinCEN's Advisory "Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags," and 2018 FATF's Report "The Financial Flows from Human Trafficking," and FinCEN's 2020 "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity."[71] In addition, private sector initiatives such as the United States Banks Alliance developed a "Toolkit" on human trafficking, including red flag indicators for financial institutions. FirstBank participated in the development of the human trafficking Toolkit.

183. The United Nations, the U.S. State Department, and the FATF have all identified Russia and former Soviet republics as "High Risk" origin countries for human trafficking victims. For example, in 2017, the U.S. State Department stated: "[a]s reported over the past five years, Russia is a source, transit, and destination country for men, women, and children subjected to

---

[71] FATF, *Money Laundering Risks Arising from Trafficking in Human Beings and Smuggling of Migrants* (July 2011), *available at* https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Trafficking%20in%20Human%20Beings%20and%20Smuggling%20of%20Migrants.pdf; FinCEN, *Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags* (Sep. 11, 2024), *available at* https://www.fincen.gov/system/files/advisory/FIN-2014-A008.pdf; FATF, *Financial Flows from Human Trafficking* (July 2018), *available at* https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Human-Trafficking-2018.pdf; FinCEN, *Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity* (Oct. 15, 2020), *available at* https://www.fincen.gov/system/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf.

forced labor and sex trafficking."[72] The Department of State kept the Russian Federation as a Tier 2 Watch List for trafficking for almost a decade and, in the most recent years, downgraded it to a Tier 3 because the country has been and continues to be a destination and source country for traffickers and trafficking victims.

184.    Financial institutions consider the human trafficking indicators alongside the customer's profile (*e.g.*, a registered sex offender or a young woman recently arriving from Russia) when evaluating whether observed behaviors or transactions are potentially suspicious.

185.    BSA laws require financial institutions to monitor for and report potentially suspicious activity related to human trafficking. In 2014, FinCEN added the keyword "Advisory Human Trafficking" in applicable SARs. In 2018, FinCEN updated the SAR form to include a standard checkbox indicating suspected human trafficking. Since the addition of the human trafficking SAR checkbox in 2018 through November 2025, banks and credit unions filed 18,491 human trafficking SARs. All financial institution types (including broker-dealers, money services businesses, etc.) filed more than 39,000 human trafficking SARs during that same period. Financial institutions can recognize human trafficking and do report it via SARs.

186.    BSA laws require FirstBank to conduct CDD on customers. As part of the CDD process, banks typically employ Negative News (alternatively called "Adverse Media") screenings against customer names and beneficial owners of accounts, especially for customers deemed higher risk.[73]

187.    "Negative News" or "Adverse Media" reports are universally known and accepted

---

[72] U.S. Department of State, *2017 Trafficking in Persons Report: Russia*, *available at* https://www.state.gov/reports/2017-trafficking-in-persons-report/russia.

[73] *Publication of the Negative News Screening FAQs*, THE WOLFSBERG GROUP (May 11, 2022), https://wolfsberg-group.org/news/3.

terms of art in the banking world, describing a basic monitoring technique all responsible financial institutions utilize to fulfill AML and KYC obligations.

188. A financial institution reviews media reports, news articles and/or other references to assist in its performance of CDD, as well as its evaluation of any transactions or activity it considers unusual or potentially suspicious. For example, negative news may prompt a financial institution to review customer activity as well as other related information, such as that of third parties with transactions involving the customer's account. Following an evaluation and investigation of the negative news in conjunction with its review of transactions, the financial institution will determine whether a SAR filing is required. When multiple negative news alerts arise based on the same underlying event, financial institutions process alerts to determine whether the alert contains new or different information that warrants investigation or assists or informs their evaluation of activity. The financial institution assesses whether to update the customer risk profile, investigate transactions that may result in the filing of a SAR, or escalate or terminate a customer relationship. As demonstrated by the multi-year lag between the Epstein-related suspicious transactions, negative news about Epstein, and FirstBank's SAR filings, FirstBank provided non-routine services to Epstein by allowing his transactions to continue unreported.

189. FirstBank was a sophisticated financial institution that understood KYC laws and other banking obligations, and it had a strict obligation to comply with those laws and obligations. Through its KYC, CDD, and other required processes, FirstBank learned, and certainly should have known, of Epstein's sex-trafficking venture; the important roles played by Maxwell, Indyke, Kahn, Kellerhals, and Klein in that venture; and the assistance and facilitation of that venture by FirstBank itself.

190. Further, accepted industry practice as well as banking rules and regulations required

FirstBank and banks performing FirstBank's functions to know the client, each account, and to monitor the transfer and processing of money, and to report all suspicious transactions.

191.   The Bank's obligation to monitor did not end at the opening of Epstein's accounts, but continued throughout the banking relationship, particularly, in light of the highly publicized reports of Epstein and his co-conspirators' wrongdoing.

192.   FirstBank's actions and inactions, when viewed against the backdrop of reality and the available knowledge to the bank, demonstrate the clear complicity of FirstBank in Epstein's sex-trafficking venture.

## 2. FirstBank knowingly and intentionally participated in Epstein's sex-trafficking venture.

193.   FirstBank knowingly and intentionally participated in the Epstein sex-trafficking venture by providing the underpinnings for Epstein to have ready and reliable access to financial resources to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations.

194.   In furtherance of his rapidly growing sexual abuse and sex trafficking operation, Epstein realized that he needed reliable banking institutions that would provide the necessary legitimate appearance for his operation, allow him to open many accounts for illegitimate companies, ignore red flags and relevant state and federal banking laws, permit him to transfer money without questioning, allow him access to abundant cash, and to otherwise knowingly facilitate the commercial aspect of his commercial sex trafficking venture.

