**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIA MOLCHONOVA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FIRSTBANK PUERTO RICO and FIRST BANCORP,<br><br>Defendants. | Case No. 1:26-cv-5327-JSR |

**PLAINTIFF'S SUPPLEMENTAL BRIEFING IN FURTHER OPPOSITION TO THE MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................ 2

I. THE COURT HAS PERSONAL JURISDICTION OVER FIRSTBANK. ...................... 2

A. FirstBank purposefully availed itself of jurisdiction in New York................................ 2

B. There is an articulable nexus, and the exercise of personal jurisdiction comports with due process. ........................................................................................................ 6

C. Defendants had an obligation to preserve evidence and their failure to do so is prejudicial to Plaintiff ........................................................................................ 7

II. PLAINTIFF HAS PROPERLY PLED CLAIMS UNDER THE TVPA. ....................... 8

A. The Complaint States a Claim for TVPA Participation Liability .................................. 8

B. The Complaint States a Claim for Obstruction of TVPA Enforcement ...................... 13

III. PLAINTIFF HAS PROPERLY PLED HER GENDER MOTIVATED VIOLENCE PROTECTION ACT CLAIM. ............................................................................ 14

CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (N.Y. 2016) .......... 3

*Chang v. Shen Yun Performing Arts, Inc.*,
2026 WL 2410052 (S.D.N.Y. Aug. 18, 2026) .......... passim

*De Deus v. Indyke*,
2026 WL 2081815 (N.Y. Sup. Ct. July 07, 2026) .......... 15

*Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*,
7 N.Y.3d 65 (N.Y. 2006) .......... 4

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
671 F. Supp. 3d 387 (S.D.N.Y. 2023) .......... passim

*Doe v. Bank of Am., N.A.*,
819 F. Supp. 3d 314 (S.D.N.Y. 2026) .......... passim

*Doe v. Combs*,
2024 WL 4987044 (S.D.N.Y. Dec. 5, 2024) .......... 15

*Doe v. Yeshiva Univ.*,
703 F. Supp. 3d 473 (S.D.N.Y. 2023) .......... 11

*Doubleline Cap. LP v. Odebrecht Fin., Ltd.*,
2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) .......... 8

*ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*,
144 F.4th 360 (2d Cir. 2025) .......... 8

*G.G. v. Salesforce.com, Inc.*,
76 F.4th 544 (7th Cir. 2023) .......... 8

*Gottwald v. Sebert*,
40 N.Y. 3d 240 (2023) .......... 15

*In re Gleason (Michael Vee, Ltd.)*,
96 N.Y.2d 117 (2001) .......... 15

*Kashef v. BNP Paribas S.A.*,
925 F.3d 53 (2d Cir. 2019) .......... 1

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) .......... 1, 7

*M.H. v. S.A.*,
2025 WL 3034263 (N.Y. Sup. Ct. Oct. 29, 2025) .......... 14

*Mueller v. Deutsche Bank Aktiengesellschaft*,
2026 WL 2220472 (2d Cir. Aug. 3, 2026) .......... passim

*Mueller v. Deutsche Bank Aktiengesellschaft*,
777 F. Supp. 3d 329 (S.D.N.Y. 2025) .......... 3, 8, 9, 13

*Rivers v. Combs*,
2025 WL 2414117 (S.D.N.Y. Aug. 19, 2025) .......... 15

*Skutnik v. Messina*,
178 A.D.3d 744 (2d Dep't 2019) .......... 7

*Smith v. Pro Camps, Ltd.*,
210 N.Y.S.3d 173 (2024) .......... 14

*Spetner v. Palestine Investment Bank*,
70 F.4th 632 (2d Cir. 2023) .......... 7

*Sutton v. Tapscott*,
120 F.4th 1115 (2d Cir. 2024) .......... 14

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
27 F. Supp. 3d 517 (S.D.N.Y. 2014) .......... 4

