**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIA MOLCHONOVA, individually and on behalf of<br>all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FIRSTBANK PUERTO RICO and FIRST BANCORP,<br><br>Defendants. | Case No. 26-cv-5327 (JSR) |

**PLAINTIFF JULIA MOLCHONOVA'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS


ARGUMENT ........ 1

A. The Requirements of Rule 23(a) Are Satisfied. ........ 2

1. Rule 23(a)(1)—Numerosity Is Satisfied Where the Trafficking Venture Injured Hundreds—and Potentially Over a Thousand—Victims During the Class Period 2

2. Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist ........ 3

3. The Class Is Sufficiently Ascertainable ........ 6

4. Rule 23(a)(3)—Plaintiff's Claims are Typical ........ 7

5. Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class ........ 10

B. The Requirements of Rule 23(b)(3) Are Satisfied. ........ 12

1. Common Questions of Law and Fact Predominate ........ 12

2. A Class Action is Superior to Other Methods of Adjudication ........ 22

C. The Court Should Appoint Boies Schiller Flexner LLP and Edwards Henderson PLLC as Class Counsel. ........ 24

CONCLUSION ........ 25

**TABLE OF AUTHORITIES**

**Cases**

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)........................................................................................... 12, 23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)............................................................................................... 2

*Baldwin v. TMPL Lexington LLC*,
2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024)...................................................... 4

*Breest v. Haggis*,
180 A.D.3d 83 (N.Y. 2019) ........................................................................... 5, 13, 23

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)................................................................................... 3

*Chalmers v. City of New York*,
2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022)....................................................... 12

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995)..................................................................................... 2

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)................................................................................... 10

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015) .......................................................................... 7

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
671 F. Supp. 3d 387 (S.D.N.Y. 2023)..................................................................... 1

*Doe 1 v. JPMorgan Chase Bank, N.A.*,
2023 WL 3945773 (S.D.N.Y. June 12, 2023) ................................................... passim

*Doe v. Bank of Am., N.A.*,
819 F. Supp. 3d 314 (S.D.N.Y. 2026)........................................................... 1, 4, 17

*Doe v. Doe*,
83 Misc. 3d 408 (N.Y. Sup. Ct. 2024) .................................................................... 6

*Doe v. Jackson*,
2025 WL 753949 (S.D.N.Y. Mar. 10, 2025) ..................................................... 6, 13

*Doe v. Mindgeek USA Inc.*,
702 F. Supp. 3d 937 (C.D. Cal. 2023) .................................................................. 11

*Ebin v. Kangadis Food Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) .................... 6

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) .................... 6

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) .................... 12

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) .................... 23

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992).................... 11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .................... 11

*In re MF Global Holdings Ltd. Inv. Litig.*,
310 F.R.D. 230 (S.D.N.Y. 2015) .................... 10

*In re Petrobras Secs.*,
862 F.3d 250 (2d Cir. 2017).................... 12

*In re Towers Fin. Corp. Noteholders Litig.*,
177 F.R.D. 167 (S.D.N.Y. 1997) .................... 12

*Lopez v. Setauket Car Wash & Detail Ctr.*,
314 F.R.D. 26 (E.D.N.Y. 2016) .................... 3

*M.H. v. S.A.*,
2025 WL 3034263 (N.Y. Sup. Ct. Oct. 29, 2025) .................... 6

*M.K.B. v. Eggleston*,
445 F. Supp. 2d 400 (S.D.N.Y. 2006).................... 13

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997).................... 2, 3

*Maywalt v. Parker & Parsley Petroleum Co.*,
147 F.R.D. 51 (S.D.N.Y. 1993) .................... 13

*Menocal v. GEO Grp., Inc.*,
882 F.3d 905 (10th Cir. 2018) .................... 3

*Novoa v. GEO Grp., Inc.*,
2019 WL 7195331 (C.D. Cal. Nov. 26, 2019).................... 7

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018) ........ 13

*Pub. Employees' Ret. Syst. Of Mississippi v. Merrill Lynch & Co.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ........ 3, 7, 10

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ........ 14

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) ........ 6, 12

*Sykes v. Mel Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ........ 3

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) ........ 7

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ........ 12

*United States v. Morrison*,
529 U.S. 598 (2000) ........ 23

*Villella v. Chem. & Mining Co. of Chile, Inc.*,
333 F.R.D. 39 (S.D.N.Y. 2019) ........ 7

**Statutes**

18 U.S.C. § 1591 ........ 4, 5, 14, 22

18 U.S.C. § 1594 ........ 5

18 U.S.C. §§ 2421–2423 ........ 5

N.Y. Penal Law § 130 ........ 5

N.Y.C. Admin Code § 10-1101-1107 ........ 4, 14

N.Y.C. Admin. Code § 10-1102 ........ 23

N.Y.C. Admin. Code § 8-902 ........ 23

**Rules**

Fed. R. Civ. P. 23 ........ passim

Plaintiff Julia Molchonova respectfully submits this memorandum of law in support of her Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification of the following Class, identified in the Complaint:

> All women who were sexually abused or trafficked by Jeffrey Epstein or Epstein's co-conspirators during the time when FirstBank maintained bank accounts for Epstein, Epstein's co-conspirators, Epstein related-entities, and/or Epstein-related accounts (the "Class Period").