195.   On July 6, 2020, a Consent Order penalizing Deutsche Bank $150 million was entered in favor of the New York State Department of Financial Services, finding violations against Deutsche Bank for violations of KYC laws. The Order detailed criminal activity committed by Epstein's top loyalists, Darren Indyke and Richard Kahn, identified respectively in the consent order as "ATTORNEY-1" and "ACCOUNTANT-1," who were carrying out

suspicious financial actions in furtherance of Epstein's sex-trafficking operation. Epstein, through these individuals, was carrying out similar suspicious activity through FirstBank as well. Indyke and Kahn, the two main Epstein organization employees responsible for carrying out the financial, immigration, and logistics work for the sex-trafficking operation, communicated with FirstBank directly in highly suspicious manners. Given their suspicious roles and actions related to Epstein-related accounts, Indyke and Kahn are likely personally identified in the Bank's internal monitoring and untimely reporting.

196.    Nevertheless, FirstBank held at least thirty different accounts in Jeffrey Epstein's name for him personally and for entities related to him and his associates, beginning as early as 1998.[74] Documents released by the DOJ as part of the EFTA show that these entities include, Cypress, Inc., FT Real Estate Inc., Gratitude America Ltd., Great St. Jim LLC, IGO Company LLC, Laurel, Inc., LSJE LLC, Maple, Inc., Michelle's Transport Co. LLC, Nautilus, Inc., Southern Trust Company, Inc., Southwestern Trust Company, Inc., and Thomas World Air LLC.[75]

197.    FirstBank maintained Epstein's business after JPMorgan publicly exited Epstein in 2013 due to irregularities and risk, and after Deutsche Bank later exited him in 2018 for the same reasons.

198.    Epstein's operational "architects"—Darren Indyke (lawyer) and Richard Kahn (accountant/financial manager through HBRK)—used FirstBank banking channels to facilitate the venture's financial system: payments, concealment, entity structures, and control over victims, with Indyke as a signatory on twenty accounts.

---

[74] EFTA01252357.

[75] EFTA01681865, at 50.

199.    Epstein accounts were opened and maintained with inadequate due diligence and in disregard of widely available red flags and public records.

200.    From November 9, 2000, through October 8, 2019, FirstBank maintained a primary account in Jeffrey Epstein's name through which he conducted countless aspects of his trafficking operation, including through the withdrawal of cash to pay his minor child victims.

201.    On September 14, 2007, FirstBank opened an account in the name of Michelle's Transportation Co., LLC—just ten days before Epstein signed the federal non-prosecution agreement, after he had already been exposed for sexually abusing at least forty minor girls.

202.    In October 2008, Epstein was approved for a highly scrutinized work-release arrangement during his incarceration. On October 31, 2008, FirstBank opened an account for Florida Science Foundation, LLC to facilitate his work-release employment. That same account was then used to pay women whom Epstein sexually abused while incarcerated and under electronic monitoring, with Darren Indyke serving as his employer, further enabling and perpetuating his ongoing abuse.

203.    In 2012 and 2016, after public reporting had exposed the international nature of Epstein's trafficking operation—including his use of private aircraft to transport victims—FirstBank nevertheless opened accounts for Thomas World Air, LLC and Freedom Air Petroleum, LLC, entities tied to the aviation infrastructure that enabled that operation.

204.    In May 2012, FirstBank opened accounts for Nautilus, Inc., Maple, Inc., Laurel, Inc., and Cypress, Inc.—single-purpose holding entities established to hold Epstein's real estate, shield him from personal liability, and conceal or compartmentalize ownership of the very properties he used to abuse and traffic women.

205.    On February 26, 2015, FirstBank allowed Epstein to open an account in the name of Gratitude America, Ltd., a corporation used to make countless payments to educational institutions on behalf of young women and an integral cog in the machinery of Epstein's trafficking operation.

206.    In the immediate aftermath of Epstein's highly publicized second arrest and subsequent death, Darren Indyke and Richard Kahn were permitted to open an account at FirstBank for the Estate of Jeffrey E. Epstein, which was used to facilitate countless payments to Epstein's victims. FirstBank never wavered in its facilitation of Epstein's trafficking—no matter how public the evidence against him became, or how stark the evidence was within his own banking activity.

207.    FirstBank held accounts for entities associated with Epstein despite in depth public reporting connecting these entities to Epstein after he had already been publicly exposed as a serial sexual predator. A September 2014 article reported that several businesses, including FT Real Estate, Laurel Inc., Maple Inc., and Nautilus Inc., that shared Epstein's address of 6100 Red Hook Quarter B3, St. Thomas Virgin Islands, donated to a New Mexico gubernatorial campaign. [76]

208.    Even solely based on the limited public information available, FirstBank has facilitated millions of dollars of wire transfers to these accounts that were then used to fund Epstein's sex-trafficking venture, including funding the ownership and management of the various homes where the abuse and trafficking occurred.

---

[76] Steve Terrell, *King Donors' Address Tied to Sex Offender*, SANTA FE NEW MEXICO (Sept. 9, 2014), https://www.santafenewmexican.com/news/local_news/king-donors-address-tied-to-sex-offender/article_705feb90-3868-11e4-a341-0017a43b2370.html.

60

209.    Cypress, Inc.'s FirstBank account received at least $1,025,000 across nine payments from one of Jeffrey Epstein's personal accounts at Deutsche Bank.[77] Cypress, Inc. is the corporate entity that owned Epstein's Zorro Ranch, where Epstein transported, harbored, and abused countless victims.

210.    FT Real Estate's FirstBank account received at least $12,368,277 across eleven payments from one of Epstein's personal accounts at Deutsche Bank.[78] FT Real Estate is a corporate entity for Epstein's real estate.

211.    Gratitude America Ltd.'s FirstBank account received three transactions from a same-name MMDA account at Deutsche Bank in the amount of $50,000 on January 21, 2016; $250,000 on April 6, 2016; and $150,000 on December 11, 2017.[79]   Gratitude America was Epstein's private foundation that listed Epstein as president from 2012 to 2015, and Kahn as president in its 2015 registration statement. Epstein used Gratitude America to donate to various charitable organizations in New York throughout 2016 and 2017, including an all-girls school in Manhattan, youth tennis programs, the Lincoln Center, and the Met Orchestra Musicians.[80]

212.    Laurel, Inc., received $455,000 across three payments from one of Epstein's personal accounts at Deutsche Bank to its FirstBank account. Laurel, Inc. also received $995,000 across six payments from another one of Epstein's personal accounts at Deutsche Bank to its

---

[77] EFTA01681865, at 34.