*Zubulake v. UBS Warburg LLC*,
229 F.R.D. 422 (S.D.N.Y. 2004) .......... 1, 7, 8

**Rules**

N.Y. Civ. Prac. L. & R. § 302(a)(1) .......... 4

N.Y.C. Admin. Code § 10-1104.1 .......... 15

**INTRODUCTION**

Even given Defendants FirstBank Puerto Rico's and First BanCorp's (collectively, "FirstBank") scant jurisdictional discovery production, those documents along with publicly available information in the EFTA confirm that this Court has jurisdiction over the Defendants. On a motion to dismiss, the Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019).[1]

The evidence shows that FirstBank transacted business in the state through its use of intermediary, correspondent, and clearing bank relationships, and FirstBank's 30(b)(6) witness admitted that he had only seen international Epstein-related transfers facilitated through New York correspondent banks and clearing relationships. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167–74 (2d Cir. 2013). This Court also has specific jurisdiction because of FirstBank's communication with New York-based principals and agents; its facilitation of payments into New York, including monthly payments to victims and a $10.9 million wire to Ghislaine Maxwell that displayed signs of money laundering; opening and maintenance of accounts for New York entities or those that operate in New York, including the holding entity for the primary place of abuse, Epstein's townhouse; its contractual relationships governed by the laws of New York, and its out of state activities that had a devastating impact on victims within the state. Each of these on its own and in combination demonstrate that FirstBank should have reasonably anticipated litigation in New York because of its actions.

On the merits, instead of substantively addressing Plaintiff's participation arguments,

---

[1] And here, because of spoliation, Plaintiff is also entitled to inferences that would "restore [the plaintiff] to the position that she would have been in had [defendant] faithfully discharged its discovery obligations." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 437 (S.D.N.Y. 2004).

FirstBank hopes that by characterizing *Mueller v. Deutsche Bank Aktiengesellschaft*, 2026 WL 2220472, at *5 (2d Cir. Aug. 3, 2026) ("*Mueller II*") as a rejection of TVPA precedent in this district court, it can persuade this Court to call all services even tangentially related to banking a "routine banking service." *Mueller* is not a rejection of this Court's precedent, but an example of allegations that are insufficient to plead TVPA participation. Plaintiff here has sufficiently pled TVPA participation, which is supported by the post-*Mueller* case *Chang v. Shen Yun Performing Arts, Inc.*, 2026 WL 2410052, at *12 (S.D.N.Y. Aug. 18, 2026). *Shen Yun* is a TVPA case that was decided after *Mueller II* and distinguishes from it, while making clear that this Court's TVPA analysis in *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023) ("*Deutsche Bank/JP Morgan*"), and by extension *Doe v. Bank of Am.*, 819 F. Supp. 3d 314, 327 (S.D.N.Y. 2026), is still precedent that is most analogous for the Court to follow here.

## ARGUMENT

### I. THE COURT HAS PERSONAL JURISDICTION OVER FIRSTBANK.

Plaintiff has adequately alleged that FirstBank purposefully availed itself of jurisdiction in New York, that there is an articulable nexus between the claims and Defendants' purposeful availment of the forum, and that the exercise of personal jurisdiction accords with due process.

#### A. FirstBank purposefully availed itself of jurisdiction in New York

FirstBank's scant jurisdictional discovery production confirms that this Court has specific jurisdiction over FirstBank because of their use of intermediary, correspondent, and clearing bank relationships in New York, FirstBank's communication with New York-based principals and agents, its facilitation of payments into New York, opening and maintenance of accounts for New York entities or those that operate in New York, contractual relationships governed by the laws of New York, and its out of state activities that had a devastating impact on victims within the state.