Compl. ¶ 254. Jeffrey Epstein's "grotesque misconduct" has been "widely recounted, including in other decisions of this Court," *Doe v. Bank of Am., N.A.*, 819 F. Supp. 3d 314, 321 (S.D.N.Y. 2026) (citing *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 396–400 (S.D.N.Y. 2023)); *see also Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *1 (S.D.N.Y. June 12, 2023). Accordingly, Plaintiff limits this motion to the facts that are particularly relevant to class certification in ***this*** case, including the common issues of fact concerning FirstBank Puerto Rico and First BanCorp's (collectively, "FirstBank") knowledge and facilitation of Epstein's sex-trafficking venture and the typicality of Plaintiff's claims.

## ARGUMENT

"A class may be certified if it satisfies each of the requirements of Rule 23(a) and satisfies at least one of the provisions of Rule 23(b)." *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *1. Rule 23(a) requires: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Fed. R. Civ. P. 23(a). Plaintiff seeks certification under Rule 23(b)(3), which requires that common questions "predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(4).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the

certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Courts must interpret Rule 23 liberally, including by "adopt[ing] a standard of flexibility" in determining whether a proposed class satisfies its requirements. *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (citation omitted). Here, the proposed class easily meets Rule 23(a)'s threshold requirements, and this action further qualifies for certification under Rule 23(b)(3).[1]

**A. The Requirements of Rule 23(a) Are Satisfied.**

1. Rule 23(a)(1)—Numerosity Is Satisfied Where the Trafficking Venture Injured Hundreds of Victims During the Class Period

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Courts presume numerosity at forty members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Here, the proposed class easily clears that threshold. It consists of all women who were sexually abused or trafficked by Epstein or his co-conspirators during the time period that FirstBank maintained bank accounts for Epstein, his co-conspirators, and associated entities—a number measuring in the hundreds by all accounts. The scale of Epstein's trafficking operation satisfies the numerosity requirement: the DOJ has stated that Epstein harmed over 1,000 victims, Ex. 9, Ex. 27, and Plaintiff's attorneys collectively have represented more than 250 victims since 2008. *See* Declaration of David Boies ("Boies Decl."), at ¶ 8; Ex. 1[2], Declaration of Bradley J.

[1] In cases against Deutsche Bank, JP Morgan, and Bank of America, the Court certified a Rule 23(b)(3) class of "[a]ll women who were sexually abused or trafficked by Jeffrey Epstein during the time when JP Morgan maintained [accounts] for Epstein and/or Epstein-related entities," reasoning that common questions predominated. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *1, *10; *Doe 1 v. Deutsche Bank Aktiengesellscha*ft, Case No. 22-cv-10018, (S.D.N.Y. Oct. 20, 2023) (Order and Final Judgment at 2–3, ECF No. 122).

[2] References to "Ex." are to exhibits to the Boies Decl., filed concurrently hereto.

Edwards ("Edwards Decl."), at ¶ 4.

As this Court noted during the hearing for final settlement approval in the case against Bank of America, "[n]umerosity, which is Rule 23(a)(1), is the class is so numerous that joinder of all members is impracticable. That's very clearly the case here. . . The Second Circuit has a presumption after at least 40 members of the class numerosity is satisfied here. There's many more than 40, so it's an easy decision." *Doe v. Bank of America, N.A.*, No. 1:25-cv-08520 (S.D.N.Y. Aug. 27, 2026) (Hr'g Tr., ECF No. 166 at 2:16–22).

2. Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist

Rule 23's commonality requirement is met if all class members' claims share a common question of law or of fact. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007). Even a single common question of law or fact may suffice. *Pub. Emps.' Ret. Syst. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) (Rakoff, J.).

A question is common to the class if it is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Lopez v. Setauket Car Wash & Detail Ctr.*, 314 F.R.D. 26, 28 (E.D.N.Y. 2016) (citation omitted). The requirement is satisfied where there is a uniform policy or practice that affected all class members. *See Sykes v. Mel Harris & Assocs. LLC*, 780 F.3d 70, 87–88 (2d Cir. 2015); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 920 (10th Cir. 2018) (finding commonality where plaintiffs asserted TVPA claims based on a common policy); *Marisol A.*, 126 F.3d at 377 (affirming commonality where the plaintiffs' "injuries derive from a unitary course of conduct by a single system."). This accommodating standard is met here.

Plaintiff brings two claims under the Trafficking Victims' Protection Act of 2000

(“TVPA”) on behalf of the class. Count I is a beneficiary liability claim under 18 U.S.C. § 1591(a)(2), the elements of which are that (1) “defendant participated in a commercial sex trafficking venture”; (2) “the defendant knew or should have known that the venture either involved the perpetrator’s use of force, the threat of force, fraud, or coercion to cause the victims to participate in sex or that the venture involved sex with victims who were under the age of 18”; and (3) “the defendant benefited from its participation in the venture.” *Bank of Am., N.A.*, 819 F. Supp. 3d 314 at 327; *see also* Compl. ¶¶ 264–85. Count II claims obstruction of TVPA enforcement, requiring proof FirstBank knowingly and intentionally obstructed, attempted to obstruct, interfered with, or prevented an investigation or prosecution into Epstein for trafficking. *See* 18 U.S.C. § 1591(d); *see also* Compl. ¶¶ 286–305.