[78] *Id.*

[79] EFTA00027019, at 8–9.

[80] Kate Briquelet, *REVEALED: We Found Billionaire Pedophile Jeffrey Epstein's Secret Charity*, DAILY BEAST (Apr. 16, 2019), https://www.thedailybeast.com/jeffrey-epstein-has-a-secret-charity-heres-who-it-gave-money-to/.

FirstBank account. Laurel, Inc. is the corporate entity that owned Epstein's Palm Beach mansion, where he transported, harbored, and abused countless victims.

213.    Maple Inc.'s FirstBank account received $650,000 across five payments from Epstein's Deutsche Bank account, and $1,725,000 across five payments from another one of Epstein's Deutsche Bank accounts.[81] Maple, Inc. is the corporate entity that owned Epstein's New York townhome at 9 East 71st Street in New York, where he transported, harbored, and abused countless victims.

214.    Michelle's Transport Co. LLC's FirstBank account received $350,000 across five payments made from one of Epstein's personal Deutsche Bank accounts, and $30,000 across two payments from another one of Epstein's personal Deutsche Bank accounts.[82]

215.    Nautilus, Inc.'s FirstBank account received $150,000 across two payments made from one of Epstein's Deutsche Bank accounts, and $200,000 across three payments made from another one of Epstein's Deutsche Bank accounts.[83] Nautilus, Inc. is the corporate entity that owned Epstein's private island, Little St. James in the U.S. Virgin Islands, where he transported, harbored, and abused countless victims.

216.    Southwestern Trust Company's FirstBank account received $450,000 across two payments made from Southern Trust Company Inc.'s Deutsche Bank account.[84]

217.    In 2011 and 2012, after public reporting had exposed the international nature of

---

[81] EFTA01681865, at 35.

[82] *Id.*

[83] *Id.*

[84] *Id.*

Epstein's trafficking operation—including his use of private aircraft to transport victims—FirstBank nevertheless opened accounts for Thomas World Air, LLC and Freedom Air Petroleum, LLC, entities tied to the aviation infrastructure that enabled that operation.

218.    Thomas World Air LLC's FirstBank accounts received $150,000 across three payments made from one of Epstein's Deutsche Bank accounts, and $400,000 across four payments made from another one of his Deutsche Bank accounts.[85]

219.    According to an FBI Investigation memo, FirstBank was also involved in circular transactions, a red flag for money laundering, between Epstein and Maxwell.  On July 28, 2011, $10.9 million was wired from a FirstBank account belonging to "FSL LLC" to Maxwell's account at JPMorgan. On the same day, nearly all $10.9 million was transferred from Maxwell's JPMorgan account to various accounts in Epstein's name for no discernible lawful purpose.[86]

220.    Additionally, from November 9, 2000, through October 8, 2019, FirstBank maintained a primary account in Jeffrey Epstein's name through which he conducted countless aspects of his trafficking operation, including the withdrawal of cash to pay his victims. The timeline makes plain that, unlike nearly every other financial institution that banked Jeffrey Epstein, FirstBank never wavered in its commitment to financially benefit from Jeffrey Epstein's sex trafficking venture—no matter how public the evidence against him became, or how stark the evidence within his own banking activity was.

221.    All of these transactions should have been flagged at the time of the transactions

---

[85] *Id.* at 36.

[86] EFTA00074147.

because FirstBank knew these were Epstein-controlled entities, and the payments were made in large, round numbers and with no apparent legitimate purpose, which are hallmarks of money laundering.

222.    Instead, FirstBank waited until two weeks *after* Epstein's second arrest to make its first disclosure, which was facially incomplete and withheld key information from regulators and law enforcement.  Despite opening over thirty accounts for Epstein and managing them for over a twenty-year period, FirstBank minimized his crimes by reporting only a fraction of the suspicious activity.  On July 19, 2019, FirstBank belatedly filed a SAR noting $1,740,000 in suspicious transactions made from June 25, 2018 to March 29, 2019 by its customer Laurel, Inc. The SAR reported suspicious transactions with no apparent economic, business, or lawful purpose and cites to various articles that predated Epstein's second arrest, including the April 2019 Daily Beast article about Gratitude America.[87] and an October 2016 New York Post article about Epstein's sex slave scandal.[88]

223.    Even after other financial institutions, who had access to less or at least equal information concerning Epstein's crimes, closed their relationships with Epstein, FirstBank continued to receive millions of dollars from those closed relationships, further benefiting from its

---

[87] Kate Briquelet, *REVEALED: We Found Billionaire Pedophile Jeffrey Epstein's Secret Charity*, DAILY BEAST (Apr. 16, 2019), https://www.thedailybeast.com/jeffrey-epstein-has-a-secret-charity-heres-who-it-gave-money-to/.

[88] EFTA00151554; *see also* Maureen Callahan, *The 'sex slave' scandal that exposed pedophile billionaire Jeffrey Epstein*, NY POST (Oct. 9, 2016), https://nypost.com/2016/10/09/the-sex-slave-scandal-that-exposed-pedophile-billionaire-jeffrey-epstein/?ref=hackernoon.com.

relationship with Epstein. In public records, both Fidelity Investments[89] and Deutsche Bank[90] closed its accounts with Epstein and sent funds from those closures to FirstBank.