*First*, FirstBank used intermediary, correspondent, or clearing relationships to process international wire transactions from Epstein's accounts. FirstBank's jurisdictional discovery confirms that it regularly used a correspondent bank based in New York, [redacted] Ex. A, [redacted]; Ex. B, [redacted] Ex. N, EFTA01273122; Ex. A, [redacted]. Further, it used [redacted] *See* Ex. A, [redacted] Ex. C, [redacted]. And FirstBank [redacted] Ex. D, [redacted]. FirstBank's 30(b)(6) witness testified that [redacted] Ex. A, [redacted]

In all of these wires, FirstBank "affirmatively act[ed] on" them, directing them through New York, and choosing to direct them through New York banks, so that the wires could be sent abroad. *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327–29 (N.Y. 2016); Ex. A, [redacted]. That FirstBank relied on correspondent bank and clearing relationships in New York is sufficient for personal jurisdiction. *See Mueller v. Deutsche Bank Aktiengesellschaft*, 777 F. Supp. 3d 329, 336 (S.D.N.Y. 2025) ("*Mueller I*") (citing *Licci*, 732 F.3d at 169).

*Second*, FirstBank conducted business in New York by speaking to New York-based principals and agents, including Darren Indyke, Richard Kahn, and Bella Klein, in addition to sending the wires above through New York. Defendants initially stated that there were no responsive communications with New York-based principals and agents; however, despite that assertion and FirstBank's failure to produce the responsive documents, there were several communications released through the EFTA that confirm that FirstBank communicated directly with Epstein and New York-based Epstein-related individuals. *See* Ex. E, [redacted]; Ex. F, [redacted] Ex. O, EFTA01388473 (communications with Bella Klein). If not for FirstBank's deletion of Epstein's case files and emails, there would be troves of documents demonstrating FirstBank's communication with Epstein and New York-based entities and individuals. *See Deutsche Bank Sec., Inc. v. Montana Bd. of Investments*, 7 N.Y.3d 65, 71 (N.Y. 2006) (holding that "using electronic and telephonic means to project [oneself] into New York to conduct business transactions" satisfies CPLR § 302(a)(1)).

*Third*, FirstBank's limited production of documents shows that FirstBank actively facilitated payments into New York and did so at the direction of Epstein and his New York-based agents. *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 529 (S.D.N.Y. 2014) (holding the fact that "Defendants' bids were placed on a New York-based exchange and cleared through a New York-based clearinghouse" as well as contractual relationships with other New York based entities satisfied personal jurisdiction). In addition to wires discussed above, these wires included a July 27, 2011 wire that FirstBank received to Maxwell's FSF LLC FirstBank account for $10.9 million from a Freedom Air Int'l account with the address 301 E 66th St, and a wire that FirstBank facilitated the next day for all $10.9 million from the FSF LLC FirstBank

account to Maxwell's (beneficiary address is 116 East 65th St.) account at JPMorgan. This is a classic example of layering, and as Plaintiff alleged, on the same day, $10.9 million was transferred from Maxwell's account to various accounts in Epstein's name for no discernible lawful purpose. Compl. ¶ 219; *see* Ex. P, EFTA00074147. FirstBank's own files also confirm that it knew about the allegations against Maxwell. Ex. G, [redacted].

Other wires that FirstBank directed into New York include [redacted] Ex. H, [redacted]; [redacted] Ex. D, [redacted], Compl. 219, 230(b); [redacted], Ex. I, [redacted]; [redacted] Ex. J, [redacted]; [redacted] Ex. K, [redacted]. [redacted] Ex. L, [redacted]. The wire documents received are woefully incomplete, covering a small sliver of the Epstein/FirstBank relationship, and if not for FirstBank's failure to preserve, there would be many more documents further solidifying jurisdiction.

Furthermore, the fact that some documents reveal that FirstBank bankers were actively

[2] This charitable entity's contacts with New York were so extensive that the New York Attorney General asked whether the entity should be registered under New York law. Compl. ¶ 121.

offering specialized assistance to Epstein and associated individuals leads to a reasonable inference that it was also doing so for the Epstein-related individuals based in New York, with whom FirstBank communicated. *See* Ex. Q, EFTA01268890, at -943 (FirstBank banker offering to pick up documents from Epstein-related individual); Ex. G, [redacted]

*Fourth*, as described in Plaintiff's opposition, FirstBank held more than 30 different accounts for Epstein—both in Epstein's name personally and for entities related to him and his associates—beginning as early as 1998. Compl. ¶ 4. Many of these bank accounts were opened for entities that operated in New York and processed transactions for entities operating in or with contacts in New York.[3] *Id.* ¶¶ 138(d), 213; *see* Pl's Opp. Br. 8.