Plaintiff also brings one claim under the Gender-Motivated Violence Protection Act (“GMVPA”), N.Y.C. Admin Code § 10-1101, *et seq.* (Count III). The GMVPA, as amended in 2026, provides a cause of action for plaintiffs to pursue a claim against a party who “commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender” that occurred before January 9, 2022. N.Y.C. Admin Code §§ 10-1101–1107. The elements of a GMVPA claim are a showing that FirstBank “enable[d], participate[d] in, or conspire[d] in,” (*id.*), “(1) the alleged act [that] constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff’s gender; (3) in part because of animus against plaintiff’s gender; and (4) resulted in injury.” *Baldwin v. TMPL Lexington LLC*, 2024 WL 3862150, at *12 (S.D.N.Y. Aug. 19, 2024). The acts of sex trafficking, commercial sexual exploitation, sexual battery, sexual abuse, rape, and forcible touching committed against Plaintiff and the class members by Epstein and his co-conspirators, each separately and together constitute

"crime[s] of violence" within the meaning of the GMVPA.[3] *See Breest v. Haggis*, 180 A.D.3d 83, 88 (N.Y. 2019) (recognizing that allegations of rape and sexual assault are sufficient to state a crime of violence committed with animus on the basis of gender).

Each of these claims requires addressing common questions of law and fact shared by all class members. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *4. As to the TVPA participation claim, common questions include at least the following:

- Whether Jeffrey Epstein ran a sex-trafficking venture;
- Whether FirstBank knew or should have known about Epstein's sex-trafficking venture, which will be shown through testimony and evidence from FirstBank's employees;
- Whether FirstBank benefited from the trafficking venture, which will be shown through evidence of revenues FirstBank earned from Epstein's and his close co-conspirators' accounts, their recruitment of additional customers for FirstBank, and their growing network to high-net-worth individuals;
- Whether FirstBank participated in the venture by, for example, facilitating wire transfers used to pay class members for commercial sex, paying funds to co-conspirators, or deliberately failing to file reports, including SARs, that might result in government intervention.

As to the obstruction claim, each class member would have to prove common questions of knowledge, intent, and whether FirstBank obstructed a prosecution or investigation.

[3] The conduct alleged would, as to each Plaintiff and class member, constitute one or more misdemeanors or felonies against the person under, inter alia, New York Penal Law Article 130 (including §§ 130.20 (sexual misconduct), 130.25–130.35 (rape in the third, second, and first degrees), 130.52 (forcible touching), 130.55–130.65 (sexual abuse in the third, second, and first degrees), and 130.65-a (aggravated sexual abuse in the fourth degree)); the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1591, 1594; and the Mann Act, 18 U.S.C. §§ 2421–2423. Criminal charge or conviction is not an element of this Count.

As to the GMVPA claim, each class member will need to prove common questions of whether FirstBank enabled or participated in Epstein's venture and whether the abuse was perpetrated because of gender animus.[4] These questions overlap with the TVPA beneficiary liability claim's common questions of law and fact and are appropriately decided on a class basis. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011) (holding that state employment law class could be certified alongside FLSA collective action where claims derived from common nucleus of operative facts, common questions predominated); *see also Doe v. Jackson*, 2025 WL 753949, at *7 (S.D.N.Y. Mar. 10, 2025) (concluding alleged acts of rape and sex trafficking were sufficient to state a claim under the GMVPA).

3. <u>The Class Is Sufficiently Ascertainable</u>

The Second Circuit recognizes an implied requirement of ascertainability, or that "the identity of class members must be reasonably ascertainable by reference to objective criteria." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566–67 (S.D.N.Y. 2014) (Rakoff, J.). Ascertainability requires only that a proposed class is defined using objective criteria that establish membership with definite boundaries. *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716 (2d Cir. 2023). A class definition meets that requirement by providing the timeframe and place in which a particular group was harmed. *Id*. "That is all that is needed." *Id*.

This Court, citing *Fikes*, recently determined that a similar class definition in a class action against Bank of America was ascertainable because the class was defined using objective criteria that establish a member with definite boundaries. *Doe v. Bank of America, N.A*., Docket No. 1:25-

[4] Courts have recognized the statute's broad territorial reach. *See, e.g*., *M.H. v. S.A*., 2025 WL 3034263, at *7 (N.Y. Sup. Ct. Oct. 29, 2025) ("[S]o long as at least some of the acts transpired within New York City, the GMVA would cover the entire series of acts"); *Doe v. Do*e, 83 Misc. 3d 408, 415 (N.Y. Sup. Ct. 2024) (recognizing that abuse occurring outside of NY supports a GMVPA claim if the victim was a resident of NY at the time of her abuse).

cv-08520 (S.D.N.Y. Aug. 27, 2026) (Hr'g Tr., ECF No. 166 at 4:5–7:1). Here too class membership is ascertainable by objective criteria. The class includes women abused or trafficked by Epstein throughout the period that FirstBank maintained bank accounts for him, his affiliated entities, or his co-conspirators. The class may be ascertained by reference to publicly available information including law enforcement reports, legal proceedings, statements to the media, and documents produced by FirstBank. *Id*. (recognizing that "the ascertainability requirement, even under the more severe requirements required by other circuits, has been satisfied here," where class members could be ascertained from prior litigations, social media, and Ms. Lelchuk's cooperation); *see also JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *5.