224.    In fact, almost every institution that Jeffrey Epstein banked with ultimately ended up terminating him, except for FirstBank. Due to Epstein's suspicious banking activity, in conjunction with Epstein's known criminal behavior and stated suspicious employment status, the overwhelming red flags caused numerous financial institutions to terminate relationships with Jeffrey Epstein and his companies. These included: HSBC in 2007; Goldman Sachs in 2010; Bank of America in 2012; Merrill Lynch in 2012; JP Morgan Chase in 2013; UBS in 2014; CitiBank in 2015; Deutsche Bank in 2018. First Bank of Puerto Rico was always there for Jeffrey Epstein no matter how many other banks terminated him.

225.    HSBC's Paris branch closed Epstein's accounts in December 2007 after compliance personnel flagged suspicious transactions involving young women connected to MC2 and Jean-Luc Brunel.[91] In 2010, Goldman Sachs terminated its client relationship with Epstein.[92] In 2013, JPMorgan terminated Epstein as a client based on concerns regarding large withdrawals

---

[89] Spencer Woodman, *Fidelity opened account for Epstein, even as outrage grew*, ICIJ (June 1, 2026), https://www.icij.org/news/2026/06/fidelity-opened-account-for-epstein-even-as-outrage-grew/?utm_content=buffer9400c&utm_medium=social&utm_source=twitter.com&utm_campaign=Buffer+-+Twitter.

[90] EFTA02731082, at 67.

[91] Jason Leopold et al., *The French Account*, BLOOMBERG (Nov. 21, 2025), https://www.bloomberg.com/features/2025-jeffrey-epstein-emails-hsbc/?embedded-checkout=true.

[92] Reuters, *Jeffrey Epstein had accounts with Goldman Sachs and HSBC, documents show*, AOL NEWS (Nov. 4, 2025), https://www.aol.com/news/jeffrey-epstein-had-accounts-goldman-172755291.html.

of cash from his account.[93] In September 2014, UBS closed its accounts it had with Epstein, citing the "reputational risk" he presented.[94] And in 2018, Deutsche Bank ended its relationship following the publication of investigate reporting detailing his sexual abuse.[95] Each of these institutions, concluded, some more than a decade before Epstein's death, that continuing to provide him with financial and banking services would only further his sex-trafficking venture. FirstBank, by contrast, continued to bank Jeffrey Epstein through his death, where accounts for his Estate are still maintained.

226.    For years, FirstBank knowingly and intentionally participated in the Epstein sex-trafficking venture by (among other things) providing the essential financial underpinnings for the venture. It also financially benefitted from that participation and was financially incentivized to retain Epstein as a client due to his connections and referrals of other high-net-worth clients to the Bank.

227.    Epstein could not expand his operation to the level it ultimately reached without complicit financial banking institutions that would ignore red flags and assist him in his sex-trafficking scheme. He could not risk having a typical banking relationship where the bank might uncover something suspicious and report him to law enforcement. The essential ingredient Epstein

---

[93] Lauren del Valle, *JPMorgan executives knew about sex abuse claims against then-client Jeffrey Epstein, court filing alleges*, CNN (Apr. 13, 2023), https://www.cnn.com/2023/04/13/business/jpmorgan-chase-epstein-abuse-allegations.

[94] Elisa Martinuzzi et al., *UBS banked Ghislaine Maxwell for years, moving her money after Epstein's arrest*, NEW HAMPSHIRE UNION LEADER (Feb. 8, 2026), https://www.unionleader.com/news/national/ubs-banked-ghislaine-maxwell-for-years-moving-her-money-after-epsteins-arrest/article_2ff90d2d-d9d4-504d-8aca-75295f7528dc.html.

[95] Aly McDevitt, *Chapter 2: KYC Shortfalls: JPMorgan and Deutsche Bank's onboarding of Epstein*, Compliance Week (Mar. 19, 2024), https://www.complianceweek.com/ethics-culture/chapter-2-kyc-shortfalls-jpmorgan-and-deutsche-banks-onboarding-of-epstein/.

needed to expand his sexual abuse of young women and sex trafficking venture was a financial institution that would know—but not care—that Epstein was sexually abusing women on a daily basis and paying out millions in hush money. Epstein needed an institution that would in fact assist and participate in that activity, and that would support his venture and conceal it if he was ever caught.

228.    Rather than merely providing routine banking services to Epstein, FirstBank went far beyond what a non-complicit bank would have done and instead assisted Epstein in setting up the necessary financial structure to operate his sex-trafficking venture.

229.    FirstBank also failed to follow routine banking practices of reviewing Epstein-related accounts against the backdrop of the public information outing him as a serial sex abuser and reporting Epstein for running what was obviously a sex trafficking operation. FirstBank, for example, purposely and deliberately failed to timely file required SARs for Epstein's suspicious activities. In short, instead of behaving as an ordinary provider of routine banking services, FirstBank instead assisted Epstein in covering up his past crimes and committing new ones.

230.    FirstBank facilitated payments to various people and entities related to Epstein, which were directly used to fund Epstein's sex-trafficking venture, including:

(a) Via sham accounts set up for Epstein's fake "non-profits," FirstBank paid the operating, maintenance, and payroll expenses for various entities known to have been part of Epstein's sex-trafficking conspiracy.[96]

(b) Using FirstBank accounts, Epstein made fake charitable contributions to institutions linked to individuals known to have recruited for him, including to the Icahn School of

---

[96] Steve Eder & Matthew Goldstein, *Jeffrey Epstein's Charity: An Image Bost Built on Deception*, N.Y. TIMES (Nov. 26, 2019), https://www.nytimes.com/2019/11/26/business/jeffrey-epstein-charity.html.

Medicine at Mount Sinai in New York City[97] and the Stockholm School of Economics.[98]

(c) FirstBank facilitated transactions from Epstein's FirstBank accounts to pay victims and their family members directly. Some of these transfers from the FirstBank accounts were made through New York banks, including the Bank of New York Mellon, Deutsche Bank Trust Co. Americas, and Societe Generale, to beneficiary accounts in Lithuania, Russia, London, and Paris.