*Fifth*, as described in Plaintiff's opposition, FirstBank's conduct in participating in Epstein's sex-trafficking venture entails tortious conduct outside of the state that affected Epstein's victims within the state. *See* Pl's Opp. Br. 9–10.

**B. There is an articulable nexus, and the exercise of personal jurisdiction comports with due process.**

Plaintiff has also adequately pleaded an articulable nexus between her claims and FirstBank's purposeful availment through conducting business in New York, and that the exercise of personal jurisdiction comports with due process. *See* Pl's Opp. Br. 7–11. FirstBank argues that Plaintiff cannot link FirstBank's contacts with New York to either the alleged misconduct or Plaintiff's specific injury, but this contradicts the Second Circuit's holding that New York's long-arm statute "does not require a causal link between the defendant's New York business activity

[3] These accounts include but are not limited to Epstein's account, Maple Inc., J. Epstein Virgin Islands, Gratitude America, Financial Trust Company, Southern Trust Company, and FSF LLC.

and a plaintiff's injury" but only that "the latter is not completely unmoored from the former." *Licci*, 732 F.3d at 168–69; *see also Skutnik v. Messina*, 178 A.D.3d 744, 745–46 (2d Dep't 2019) (holding the "articulable nexus" inquiry is "relatively permissive"). Even so, Defendants use of New York banks played a direct role in Epstein's sex-trafficking, which also makes a New York suit foreseeable. Ex. D, [redacted].

The standard for due process also does not require causation but requires that defendant "directed its conduct at New York such that it could reasonably foresee being subject to suit here." *Spetner v. Palestine Investment Bank*, 70 F.4th 632, 645 (2d Cir. 2023). FirstBank banked Epstein, a convicted sex offender and a man publicly accused of operating a sex-trafficking venture in New York, including by regularly abusing his victims in his New York townhouse (9 East 71st St), housing his victims in a New York apartment building (301 E 66th St), and relying on his New York connections to fund and sustain the venture. This constitutes reasonable foreseeability.[4]

**C. Defendants had an obligation to preserve evidence and their failure to do so is prejudicial to Plaintiff**

Plaintiff notes that while discussing deficiencies in jurisdictional discovery with the Court on September 8, FirstBank disclosed for the first time that documents from 2019 and earlier are no longer in FirstBank's possession, which impacts all discovery. For the purposes of personal jurisdiction, when addressing sanctions for spoliation issues, courts consider "punishing [] and deterring future misconduct" as well as "restor[ing] [the plaintiff] to the position that she would have been in had [defendant] faithfully discharged its discovery obligations." *Zubulake*, 229

[4] In its moving brief, FirstBank argued that Plaintiff's Complaint did not adequately allege jurisdiction because the Complaint engaged in impermissible group pleading. In addition to Plaintiff's arguments in her opposition brief, [redacted] Ex. A, [redacted]

F.R.D. at 437. Defendants' failure to preserve documents entitles Plaintiff to not only the standard motion to dismiss inferences, but adverse inferences that "restore [Plaintiff] to the position that she would have been in" if not for FirstBank's actions. *Zubulake*, 229 F.R.D. at 437.[5] [redacted]. Ex. A, [redacted].

## II. PLAINTIFF HAS PROPERLY PLED CLAIMS UNDER THE TVPA.

### A. The Complaint States a Claim for TVPA Participation Liability

Contrary to FirstBank's argument, the Second Circuit's opinion in *Mueller II* is not a rejection of precedent, like *Salesforce.com, Inc.*, that Plaintiff has relied on, nor is it a departure from the standards this Court has previously applied to TVPA claims. *See Mueller II*, 185 F.4th at 314-15 (citing *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 560 (7th Cir. 2023)); *Shen Yun*, 2026 WL 2410052, at *12 (relying on *Deutsche Bank/JP Morgan*).