4. Rule 23(a)(3)—Plaintiff's Claims are Typical

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). The typicality requirement "is not demanding." *Pub. Emps.' Ret. Sys. of Miss.*, 277 F.R.D. at 107 (citation omitted). "Plaintiffs are not required, in proving typicality, to show that the situations of the named representatives and the class members are identical." *Id*. at 109; *see also Robidoux*, 987 F.2d at 936–37 (explaining typicality requirement is met "irrespective of minor variations in the fact patterns underlying the individual claims"). Instead, courts focus on the defendant's uniform course of conduct. *See Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113–14 (S.D.N.Y. 2015). And typicality does not "require that damages be identical among class members." *Villella v. Chem. & Mining Co. of Chile, Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019) (citation omitted); *Novoa v. GEO Grp., Inc.*, 2019 WL 7195331, at *14 (C.D. Cal. Nov. 26, 2019) (explaining in a TVPA case that "[t]he typicality requirement can be met notwithstanding varying fact patterns supporting class

member claims, and this extends to disparity in damages by the representative plaintiffs").

Plaintiff's claims are representative of those of the Class because her claims arise from FirstBank's uniform practice of providing extensive financial services to Epstein that enabled him to traffic and abuse victims in the Class at an unprecedented scale, evading government detection and oversight through FirstBank's complicity. Indeed, FirstBank presents a potentially even stronger narrative than the cases against other financial institutions: FirstBank was Epstein's ***longest-serving*** bank—maintaining his accounts for nearly three decades—and was the ***last institutional holdout***, continuing to bank Epstein even after JPMorgan and Deutsche Bank had terminated their relationships with him. Like the other class members, Plaintiff suffered injuries during Epstein's relationship with FirstBank, caused by the sex-trafficking venture, and pursuant to Epstein's well-established modus operandi. Compl. ¶¶ 284–85, 304–05; Ex. 2 at 17–31.

Epstein's modus operandi is widely known. He targeted vulnerable women and young girls, dangling money, opportunities, and access to powerful individuals, then using threats, coercion, and indoctrination to force submission. Compl. ¶¶ 24, 33(c), 152; *see also* Ex. 2 at 27, 30; Ex. 35; Ex. 53. He promised career advancement, education, and a better life, positioning himself as the sole provider of those opportunities. Compl. ¶¶ 33(b), 147, 159; Ex. 2 at 4, 24; Ex. 35. He paid for travel, housing, and medical services, intentionally creating financial dependence that left victims unable to escape. Compl. ¶¶ 147, 159; Ex. 35. Epstein then demanded gratitude through submission and forced sex acts, and threatened financial, reputational, and personal ruin if victims refused. This modus operandi is common to the TVPA and GMVPA claims.

Epstein did not act alone. His venture depended on co-conspirators who recruited victims, managed the financial infrastructure funding their abuse, and maintained control over their lives. Compl. ¶¶ 150–51, 157, 161; Ex. 35; Ex. 2 at 22, 28. Ghislaine Maxwell procured victims by

recruiting young women and grooming them for abuse; she was convicted on five federal sex-trafficking counts and is serving nearly 20 years in prison. Compl. ¶¶ 40, 52–53; Ex. 35; Darren Indyke (Epstein's in-house attorney) and Richard Kahn (his longtime accountant) were the operational architects of the venture's financial system, "control[ling] the movement of funds through Epstein's bank accounts and oversaw virtually every aspect of the financial infrastructure that paid for Epstein's sex trafficking activities." Compl. ¶ 56; Ex. 49. At Epstein's direction, they structured hundreds of bank accounts, created dozens of corporate entities, made large cash withdrawals, and authorized thousands of suspicious wire transfers—with Indyke structuring withdrawals to avoid triggering federal reporting requirements. Compl. ¶¶ 57–58; Ex. 49; Ex. 50. Indyke was a signatory on twenty FirstBank accounts. Ex. 37. Both he and Kahn served as officers and directors of shell entities holding properties where Epstein harbored and abused victims, including Nautilus, Inc. (Little St. James), Cypress, Inc. (Zorro Ranch), Maple, Inc. (New York townhome), and Laurel, Inc. (Palm Beach mansion). Compl. ¶¶ 134, 138, 198; Ex. 40. Kahn also serviced victims' taxes and devised schemes to entrap them. Compl. ¶¶ 47, 56. Erika Kellerhals, a USVI tax attorney, organized shell entities, acted as trustee for trusts paying victims, managed real estate transfers, and was the primary day-to-day contact between the Epstein organization and FirstBank. Compl. ¶¶ 48, 130; *see also* Ex. 40; Ex. 42; Ex. 43; Ex. 44. Other co-conspirators who communicated with FirstBank included Harry Beller and Eric Gany (accountants who paid victims and held hush money), Lesley Groff (executive assistant and signatory), Cecile de Jongh (former first lady of USVI), Jeanne Brennan, and Bella Klein (assistant and signatory). Compl. ¶ 47, 93, 131, 230(e); Ex. 35; Ex. 2 at 60–61. Each was positioned to convey to FirstBank the information necessary for the Bank to know—and act upon—the nature of the conduct it was facilitating. Compl. ¶ 131.