(d) FirstBank received a $32,6000 wire transfer from Epstein's account at a different bank to the account of its customer Ann M. Rodriquez, the former property manager on Epstein's St. James Island.[99] This wire should have been flagged when it was made because of the unusual amount of the transaction in large, round numbers with no known legitimate or business purpose.

(e) FirstBank customer Cecile de Jongh, former First Lady of U.S. Virgin Islands, received a $200,000 wire transfer from Southern Trust Company on December 29, 2015.[100] FirstBank should have flagged this wire when it was made because of the unusual amount of the transaction in large, round numbers with no known legitimate or business purpose. Not only was this transaction sent from an entity associated with a known sex offender, but de Jongh, as First Lady, should have been characterized as a PEP and subject to greater scrutiny.

---

[97] EFTA00311293.

[98] EFTA01192706.

[99] EFTA01681865.

[100] *Id.*

231.    Recent investigation into Epstein's crimes has revealed that Epstein's ties and relationship to FirstBank were so significant that when Epstein applied for his own banking license in 2014—with undeniable knowledge that six years prior Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008—the two banks he listed as references included FirstBank and JP Morgan.[101]

232.    Despite Epstein's status as a sex-offender, he had developed such a significant relationship with FirstBank so as to identify them as a reference on his very own banking license application in the United States Virgin Islands—which the Federal Reserve Bank of New York has described as "high risk" due to their potential for abuse, including money laundering.[102]

233.    Epstein's relationship with FirstBank dates back to at least the late 1990s and continued through his death until Present Day where funds for his Estate continue to be maintained.

234.    Despite the abundance of available information related to Epstein's conduct throughout the duration of their banking relationship, FirstBank failed to perform proper due diligence that would have prevented Epstein's crimes.

235.    In fact, from 2013 through his death in 2019, after Epstein had already been offboarded by JP Morgan Chase & Co., as a client related to suspicious activity, FirstBank processed at least $21 million in wire transactions to and from Jeffrey Epstein accounts.

236.    By April 2016, when other banks had already exited their relationships with Epstein, FirstBank categorized Epstein as a Platinum Banking client and approved waived account service charge fees and wire transfer fees for all of his accounts.[103]

---

[101] Matthew Goldstein, *Jeffrey Epstein's mystery bank came alive after his death*, N.Y. TIMES, https://www.nytimes.com/2020/02/04/business/jeffrey-epstein-estate-bank.html (Feb. 4, 2020).

[102] *Id.*

[103] EFTA01268689 at 28.

69

237. In May 2018, FirstBank opened a bank account for a victim, using the same Virgin Islands address that other Epstein accounts used. Known Epstein associates, including Kahn, facilitated the opening of the account.

238. As late as February of 2019, FirstBank, attempted to open "six (6) additional deposit accounts" for Epstein despite the high volume of suspicious transactions involving his accounts.[104] Despite the diligence FirstBank was required to conduct in the "review and consideration" of these accounts, FirstBank failed to close or otherwise report Epstein's other accounts, which remained open years after his arrest and death.

239. Rather than do their due diligence and file a SAR as to these highly suspicious transactions, FirstBank sat idly by while Epstein and his co-conspirators trafficked and abused women. FirstBank's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

240. Indeed, FirstBank chose not to cooperate with law enforcement and other investigations into Epstein's sex trafficking at any time, because it knew it would be exposed as assisting in Epstein's scheme.

241. With FirstBank's complicity, Epstein was free to sexually abuse hundreds of women without the fear of detection by law enforcement. Epstein used the support of a reputable institution—FirstBank—to help cover up his sex-trafficking venture.

242. FirstBank cared about one thing—profit—and showed absolute loyalty to Epstein, including a willingness to violate banking laws, ignore multiple red flags of criminality, and participate directly in sex trafficking to enable Epstein to fulfill his abusive sexual appetite at the expense of countless vulnerable young women.

---

[104] EFTA01032176.

243. Epstein only offered his business to FirstBank because it was knowingly aiding Epstein's sex trafficking operation and the concealment thereof. FirstBank knew that if it stopped aiding the operation, it would lose the Epstein-related accounts and the financial benefits attached to handling those accounts.

244. FirstBank assisted and participated in Epstein's sex-trafficking venture by knowingly providing financial services which enabled him to make payments to victims, including directly or indirectly Jane Doe, and others similarly situated.

245. Ultimately, FirstBank financially benefitted in the form of profits, high-net-worth clients, and other financial incentives, for its participation in the Epstein sex-trafficking venture.

246. Throughout its relationship with Epstein, FirstBank violated numerous banking laws and regulations in order to conceal and continue its lucrative venture facilitating the Epstein sexual abuse and sex-trafficking scheme.

247. In taking the steps described immediately above, FirstBank obstructed, attempted to obstruct, and interfered with the federal government's enforcement of the TVPA.

**3. Epstein uses FirstBank accounts for the sex-trafficking venture, and FirstBank directly benefits from the venture.**

248. Over the course of the relationship, Epstein and his associates used FirstBank accounts and the bank's financial services in furtherance of the sex-trafficking scheme.

249. Given FirstBank's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause Epstein's victims to engage in commercial sex acts.

250. If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its

71

transaction monitoring to detect suspicious or unlawful activity based on what the risk is. FirstBank knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

251. FirstBank knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls into engaging in commercial sex acts.

252. By facilitating and financing Epstein's commercial sex acts in interstate and foreign commerce, FirstBank earned interest, commissions, service fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to FirstBank precisely because it was facilitating his sex-trafficking venture—and FirstBank knew that was the reason that Epstein was providing them with those financial benefits.

253. FirstBank benefitted by receiving things of value from its participation in the Epstein sex-trafficking venture, including (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the opportunity to earn financial benefits from the funds that had been deposited with it; and (4) customer referrals from Epstein, his co-conspirators, and his wealthy friends. FirstBank knowingly and intentionally received these things of value as a direct result of its participation in the Epstein sex-trafficking venture and because it was furthering Epstein's sex-trafficking venture.