Regarding the participation element, this Court previously considered and adopted the district court's interpretation of "participation" in *Mueller I* when defining "participation." *Bank of Am.*, 819 F. Supp. 3d at 327. Plaintiff's claims are distinguishable from those in *Mueller* and are

[5] FirstBank had an obligation to preserve evidence because "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, 144 F.4th 360, 375 (2d Cir. 2025); *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at *6 (S.D.N.Y. Mar. 30, 2021) (finding that, though litigation had not yet commenced, the defendants were on notice of their obligation to preserve the electronic data where there was a government investigation taking place). Instead of maintaining a litigation hold that was already in place in response to government subpoenas, FirstBank decided to affirmatively lift those holds and intentionally delete documents. *See ELG Utica Alloys, Inc.*, 144 F.4th at 375 (referring to failure to maintain a document hold as "grossly negligent").

more analogous to those in *Bank of Am., Shen Yun,* and *Deutsche Bank/JP Morgan*.

*First*, *Mueller* involved an attenuated, indirect relationship between the bank and the underlying trafficking. Deutsche Bank provided banking services to two men, who were European VAT fraudsters who funneled proceeds to al-Qaeda, which ultimately trafficked the plaintiffs. *See Mueller* Compl. ¶¶ 140–96; *Mueller I*, 777 F. Supp. 3d at 333–34. Deutsche Bank never banked or communicated with al-Qaeda or ISIS' agents, and never maintained accounts in their name. Here, by contrast, FirstBank banked Epstein himself, the actual perpetrator, in a "continuous relationship with the venture" from 1998 through his death and in the present day, maintaining over 30 accounts in his name and in the names of entities over which Epstein was the beneficial owner. *See Mueller II*, 2026 WL 2220472, at *5. As in *Shen Yun*, these entities displayed red flags, including the number of accounts, the same signers, and a shared address. Compl. ¶¶ 220, 224, 233, 236; *see Shen Yun*, 2026 WL 2410052, at *13 (inferring participation in trafficking venture from a bank's ignoring red flags, including the large number of opened accounts with the same custodian and address). Also, similar to *Shen Yun*, Epstein's introduction of a victim for a personal account with the same registered agent address as the one used for his entities, and FirstBank's willingness to open that account without proper documentation constitutes participation. Compl. ¶ 237. FirstBank also communicated with Epstein's known agents, including Indyke and Kahn.

*Second*, in *Mueller*, the plaintiffs did not allege that the defendant bank deliberately concealed suspicious activity by failing to file SARs. In *Mueller*, the plaintiffs alleged that the defendant bank's employees identified and flagged suspicious activity, totaling more than $2.9 billion between 2013 and 2015, and while the Mueller plaintiffs alleged that the filings were untimely in some instances, the SARs were only six months after the transactions were made. *Mueller* Compl. ¶¶ 200–17, 236. Here, by contrast, Plaintiff alleges that FirstBank purposely and

deliberately failed to file required SARs for decades. Further, despite managing over thirty accounts for more than twenty years, FirstBank's 2019 SAR, which was filed after the perpetrator was already arrested, was facially incomplete, only reporting a fraction of suspicious activity, and withholding key information from regulators. Compl. ¶¶ 221–222, 229, 239, 269–270, 293–296. As the court explained in *Bank of Am.*, "intentionally facilitating suspicious account transfers and failing to file SARs are among the ways that banks can go 'beyond merely providing their usual services to Jeffrey Epstein and his affiliated entities.'"[6] *Bank of Am.*, 819 F. Supp. 3d at 328 (quoting *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 406).

*Third*, unlike in *Mueller*, FirstBank "acquired a financial interest" in Epstein's sex-trafficking venture by providing him with a credit card at a time when no other bank would do so and after his crimes were public. *See* Compl. ¶¶ 4, 224, 236. A lender maintains a financial interest in the success of the borrower and his ability to pay back the credited funds, and FirstBank could have continued banking Epstein without acquiring a financial interest. Instead, FirstBank chose to provide him with a credit card, which helped Epstein continue his trafficking enterprise.