Plaintiff was one of Epstein's many victims, abused, controlled, and intimidated for years while he banked at FirstBank; her experience is typical of the other class members. Compl. ¶¶ 147–52; Ex. 2 at 12, 24–25. Epstein targeted Plaintiff in Russia in 2011, and he and his co-conspirators groomed her, instilling fear and dependence through constant reminders of his wealth and power, and threatening severe harm if she did not comply. Compl.¶¶ 149–51. From 2011 to 2019, Epstein sexually assaulted Plaintiff on at least 100 occasions, recruiting and transporting her across state lines and in foreign commerce, including to the U.S. Virgin Islands. *Id.* ¶¶ 153, 155–56. As with other victims, Plaintiff was repeatedly paid through cash, gifts, and financial support so Epstein could maintain control. *Id.* ¶¶ 159–60. Throughout, FirstBank maintained Epstein's accounts and processed financial transactions funding his sex-trafficking venture, without filing legally required SARs or alerting law enforcement. *Id.* ¶¶ 3–4, 7, 129, 239–44. Plaintiff's injuries are representative of those of the Class and easily satisfy the typicality requirement. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *5.

5. <u>Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class</u>

Under Rule 23(a)(4), the representative parties must "fairly and adequately protect the interests of the class." *See In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 237 (S.D.N.Y. 2015). "A finding that a proposed class representative satisfies the typicality inquiry constitutes strong evidence that [its] interests are not antagonistic to those of the class." *Pub. Emps' Ret. Sys. of Miss.*, 277 F.R.D. at 109 (citation modified). Even if a conflict exists, it must be "fundamental" to defeat certification. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Here, Plaintiff will "fairly and adequately" represent the Class. Plaintiff's interests align with the class members' interests; she has no interests adverse to those of other class members;

she is committed to vigorously prosecuting this action on behalf of the Class as has been demonstrated by her defense of her Complaint and jurisdictional grounds to bring her case; and she will continue to pursue this matter aggressively until final resolution. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *7 (explaining that plaintiff was a "strong" representative for a class of Epstein victims in a TVPA action because she was "incentivized to promote the interests of the class, since her own interest—like that of other class members—is to secure a judgment against JP Morgan and to secure as large an award of damages as is possible"); *see also Doe v. Mindgeek USA Inc.*, 702 F. Supp. 3d 937, 947–48 (C.D. Cal. 2023) (finding a survivor-plaintiff to be an adequate representative where her claims aligned with the class, giving her "every reason to vigorously pursue those claims"). Plaintiff has subjected herself to the emotional process of reliving her abuse and will continue to do so during discovery, including depositions, and the remainder of this litigation. *Mindgeek USA Inc.*, 702 F. Supp. 3d at 947–48, 952; *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015).

Plaintiff, through her counsel, intensely defended FirstBank's motion to dismiss, participated in jurisdictional discovery, briefed related discovery disputes, including FirstBank's spoliation of key documents, and participated in several telephonic and in-person hearings with the Court. Moreover, Plaintiff's counsel is "qualified, experienced and generally able to conduct the litigation." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992) (citation modified). Plaintiff's counsel includes attorneys experienced in class actions, complex litigation, and Epstein-related cases. They have demonstrated their dedication through successful multi-million-dollar settlements in lawsuits against Deutsche Bank, JP Morgan, and Bank of America, and through their contributions to the arrest and prosecution of Epstein, Maxwell, and Brunel. Rule 23(a)(4) is amply satisfied.

**B. The Requirements of Rule 23(b)(3) Are Satisfied.**

Plaintiff can also demonstrate certification is appropriate under Rule 23(b)(3) because common questions predominate and resolving these claims by class action is superior to individual adjudication.

1. Common Questions of Law and Fact Predominate

Rule 23(b)(3) certification "does not require a plaintiff to show that *no* individual issues exist; that would be an impossibly high standard." *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *8; *see also Chalmers v. City of New York*, 2022 WL 4330119, at *17 (S.D.N.Y. Sept. 19, 2022) (citation omitted) ("The predominance requirement calls only for predominance, not exclusivity, of common questions."). Rather, certification requires only that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 213–14 (S.D.N.Y. 2021). "[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.'" *In re Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)); *see also JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *8 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

Here, Plaintiff brings claims for violation of the TVPA and the GMVPA. Those claims arise out of the same core facts—FirstBank's knowing participation in Epstein's sex-trafficking venture—and will be proven with common evidence. *See Shahriar*, 659 F.3d at 245; *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 172 (S.D.N.Y. 1997) (certifying state law claims alongside federal securities claims, where both arose out of the same conduct as the federal claims

and proof at trial would be the same for both); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 55 (S.D.N.Y. 1993) (certifying class alleging state and federal law claims because they alleged a common course of conduct by defendants). Factual questions affecting individual members cannot defeat class certification given the common issues regarding FirstBank's liability. *See, e.g.*, *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 441 (S.D.N.Y. 2006) (certifying class of immigrants denied public benefits even though "each member of the class was denied benefits for slightly different reasons and under slightly different circumstances").

With respect to the TVPA claims, the "TVPA's explicit statutory language makes clear that a 'reasonable person' standard applies in determining whether a particular harm (or threat of harm) is sufficiently serious" to force compliance, any claim that litigating "coercion" under the TVPA "would require an individualized consideration of each putative class member is mistaken." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018).