## CLASS ACTION ALLEGATIONS

254. Jane Doe brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3)

and 23(c)(4) on behalf of themselves and the following Class:

All women who were sexually abused or trafficked by Jeffrey Epstein or Epstein's co-conspirators during the time when FirstBank maintained bank accounts for Epstein, Epstein's co-conspirators, Epstein related-entities, and/or Epstein-related accounts (the "Class Period").

255.    Jane Doe reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

256.    **Numerosity:** The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Classes and the identities of the individual Class Members are ascertainable through records maintained by the Epstein Estate and Defendant, including but not limited to records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class Members).

257.    **Typicality:** Jane Doe's claims are typical of the claims of the other Class Members she seeks to represent. The claims of Jane Doe, and the other Class Members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendant's participation in and funding of the Epstein's sexual abuse and Epstein's sex-trafficking venture.

258.    **Commonality:** There are many questions of law and fact common to the claims of Jane Doe, and the other Class Members, and those questions predominate over any questions that may affect only individual Class Members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

259.    **Common Questions of Fact and Law affecting Class Members** include, but are not limited to, the following:

    a.   Whether Epstein ran a sex-trafficking venture;

b. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

c. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

d. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts;

e. Whether FirstBank knew or recklessly disregarded the existence of the Epstein sex-trafficking venture;

f. Whether FirstBank participated in the Epstein sex-trafficking venture;

g. Whether FirstBank knowingly and intentionally assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

h. Whether FirstBank benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

i. Whether FirstBank knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a); and

j. Whether FirstBank obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture.

260.    Absent a class action, most of the Class Members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The Class treatment of

common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

261. **Adequacy:** Jane Doe will fairly and adequately represent and protect the interests of the other Class Members they seek to represent. Jane Doe has retained counsel with substantial experience in prosecuting complex litigation and class actions. Jane Doe and her counsel are committed to vigorously prosecuting this action on behalf of the other Class Members and have the financial resources to do so. Neither Jane Doe nor her counsel have any interests adverse to those of the other Class Members.

262. This action has been brought and may properly be maintained as a class action against FirstBank pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from FirstBank's records.

263. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

   a. Joinder of all Class Members is impracticable;

   b. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for FirstBank and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

   c. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual

actions would engender;

d. Absent a class action, Class Members will continue to suffer losses and be aggrieved and FirstBank will continue to violate New York and federal law without remedy;

e. Class treatment of this action will allow for the orderly and expeditious administration of class claims, economies of time, streamline effort and expense, and ensure uniformity of decisions;

f. Jane Doe and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g. The forum is desirable because FirstBank conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h. This action presents no difficulty that would impede its management by the Court as a class action.

## VII. CAUSES OF ACTION

### COUNT I
### KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

264. Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 263, as if fully set forth in this Count.

265. Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

266. FirstBank knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

76

267.    FirstBank took many concrete steps to aid Epstein's sex-trafficking venture, as outlined above. Among the concrete steps that FirstBank took to aid Epstein was providing financial services that made the sex-trafficking venture possible. FirstBank's willingness to provide these services was the quid pro quo for it receiving financial benefits from Epstein.

268.    Among the concrete steps that FirstBank took to aid and participate in the Epstein sex-trafficking venture was opening accounts at FirstBank for Epstein, his related entities, and associates. By opening these accounts, FirstBank received many benefits from participating in Epstein's venture. The opening of these accounts was affirmative conduct that caused FirstBank to receive those benefits.

269.    Among the concrete steps that FirstBank took to aid the Epstein sex-trafficking venture, FirstBank willfully failed to timely file required SARs with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. FirstBank's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking venture.

270.    Among the concrete steps that FirstBank took to aid the Epstein sex-trafficking venture was its failure to follow AML requirements. This failure was not just passive facilitation, but a deliberate omission by FirstBank. This omission was a specific act of concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

271.    By taking the concrete steps outlined above (along with the others alleged in this complaint), FirstBank knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture. The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success. The concrete steps above constituted active engagement by

FirstBank in Epstein's sex-trafficking venture.

272.    FirstBank knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with FirstBank's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

273.    FirstBank helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which FirstBank helped to conceal the venture's existence was by providing services to avoid leaving a visible "paper trail."

274.    FirstBank's concealment included failing to follow through on enhanced monitoring that was required for someone like Epstein.  FirstBank failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking.

275.    FirstBank's concealment included failing to file required SARs for Epstein's suspicious transactions.

276.    In addition to having actual knowledge that it was participating in Epstein's sex trafficking venture, FirstBank had constructive knowledge that it was participating in Epstein's sex trafficking venture. FirstBank also had constructive knowledge that Jane Doe, as well as other Members of the Class, were being coercively sex trafficked by Epstein. Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims.

277.    FirstBank had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture.

78

278.    FirstBank benefited from Epstein's sex trafficking venture. Among the financial benefits it received were the deposit of funds that Epstein and Epstein-controlled entities made to FirstBank.

279.    FirstBank knowingly received financial benefits in return for its assistance, support, and facilitation of Epstein's sex-trafficking venture.

280.    FirstBank knew, and was in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

281.    FirstBank and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

282.    Despite such knowledge, FirstBank intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which FirstBank knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe, as well as other Members of the Class, to engage in commercial sex acts.

283.    In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, FirstBank also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C.§ 1595(a).

284.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2) and 1595, FirstBank is liable to Jane Doe and the other Members of the Class for the damages they

sustained and reasonable attorneys' fees.

285.     By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2) and 1595, FirstBank is liable to Jane Doe and other members of the Class for punitive damages.

## COUNT II
## OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. § 1591(d)

286.     Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 263, as if fully set forth in this Count.

287.     Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

288.     FirstBank and its officers and employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

289.     FirstBank's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and FirstBank thereby violated Chapter 77, Title 18. FirstBank's obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

290.     As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019.  On or about that date, the U.S. Attorney's Office for the Southern District

80

of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

291.    By providing financing for Epstein's sex trafficking organization, FirstBank obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by FirstBank's actions. Because of that delay Jane Doe and other members of the Class were coercively caused to engage in commercial sex acts.