*Fourth*, Plaintiff's allegations go far beyond routine banking services. *Mueller* does not "categorically bar" consideration of account maintenance and transaction processing that on their own may not support participation in a venture. The seven examples that FirstBank argues are "categorically barred," *see* Reply at 2, are not routine services but demonstrates FirstBank's willingness to provide banking services despite red flags and after other banks had exited Epstein's

---

[6] Unlike Bank of New York, where the court reasoned that many of the transfers "were between Epstein-related accounts," *Bank of Am.*, 819 F. Supp. 3d at 329, Plaintiff's allegations against FirstBank extend well beyond its processing of hundreds of millions of dollars in wire transfers, including transfers to victims. Plaintiff further alleges that FirstBank facilitated large, round-number transfers to Cecile de Jongh, the former First Lady of the U.S. Virgin Islands, and Ann M. Rodriquez, Epstein's property manager, notwithstanding the lack of any apparent legitimate or business purpose. *See, e.g.*, Compl. ¶¶ 62, 65, 67, 75–76, 129, 208, 219, 230,

accounts. *Bank of Am.*, 819 F. Supp. 3d at 327–28 (considering that Bank of America provided banking services "notwithstanding circumstances that the bank allegedly knew were suspicious and non-routine" and intentionally filing late SARs). Here, Plaintiff alleges active facilitation beyond mere transaction processing—serving as a reference for Epstein to open his own bank, keeping accounts open years after public exposure, opening a bank account for a victim at the same address as Epstein, attempting to open six accounts despite known suspicious activity, and offering specialized services, including designation as a Platinum Banking client and offers by a FirstBank employee to personally pick up documents from an Epstein-affiliated individual and open and maintain accounts without proper documentation.[7] *See* Compl. ¶¶ 4, 67, 130, 133, 138, 140–42, 202, 207–08, 219, 224, 226–228, 230-32, 236–238, 267–271; *Shen Yun*, 2026 WL 2410052, at *2, *14 (considering that the bank defendant provided specialized services by sending representatives inside Dragon Springs). Also, Plaintiff's allegations regarding FirstBank's receipt of $10.9 million only for that amount to be transferred to Maxwell the next day is a red flag that FirstBank intentionally ignored. Compl. ¶¶ 67, 219. These acts go well beyond passive financial services.

Further, by FirstBank's own admission, three of Plaintiff's allegations are not the type of business services that can be dismissed as routine. Epstein's treatment as a platinum banking client, despite being a registered sex offender, is far from "routine." Contrary to FirstBank's suggestion, waiving certain fees, including pertinently for international wire fees for Epstein's payment of numerous of his sex-trafficked victims, is more serious than the higher fees Deutsche Bank charged in *Mueller II* because FirstBank removed the fees to encourage increased transactions as part of its participation in the scheme. [redacted]

[7] Ex. Q, EFTA01268890 at -942–43; *see Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 489 (S.D.N.Y. 2023) (finding courts can consider documents incorporated by reference, in plaintiffs' possession, or of which plaintiffs had knowledge and relied on in bringing suit on motion to dismiss).

[redacted]. FirstBank ultimately did not open the additional accounts for Epstein in February 2019, but more importantly, it failed to close the existing accounts despite clearly being on notice by its compliance department. This was a decade after his crimes were publicly exposed, and allowed Epstein's sex trafficking to continue for months until his arrest. Moreover, Plaintiff plausibly alleges that FirstBank "vouched for Epstein at a time when its own internal monitoring records reflected the very red flags the institution was bound by law to act upon" by serving as a reference for him to open his own bank. Compl. ¶ 81. *Contra* Reply at 3 ("Plaintiff does not allege that FirstBank . . . vouched for [Epstein].").

*Fifth*, FirstBank has revealed it deleted what amounts to decades of documents and correspondence related to Jeffrey Epstein, including records concerning accounts that remained active when the documents were destroyed. The destruction of these highly relevant documents—despite the Bank's extensive notice of criminal and civil investigations involving its highest profile client, as well as its own suspicious activity reporting—was anything but routine. Discovery will likely reveal that this decision was yet another non-routine accommodation provided Epstein to cover up and conceal crimes of Jeffrey Epstein's trafficking and the Bank's participation therein.