Further, the central question of whether FirstBank's institutional conduct knowingly enabled or constitutes participation in Epstein's sex-trafficking venture is identical across the class under the TVPA and the GMVPA. The GMVPA's gender-animus element is likewise a common question because allegations of rape and sexual assault, including sex trafficking, satisfy this element. *See Breest*, 180 A.D.3d at 94; *see also Jackson*, 2025 WL 753949, at *7.

Proof pertaining to specific class members does not predominate over the core common questions regarding FirstBank's liability to the class members. The fact that damages determinations may be individualized does not alter this fact or undermine the appropriateness of class certification. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *10 ("[I]t is well-established that the fact that damages may have to be ascertained on an individual basis is not

sufficient to defeat class certification") (citation omitted); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3)."). Plaintiff's TVPA and GMVPA claims require adjudication and proof of common issues of law and fact including, but not limited to, the following:

**a. Whether Epstein ran a sex-trafficking venture.** Proof of the existence of the venture is common to the Class and will be established by evidence including, *e.g.*, testimony from victims and witnesses about the operation of Epstein's trafficking venture, documents from law enforcement, documents released by the Department of Justice pursuant to the Epstein Files Transparency Act, and documents produced by the Epstein Estate regarding the venture.[5] Indeed, there can be no dispute that Epstein's sex-trafficking venture existed. *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *9–10.

**b. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1) and the Gender Motivated Violence Protection Act, N.Y.C. Admin. Code § 10-1103.** Proof of this fact is common to the Class and would involve financial records reflecting payments to victims, documents released by the Department of Justice pursuant to the Epstein Files Transparency Act, and documents produced by the Epstein Estate regarding the sex-trafficking venture.

[5] Epstein was charged for the conduct underlying his sex-trafficking venture twice. After receiving a complaint, the Palm Beach Police Department identified more than 30 girls who Epstein sexually abused at his Palm Beach mansion. Ex. 4. In 2006, the Palm Beach Police Department investigation was turned over to the United States Attorney's Office, which after identifying nearly forty underage victims, entered into a non-prosecution agreement ("NPA") pursuant to which Epstein plead guilty to prostitution charges. Ex. 7. A decade later, on July 2, 2019, the U.S. Attorney's Office for the Southern District of New York charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591. Ex. 8. Epstein died in jail on August 10, 2019.

**c. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce.** Proof of this fact is common to the Class and would entail, *e.g.*, testimony of victims and witnesses and production of documents from law enforcement, documents released by the Department of Justice pursuant to the Epstein Files Transparency Act, and documents produced by the Epstein Estate regarding the sex-trafficking venture, including, flight manifests kept by Epstein's pilots showing Epstein transporting young females on his private planes. Ex. 13.

**d. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts.** Proof of this fact is common to the Class and would entail, *e.g.*, testimony of victims and witnesses which should not needlessly be duplicated and documents that show Epstein and his co-conspirators threatened the victims. *See, e.g.*, Ex. 5; Ex. 6, at 55:20–57:5; (deposition testimony detailing Epstein's abuse and threats in *Giuffre v. Maxwell*, No. 15-cv-07433 (S.D.N.Y.)).

**e. Whether FirstBank participated, enabled, and conspired in Epstein's sex-trafficking venture**. Proof of this fact is common to the Class and would rely on FirstBank's internal documents, records, and memoranda showing how FirstBank supported Epstein's sex-trafficking venture, and testimony of current and former FirstBank employees. To date, evidence shows that FirstBank participated in Epstein's sex-trafficking venture by:

1. Opening over 30 accounts for Epstein-related entities and agents without due diligence despite FirstBank's actual and constructive knowledge of his sex crimes. Compl. ¶¶ 4, 67, 133, 140–42; Ex. 45; [redacted]
2. Opening a work-release employment account used to pay victims while Epstein was

incarcerated. Compl. ¶ 202;

3. [redacted] Ex. 59 (reflecting payment from Epstein-related FirstBank account to victim);

4. Facilitating transfers from Epstein to known co-conspirators, including a July 2011 $10.9 million wire from a FirstBank account to Maxwell's JPMorgan account and then back to Epstein-related accounts, a classic example of layering. Compl. ¶ 219; Ex. 26. [redacted];

5. Designating Epstein as a "Platinum Banking" client and waiving fees in April 2016. Compl. ¶ 236; *see also* Ex. 30 (FirstBank memoranda confirming Epstein as a "large non-borrowing deposit Platinum Banking client" with "several companies with all of the accounts with FirstBank" and an average combined balance of over $5.3 million);

6. Serving as his personal banking reference. Compl. ¶ 232. By serving as a banking reference on Epstein's application to open Southern Country International, Ltd., Epstein's international banking entity, FirstBank lent its institutional credibility to help a convicted sex offender and known sex trafficker to obtain a license to run, in substance, his own bank, outside regulatory oversight, further enabling Epstein to conceal his crimes. Ex. 51; Ex. 55; Ex. 58;