292.    FirstBank provided its services to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

293.    As another example of how FirstBank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, FirstBank did not follow AML and anti-structuring reporting requirements found in the Bank Secrecy Act and other laws. These requirements included an obligation for FirstBank to review transactions in Epstein's (and his associates') FirstBank accounts to determine whether they involved suspicious transactions.  If FirstBank had observed these requirements imposed by law, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. FirstBank knowingly did not follow these requirements because it knew that doing so would have prevented the secret cash transactions that were necessary to making sure that Epstein's sex-trafficking operation escaped the attention of federal investigative and prosecuting agencies.

294.    FirstBank obstructed, attempted to obstruct, interfered with, and prevented the

81

federal government's enforcement of the TVPA by failing to timely file with the federal government the required SARs that financial institutions must file with FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the Bank Secrecy Act and related laws and regulations. By failing to timely file the required SARs regarding Epstein's cash and other suspicious transactions, FirstBank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA by concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

295.     FirstBank's failure to timely file SARs about Epstein's sex-trafficking venture, despite numerous red flags, was wrongful and purposeful.

296.     If FirstBank had filed timely SARs, as required, about Epstein's sex-trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations. FirstBank's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe and other Class Members. If FirstBank had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash to pay off victims.

297.     By providing Epstein and his associates with banking services, FirstBank intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.

298.     FirstBank's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly. For example, FirstBank knew that Epstein was high risk—specifically, at a high risk of violating the TVPA

82

through continuing criminal sex trafficking activities.

299.    FirstBank was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA.  FirstBank was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators.  FirstBank's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

300.    FirstBank's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful. FirstBank therefore intentionally and willfully caused Epstein's commission of the forcible commercial sex acts against Jane Doe and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

301.    FirstBank knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe and other Class Members. FirstBank's obstruction has caused Jane Doe and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

302.    FirstBank's obstruction has caused Jane Doe harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring further harm.

303.    This case does not involve mere fraud.  Instead, FirstBank's conduct in obstructing

enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking venture. FirstBank's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. FirstBank's obstruction was directed specifically at Jane Doe and other members of the Class, who were the victims of Epstein's sex trafficking organization.

304. By virtue of these violations of 18 U.S.C. § 1591(d), FirstBank is liable to Jane Doe and the other Members of the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. FirstBank perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

305. By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), FirstBank is liable to Jane Doe and the other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## COUNT III
### GENDER-MOTIVATED VIOLENCE PROTECTION ACT, ADMINISTRATIVE CODE OF CITY OF N.Y. §§ 10-1101 – 10-1107

306. Plaintiff Jane Doe realleges and incorporates by reference paragraphs 1 – 263, as if fully set forth in this Count.

307. Jane Doe brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

308. The Council of the City of New York enacted the Victims of Gender-Motivated Violence Protection Law, N.Y.C. Admin. Code §§ 10-1101 – 10-1107 (the "GMVA"), in 2000 in direct response to the United States Supreme Court's decision in *United States v. Morrison*, 529 U.S. 598 (2000), which struck down the civil-remedy provision of the federal Violence Against Women Act on Commerce Clause grounds. See N.Y.C. Admin. Code § 10-1102 (declaring

legislative purpose to "resolve the difficulty that victims face in seeking court remedies by providing an officially sanctioned and legitimate cause of action for seeking redress for injuries resulting from gender-motivated violence"). The Council amended the GMVA in 2022 to extend its statute of limitations and create a lookback window, and again, materially, in January 2026 by passing Local Law of 2026, Int. No. 1297-A (effective January 29, 2026), which (i) confirms that institutional defendants are subject to liability under the statute on the same terms as individual perpetrators, (ii) clarifies that physical injury is not an element of a claim, and (iii) opens an additional eighteen-month lookback window through approximately July 29, 2027 for claims arising from gender-motivated violence occurring on or before January 9, 2022.

309.    Section 10-1104 of the New York City Administrative Code provides, in pertinent part, that "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction for any or all of the following relief: a. Compensatory and punitive damages; b. Injunctive and declaratory relief; c. Attorney's fees and costs; and d. Such other relief as a court may deem appropriate." N.Y.C. Admin. Code § 10-1104.

310.    Section 10-1103 defines a "crime of violence" as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction." N.Y.C. Admin. Code § 10-1103.

311.    Section 10-1103 defines a "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." N.Y.C. Admin. Code § 10-1103. It is settled law in this

85

jurisdiction that allegations of rape and sexual assault state a claim under the GMVPA because "[m]alice or ill will based on gender is apparent from the alleged commission of the act itself." *Breest v. Haggis*, 180 A.D.3d 83, 94 (1st Dep't 2019).

312.    The acts of sex trafficking, commercial sexual exploitation, sexual battery, sexual abuse, rape, and forcible touching committed against Plaintiff and the class members she seeks to represent by Jeffrey Epstein and his co-conspirators, as set forth in the foregoing paragraphs, each separately and together constitute "crime[s] of violence" within the meaning of N.Y.C. Admin. Code § 10-1103. The conduct alleged would, as to each Plaintiff and class member, constitute one or more misdemeanors or felonies against the person under, *inter alia*, New York Penal Law Article 130 (including §§ 130.20 (sexual misconduct), 130.25–30.35 (rape in the third, second, and first degrees), 130.52 (forcible touching), 130.55–30.65 (sexual abuse in the third, second, and first degrees), and 130.65-a (aggravated sexual abuse in the fourth degree)); the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1594; and the Mann Act, 18 U.S.C. §§ 2421–2423. Criminal charge or conviction is not an element of this Count. N.Y.C. Admin. Code § 10-1103.