Plaintiff also adequately alleged that FirstBank "knew or should have known" about Epstein's sex trafficking venture. *Bank of Am.*, 819 F. Supp. 3d at 330. And one of FirstBank's documents show that Defendants had actual knowledge by at least July 2017. *See* Ex. M, [redacted]. FirstBank inappropriately extends *Mueller* where the district court and Second Circuit declined to do so. Reply 4–5; *Mueller II*, 2026 WL 2220472, at *4 n.1; *Mueller I*, 777 F. Supp. 3d at 339 n.6. Like in *Bank of Am.*, the

"complaint plausibly asserts that the bank turned a blind eye to these repeated, detailed allegations, some emanating from police reports widely circulated in the press, by utterly failing to engage in due diligence about them." *Bank of Am.*, 819 F. Supp. 3d at 331; Compl. ¶¶ 86–88, 91–98. Plaintiff also alleges that FirstBank "recklessly disregarded 'numerous red flags associated with Epstein's accounts, which all suggested that Jeffrey Epstein operated a sex-trafficking venture." *Bank of Am.*, 819 F. Supp. 3d at 331; Compl. ¶¶ 200, 207, 237.

Finally, Plaintiff has adequately alleged that FirstBank knowingly benefited from its participation in Epstein's venture. *See* Compl. ¶¶ 243-45. As this Court has previously recognized, the benefit element does not require allegations of an explicit quid pro quo between the trafficker and the bank. *Shen Yun* held that evidence of a causal relationship is not required to allege benefit at the motion to dismiss stage and may not be required on the merits. *Shen Yun*, 2026 WL 2410052, at *13; *see also Bank of Am.*, 819 F. Supp. 3d at 332. Further, the *Shen Yun* Court held that allegations that the bank defendant "turn[ed] a blind eye to the red flags of unlawful activity and thus continu[ed] to retain the close, decades-long relationship," and received access to a "pipeline of accounts" and a "competitive edge" in terms of business associated with Shen Yun, were sufficient to allege benefit at the motion to dismiss stage. *Shen Yun*, 2026 WL 2410052, at *13. Here, Plaintiff alleges that FirstBank derived significant benefits from its longstanding relationship with Epstein, a high-value client whose more than 30 accounts generated substantial banking business and whose relationship provided FirstBank with opportunities to cultivate and maintain other lucrative client relationships. Compl. ¶¶ 9, 93, 222, 230, 253; *see Shen Yun*, 2026 WL 2410052, at *13–14. These allegations are sufficient to support a reasonable inference that FirstBank knowingly benefited from its participation in Epstein's sex-trafficking venture.

**B. The Complaint States a Claim for Obstruction of TVPA Enforcement**

That FirstBank may have ultimately filed SARs, Reply at 7, does not negate Plaintiff's allegations that FirstBank delayed filing SARs for years, which enabled Epstein's trafficking and benefited FirstBank. Plaintiff alleges FirstBank knew of investigations into Epstein's sex-trafficking and of numerous red flags and "failing to file suspicious activity reports." *Deutsche Bank/JP Morgan*, 671 F. Supp. 3d at 409; Compl. ¶¶ 40–52, 65–67, 75, 80–83, 240, 290, 296–97.[8]

### III. PLAINTIFF HAS PROPERLY PLED HER GENDER MOTIVATED VIOLENCE PROTECTION ACT CLAIM.

Defendants' attack on Plaintiff's GMVPA claim fails at every step. First, Plaintiff plausibly alleges that FirstBank enabled, participated in, or conspired in the underlying gender-motivated violence by providing substantial assistance that went well beyond routine banking services. As explained *supra*, First Banks' involvement "went beyond a mere arm's length transaction."