7. Approving Epstein for a credit card in 2014 when other banks refused. Compl. ¶¶ 4, 224; Ex. 45;

8. Failing to timely file required SARs by ignoring red flags for years. Compl. ¶¶ 200, 207, 237–39, 296; Ex. 46;

9. Processing transfers between numerous Epstein-related accounts in a manner indicative of layering. Compl. ¶¶ 65, 207–08, 219; Ex. 26; [redacted]

10. Facilitating wire transfers at the direction of Epstein, his agents, and related entities (Compl. ¶¶ 130, 138(d), 219, 230(c)); *see also* Ex. 25; Ex. 22 [redacted]

[redacted];

11. FirstBank bankers actively offering specialized assistance to Epstein and associated individuals. *See* Ex. 32, (FirstBank banker offered to pick up documents from Epstein-related individual when she has them); Ex. 19 [redacted]

12. Absorbing monies from other financial institutions that had closed Epstein's accounts following his 2019 arrest. After JPMorgan, Deutsche Bank, and Fidelity had all terminated their relationships with Epstein, FirstBank remained the last institutional holdout—not only maintaining Epstein's accounts but actively accepting transfers from his shuttered accounts elsewhere. Ex. 47 [redacted].

**f. Whether FirstBank knew or recklessly disregarded the existence of Epstein's sex-trafficking venture**. Proof of this fact is common to the Class and would rely on evidence including, *e.g.*, FirstBank's internal documents and records, memoranda, testimony of current and former employees, written communications discussing the venture, media reports regarding the venture, and publicly available information about the venture demonstrating that FirstBank should have known about the venture.[6] [redacted].

Documents made public by the Department of Justice and received through the very early stages of discovery have shown that FirstBank employees were directly involved in opening,

[6] This is especially true with respect to the knowledge element of a TVPA participation liability claim, which the Court recently reaffirmed applies to the sex-trafficking venture and "does not require that the defendant know or recklessly disregard the fact that the force, fraud, or coercion was used with respect to plaintiff herself." *Bank of Am., N.A.*, 819 F. Supp. 3d at 330.

maintaining, and servicing Epstein's accounts, and the documentary record shows they possessed actual knowledge of his sex crimes throughout the relationship. Compl. ¶¶ 227–30, 239–42, 246; Ex. 11 ([redacted]). Despite this knowledge, it was only after his death that FirstBank finally acknowledged what should have been, and certainly was, obvious to it all along: Epstein was using his FirstBank accounts to fund his sex-trafficking venture and to remain hidden from law enforcement.

In April 2008, two days ***after*** civil lawsuits were filed against Epstein for sexual exploitation of young women in Florida, FirstBank approved personal accounts for Epstein, Darren Indyke, and Harry Beller as "high risk." Ex. 34. FirstBank also approved accounts for Epstein-related entities, including FT Real Estate, Inc., which was formed to "handle the management of and rental of real estate property owned by Mr. Jeffrey Epstein." Ex. 2 at 51; Ex. 34; Ex. 41. FirstBank knew and recklessly disregarded that these accounts were connected to Epstein who by this time had already been arrested in 2006 for child abuse and had violated the TVPA. Compl. ¶¶ 40–41; Ex. 4. FirstBank opened these accounts without conducting the requisite due diligence, despite Epstein's conviction, decades of public reporting of his crimes, and active civil litigation, and without any indication of the source of funds. Compl.¶¶ 67–129; Ex. 2 at 35–38, 40–41.

By 2016, FirstBank's own Platinum & Business Bank Manager acknowledged that Epstein "is a large non-borrowing Platinum Banking client" who "keeps $5.3MM at First Bank." Ex. 27; Ex. 33. Instead of distancing itself from Epstein like other financial institutions, FirstBank extended this preferential treatment to Epstein even as years of public reports detailed his crimes, absorbing him as a prized client when other major financial institutions refused to touch him. FirstBank was the last institutional holdout. Compl. ¶ 236; Ex. 47.

Between 2016 and 2019, FirstBank's compliance department [redacted] regarding Epstein-related entities but, remarkably, repeatedly failed to file the required SARs. Ex. 17; Ex. 3; Ex. 19; 54. [redacted].

[redacted]

[redacted].

[redacted]

[redacted] Around this time, [redacted] Ex. 47. Rather than follow suit with other financial institutions and abandon Epstein as a client, FirstBank accepted monies from his closed accounts, serving as the final repository for funds that every other major institution had refused. To make matters worse, [redacted] *Id*. at 3.

[redacted].

[redacted].

**g. Whether FirstBank benefited financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1).** Proof of this fact is common to the Class and would rely on evidence

including, *e.g.*, FirstBank's financial records, executive compensation, testimony of current and former employees that FirstBank earned millions of dollars from servicing Epstein's accounts and financial needs and the accounts and financial needs of his close co-conspirators, and customer referrals from Epstein, his co-conspirators, and wealthy network.

**h. Whether FirstBank knew or should have known that the Epstein sex-trafficking venture engaged in violations of the TVPA, 18 U.S.C. § 1591(a).** Proof of this fact is common to the Class and would rely on evidence including, that suggested in (e) and (f) above.