313.    Each of the predicate crimes of violence alleged in the preceding paragraph was "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender," N.Y.C. Admin. Code § 10-1103. Plaintiff and the members of the class were targeted, recruited, transported, and abused by Jeffrey Epstein and his co-conspirators because they are women and girls; the venture by its design exploited, and depended upon the exploitation of, the victims' gender; and the conduct itself — forced, coerced, and non-consensual sexual contact — manifests on its face the malice and ill will toward the victims' gender that *Breest* recognized as sufficient. *Breest*, 180 A.D.3d at 94.

86

314.    Defendant FirstBank **"enable[d]" and "participate[d] in"**, and on information and belief **"conspire[d] in,"** the commission of the crimes of violence motivated by gender alleged herein, within the meaning of N.Y.C. Admin. Code § 10-1104. FirstBank knowingly provided the financial infrastructure indispensable to the operation of the Epstein sex-trafficking venture, including (a) the opening, maintenance, and active servicing of more than twenty bank and investment accounts in the names of Epstein, his entities, and his co-conspirators; (b) the processing of wire transfers used to compensate victims for the purpose of perpetuating the abuse, to pay recruiters for the procurement of new victims, and to compensate the co-conspirators whose role in the venture was the recruitment, transportation, and control of women and girls; (c) the processing of recurring cash withdrawals used by Epstein and his agents to compensate victims and recruiters; (d) the routing of funds through the network of Epstein-related entity accounts in a manner designed to obscure the true purpose of the underlying transactions; and (e) the continued provision of those services after each of FirstBank's peer institutions had terminated its own Epstein relationship for suspicious-activity reasons known or readily ascertainable to FirstBank.

315.    The January 2026 amendment of the GMVA confirms that institutional defendants — including financial institutions — are subject to the cause of action created by § 10-1104 on the same terms as individual actors. The statute's operative verbs ("commits, directs, enables, participates in, or conspires in") by their terms reach entities as well as natural persons, and the 2026 amendment was enacted specifically to remove any doubt on that point following the narrowing interpretation rejected by the Council. *See* Local Law of 2026, Int. No. 1297-A (Jan. 29, 2026); *See* Press Release, N.Y.C. Council, NYC Council Approves Legislation to Create Legal Framework for City's Gender-Motivated Violence Survivors to Seek Accountability (Nov. 25,

2025), https://council.nyc.gov/press/2025/11/25/3012/.  FirstBank is a "party" within the meaning of § 10-1104 and is amenable to suit on the allegations pleaded in this Count.

316.    FirstBank acted with actual knowledge of Epstein's sex-trafficking venture and of its own role in enabling and participating in that venture, or, in the alternative, acted with reckless disregard of the same. FirstBank's knowledge is established by, among the matters set forth in the foregoing paragraphs, (a) the array of statutorily defined red flags present in the Epstein account activity that FirstBank was bound to detect, escalate, and act upon under its Know-Your-Customer and Anti-Money-Laundering obligations; (b) the prior termination of Epstein's banking relationships by peer institutions for the very conduct FirstBank elected to continue facilitating; (c) the public record of Epstein's 2008 conviction, sex-offender registration, and continued civil and criminal exposure throughout the relevant period; (d) Congressional, regulatory, and law-enforcement investigations identifying the conduct of which Epstein was the principal beneficiary; and (e) FirstBank's own internal compliance records, monitoring outputs, and customer-due-diligence files. FirstBank's continued provision of banking services to Epstein, his entities, and his estate, on the facts pleaded above, can be explained only by knowing or reckless conduct — it cannot be explained by the inadvertent failure of a competent compliance function.

317.    As a direct and proximate result of the crimes of violence motivated by gender alleged in this Count, and of FirstBank's enabling and participating conduct in connection with those crimes, Plaintiff and each member of the class has suffered and continue to suffer substantial injury, including without limitation physical, psychological, emotional, sexual, and dignitary injury; severe and continuing emotional distress; loss of liberty and bodily autonomy; loss of educational, professional, and economic opportunity; and the past and future costs of medical and

psychological treatment. As clarified by the 2026 amendment to the GMVA, physical injury is not an element of a claim under § 10-1104.

318.    This Count is timely. It is timely under N.Y.C. Admin. Code § 10-1105(a) (as amended in 2022) for those acts of gender-motivated violence committed within nine years of the filing of this Complaint and for those acts to which the parties' tolling agreement applies. It is independently timely as to acts of gender-motivated violence occurring on or before January 9, 2022 pursuant to the eighteen-month lookback window enacted by Local Law of 2026, Int. No. 1297-A, effective January 29, 2026 and open through approximately July 29, 2027. This Complaint has been filed within that window.

319.    By reason of the foregoing, Plaintiff and the class are entitled to, and hereby seek, the full measure of relief authorized by N.Y.C. Admin. Code § 10-1104, including (a) compensatory damages in an amount to be determined at trial; (b) punitive damages, the conduct alleged being knowing, intentional, malicious, and undertaken with conscious disregard for the rights and safety of Plaintiff and the class; (c) injunctive and declaratory relief, including a declaration that FirstBank's conduct violated the GMVA and an injunction against the continued provision of banking services to the Epstein estate, entities, and successors on terms inconsistent with FirstBank's compliance obligations; (d) reasonable attorneys' fees and costs of suit; and (e) such other and further relief as the Court deems just and proper.

## REQUEST FOR RELIEF

Jane Doe respectfully requests that the Court enter judgment in her favor, and against FirstBank, as follows:

    a.    That the Court certify the Class, name Jane Doe as Class Representative, and appoint her lawyers as Class Counsel;

b.  That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendant in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages against Defendant in an amount to be determined at trial;

d.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.  That the Court grant all such other and further relief as it deems just and proper.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all claims so triable.

Dated: June 24, 2026

Respectfully submitted,


By: */s/ David Boies*

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 446-2300
dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
(954) 356-0011
smccawley@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson

90

Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
(954) 524-2820
brad@cvlf.com
brittany@cvlf.com