Second, the GMVPA applies here because the relevant conduct was directed into New York as a part of a "series of acts" and, in any event, New York courts have recognized the statute's broad territorial reach. "[S]o long as at least some of the acts transpired within New York City, the GMVA would cover the entire series of acts." *M.H. v. S.A.*, 2025 WL 3034263, at *7 (N.Y. Sup. Ct. Oct. 29, 2025). FirstBank directed its tortious conduct into New York, the epicenter of Epstein's sex trafficking. *See supra* I.A.[9] At a time when other financial institutions refused to continue doing business with Epstein, FirstBank continued directly facilitating his sexual abuse in New York by facilitating payment to New York abuse victims. Ex. D, [redacted].

---

[8] Contrary to FirstBank's argument, Reply at 6, Plaintiff alleges FirstBank benefited from its relationship with Epstein and his connections, including de Jongh. Compl. ¶¶ 93, 226, 230, 253.

[9] Also, Plaintiff's status as a New York resident at the time of the abuse "is sufficient to bring those claims or causes of action . . . even where . . . the wrongful conduct underlying the New York resident's causes of action occurred out-of-state," as held by the Second Circuit and three of the four intermediate New York courts. *Smith v. Pro Camps, Ltd.*, 210 N.Y.S.3d 173, 175 (2024); *Sutton v. Tapscott*, 120 F.4th 1115, 1121 (2d Cir. 2024).

Third, despite Defendants' arguments that the GMVPA is preempted, the only Court to assess whether the 2026 GMVPA amendment is preempted held that it is not. *See* Pl.'s Opp. Br. at 25; *De Deus v. Indyke*, 2026 WL 2081815, at *1 (N.Y. Sup. Ct. July 07, 2026). Further, this Court explicitly held that dismissing a GMVPA claim for being preempted would be premature in light of the certified question before the New York Court of Appeals and also "risks ruling at odds with the Second Circuit[]." *Rivers v. Combs*, 2025 WL 2414117, at *9 (S.D.N.Y. Aug. 19, 2025).

Fourth, just as the revival component of § 10-1104.1 is constitutional, so too is the statute's retroactive nature. A statute applies retroactively when its language "expressly or by necessary implication requires it." *Gottwald v. Sebert*, 40 N.Y. 3d 240, 258 (2023) (citation omitted). Courts assess whether "retroactivity is explicitly stated or clearly indicated . . . [and] remedial legislation should be given retroactive effect." *Doe v. Combs*, 2024 WL 4987044, at *3 (S.D.N.Y. Dec. 5, 2024) (internal citation omitted). Here, the New York City Council passed the 2026 GMVPA amendment, acting quickly to close the loophole that the First Appellate Division, created when it held that the GMVPA did not apply retroactively.[10] Passing the 2026 GMVPA amendment "made a specific pronouncement about retroactive effect," "conveyed a sense of urgency," and rewrote "an unintended judicial interpretation." *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122 (2001). Accordingly, Plaintiff has adequately stated a claim under the GMVPA.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Plaintiff's Opposition, the Court should deny First Bank's Motion to Dismiss in its entirety.

---

[10] *See* Nov. 25, 2025 Council of N.Y.C. Comm. Rep. of Leg. Div.: Comm. on Women & Gender Equity; Oct. 16, 2025 Council of N.Y.C. Comm. Rep. of Leg. Div.: Comm. on Women & Gender Equity at 20 (2026 GMVPA amendment "addresses retroactivity . . . as claims may be brought against any individual or entity for acts committed before the GMVA's substantive amendment in 2022.").

Dated: September 16, 2026

Respectfully submitted,

*<u>/s/ David Boies</u>*
David Boies
Andrew Villacastin
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com

Sigrid McCawley
Daniel Crispino
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Dean Kaire
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@cvlf.com
Email: brittany@cvlf.com
Email: dean@cvlf.com

*Counsel for Plaintiff Jane Doe*

**CERTIFICATE OF COMPLIANCE**

I, David Boies, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law was prepared using Microsoft Word and complies with Rule 2(e) of this Court's Individual Rules and Local Rule 7.1(c).

*/s/ David Boies*