**i. Whether FirstBank obstructed the enforcement of the TVPA with respect to Jeffrey Epstein's sex-trafficking venture.** Proof of this fact is common to the Class and would rely on evidence including, that suggested in (e)–(h) above, which will illustrate FirstBank's failure to file SARs and intentional disregard of blatant indicia of international sex trafficking. The evidence discovered so far has shown it was not until [redacted]. Compl. ¶ 222; Ex. 46. In its untimely [redacted] Compl. *Id.*; Ex. 46. [redacted]. *Id.* Accordingly, common issues of law and fact subject to common proof predominate over individualized issues relating to Plaintiff's TVPA and GMVPA claims.

2. <u>A Class Action is Superior to Other Methods of Adjudication</u>

"A class action is superior to other available methods for fairly and efficiently adjudicating the controversy" in this context. Fed. R. Civ. P. 23(b)(3). The relevant factors include:

> (A) The class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

> the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* A Rule 23(b)(3) class is superior when it allows for the vindication of "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).

The TVPA was designed to protect victims of trafficking, who are vulnerable, may fear reprisal or the loss of anonymity, and wish to avoid repeatedly revisiting their past traumas. Class treatment is superior in this context. *See, e.g.*, *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *11 ("[W]hile the intensely personal nature of the claims at stake might give class members an interest in individually controlling their prosecution, it might also—to an equal or even greater extent—give them an interest in class-wide adjudication."). Similarly, the GMVPA was enacted by New York City to protect victims of sexual abuse and in direct response to the Supreme Court's decision in *United States v. Morrison*, which struck down the federal civil rights remedy for gender-motivated crimes under the Violence Against Women Act. *See Breest*, 180 A.D.3d 83 at 85; *see also* N.Y.C. Local L. No. 73 (codified at N.Y.C. Admin. Code § 8-902 (2000), and recodified as amended at N.Y.C. Admin. Code § 10-1102 (2018)).

As this Court explained in the final approval hearing in Bank of America, proceeding by class would also avoid a multiplicity of suits that would follow were the victims of Epstein's venture required to bring individual actions, and would prevent the unnecessary emotional trauma of bringing individual suits. *Doe v. Bank of America, N.A.*, Docket No. 1:25-cv-08520 (S.D.N.Y. Aug. 27, 2026) (Hr'g Tr., ECF No. 166 at 7:11–18) ("And, again, without going into endless detail here where there would be otherwise, at best, lawsuits not just across the country, but across the

globe, that it would be difficult for individual plaintiffs, many of whom have suffered severe psychological traumas, to come forward in a public lawsuit for their individual situations…there are common issues of law and fact that clearly overwhelm any individual differences.”). Further, several members of the Class are Eastern European and/or are not proficient in English and lack familiarity with the U.S. legal system such that class treatment would be preferable and equitable. *JPMorgan Chase, N.A.*, 2023 WL 3945773, at *11.

### C. The Court Should Appoint Boies Schiller Flexner LLP and Edwards Henderson PLLC as Class Counsel.

Rule 23(g)(1) provides that “a court that certifies a class must appoint class counsel,” and:

> In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel’s experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel’s knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1).

Under these criteria, Boies Schiller Flexner LLP (“BSF”) and Edwards Henderson PLLC (together, “Proposed Class Counsel”) meet Rule 23(a)(4)’s adequacy requirement and should be appointed as Class Counsel under Rule 23(g). Proposed Class Counsel invested substantial time and resources investigating Plaintiff’s claims, prosecuting this case, and gathering discovery. Since filing the initial complaint, they have participated in discovery, including taking two depositions, responded to FirstBank’s motion to dismiss, attended a hearing, prepared supplemental briefing on jurisdictional issues, and litigated discovery disputes. Proposed Class Counsel have worked vigorously to represent the Class in this case and in other matters before this Court and other courts, as well as before the Department of Justice and Congress. *See* Boies Decl. at ¶¶ 3, 5, 8, 10, 11; Ex. 1, Edwards Decl. at ¶ 3.

Proposed Class Counsel are well qualified and have substantial experience in class actions,

complex litigation, banking matters, and cases related to Epstein's sex-trafficking venture. In Class Counsel's recent representation of victims in class actions against Deutsche Bank, this Court commended them for their "extraordinarily laudable" work, *Doe 1 v. Deutsche Bank Aktiengesellschaf*t, Case No. 22-cv-10018, (S.D.N.Y. Oct. 20, 2023) (Final Approval Hr'g, ECF No. 123 at 10:23); *see also Doe v. Bank of America, N.A.*, Docket No. 1:25-cv-08520 (S.D.N.Y. Aug. 27, 2026) (Hr'g Tr., ECF No. 166 at 7:11–18). Thus, Rule 23(g) is satisfied.

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiff as the Class Representative; (3) appointing Boies Schiller Flexner LLP and Edwards Henderson PLLC as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: September 17, 2026

Respectfully submitted,

*/s/ David Boies*

David Boies
Andrew Villacastin
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com

Sigrid McCawley
Daniel Crispino
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022

Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com

Bradley J. Edwards
Brittany N. Henderson
Dean Kaire
Edwards Henderson
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@cvlf.com
Email: brittany@cvlf.com
Email: dean@cvlf.com

*Counsel for Plaintiff Julia Molchonova*

**CERTIFICATE OF COMPLIANCE**

I, David Boies, hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law was prepared using Microsoft Word and complies with Rule 2(e) of this Court's Individual Rules and Local Rule 7.1(c).

*<u>/s/ David Boies</u>*