UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIA MOLCHONOVA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

FIRSTBANK PUERTO RICO and FIRST BANCORP,

Defendants.

26-cv-5327 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.

On September 25, 2026, this Court issued a "bottom-line" Order granting in part and denying in part the motion of defendants FirstBank Puerto Rico and First Bancorp (collectively "FirstBank") to dismiss the complaint brought by plaintiff Julia Molchonova. See ECF No. 67. This Opinion sets forth the reasons for that Order.

## I. Background

This case, like several before it, concerns the alleged role that a financial institution played in facilitating "Jeffrey Epstein's widespread and well-publicized sex-trafficking operation."[1] ECF No. 1, at 1 ("Compl."); see, Doe 1 v. Deutsche Bank Aktiengesellschaft, 671 F. Supp. 3d 387 (S.D.N.Y. 2023); Doe

[1] For purposes of this recitation of the relevant background, "the Court assumes the truth of the non-conclusory allegations in the amended complaint[]." Doe v. Bank of Am., N.A., 819 F. Supp. 3d 314, 320 (S.D.N.Y. 2026).

v. Bank of Am., N.A., 819 F. Supp. 3d 314 (S.D.N.Y. 2026).[2] This Court has twice described the details of "Epstein's grotesque misconduct." Bank of Am., 819 F. Supp. 3d at 321-22; see Doe 1, 671 F. Supp. 3d at 396-400. At a high level, for three decades, Epstein operated a sex trafficking venture through which he "used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them." Compl. ¶ 33. Molchonova, who was one of Epstein's victims, see id. ¶¶ 147-62, alleges that FirstBank participated in, and benefited from, Epstein's vast criminal enterprise in violation of federal and local law.

Beginning in 1998 and continuing until 2020, FirstBank provided wide-ranging financial services to Epstein and his broader sex-trafficking operation. Id. ¶¶ 1, 3. As alleged, FirstBank maintained dozens of accounts for Epstein, his entities, and his agents, id. ¶ 4, facilitated millions of dollars in transfers to and from these accounts, id. ¶ 7, and served as a banking reference for Epstein when he sought to charter his own banking entity, id. ¶ 8. These services, among others, were

[2] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

"integral in helping [Epstein] fuel his international sex trafficking operation." Id. ¶ 1.

According to the complaint, FirstBank steadfastly provided these services despite mounting evidence of Epstein's crimes. Id. ¶¶ 1, 5-7. As alleged in great detail, evidence of Epstein's sexual abuse of children was a matter of public record beginning in the mid-2000s. See id. ¶¶ 91-127. Indeed, even as other financial institutions ended their relationships with Epstein during the 2010s, FirstBank maintained Epstein's business and continued opening new accounts. Id. ¶¶ 197, 224-25, 233-236.

Further, Molchonova alleges, there was significant activity associated with FirstBank accounts belonging to Epstein, his agents, and his entities that should have alerted FirstBank to the reality that Epstein was using its financial services to facilitate sex trafficking. For instance, in 2018, FirstBank opened a bank account for an Epstein victim using the same address in the U.S. Virgin Islands as Epstein and his other related accounts. Id. ¶ 237. More generally, Molchonova contends that FirstBank's obligations under various banking regulations did, or should have, given it knowledge both of Epstein's sex-trafficking venture and the role that its own financial services were playing in that venture. See id. ¶¶ 163-92. FirstBank's failure to comply with these regulatory obligations is alleged to have obstructed

investigation and enforcement of the TVPA and facilitated Epstein's continued criminal activity.

Molchonova brings three claims against FirstBank on behalf of a putative class of Epstein victims. First, she alleges that the defendants were knowing beneficiaries in a sex-trafficking venture in violation of the Trafficking Victims Protection Act ("TVPA"). Compl. ¶¶ 264-85; see 18 U.S.C. §§ 1591(a)(2), 1595(a). Second, she alleges that Defendants obstructed enforcement of the TVPA in violation of 18 U.S.C. § 1591(d). Compl. ¶¶ 286-305. And finally, she alleges that Defendants violated the New York City Gender-Motivated Violence Protection Act ("GMVPA"). Compl. ¶¶ 306-19.

On July 30, 2026, FirstBank filed the instant motion to dismiss, alleging want of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), improper venue under Fed. R. Civ. P. 12(b)(3), and failure to state a claim under Fed. R. Civ. P. 12(b)(6). See ECF No. 42. Following full briefing, oral argument, and limited discovery on the jurisdictional issue, the Court granted FirstBank's motion in part and denied it in part. The Opinion that follows states the reason for those rulings.

## II. Legal Standard

To survive FirstBank's motion to dismiss under Fed. R. Civ. P. 12(b)(6), Molchonova's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662,

678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

"To defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple, 92 F.4th 450, 455-56 (2d Cir. 2024). Typically, a plaintiff can satisfy this burden "solely by allegations." Astor Chocolate Corp. v. Elite Gold Ltd., 510 F. Supp. 3d 108, 121 (S.D.N.Y. 2020). But where, as here,[3] "jurisdictional discovery has been conducted . . . a plaintiff's prima facie showing must be factually supported; in other words, it must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Id. In determining whether a plaintiff has made a sufficient showing, "the court applies a standard akin to that on a motion for summary judgment, construing the pleadings documents, and other evidentiary materials in the light most favorable to the plaintiff and all doubts are resolved in its favor." Id. As noted below, issues of venue largely track the issues related to personal jurisdiction discussed below.

[3] On August 20, 2026, the Court granted Molchonova's motion for limited jurisdictional discovery. See ECF No. 47.

## III. Analysis

### A. Personal Jurisdiction

"Personal jurisdiction can be general or specific." Oklahoma Firefighters, 92 F.4th at 456. Molchonova claims only specific jurisdiction here. Determining whether a court may exercise specific personal jurisdiction requires a two-step inquiry: "First, the court applies the forum's long-arm statute. Second, if the long-arm statute permits the exercise of jurisdiction, the court determines whether that exercise would comport with the Due Process Clause." Id. Applied here, the Court concludes that it has specific jurisdiction as to both defendants.

New York law provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent (1) transacts any business within the state or contracts anywhere to supply goods or services in the state."[4] N.Y. C.P.L.R. § 302(a). In other words, "[c]ourts in New York have jurisdiction over a foreign defendant for causes of action that arise out of transacting any business within the state,

[4] Molchonova also asserts that jurisdiction is proper under § 203(a)(3), which provides that, under certain circumstances, jurisdiction extends to a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state." Because the Court concludes that jurisdiction is proper under § 302(a)(1), it does not reach this alternative basis for jurisdiction.

whether in person or through an agent." Mueller v. Deutsche Bank Aktiengesellschaft, 777 F. Supp. 3d 329 (S.D.N.Y. 2025), aff'd, 185 F.4th 307 (2d Cir. 2026).

Two requirements must be satisfied to establish personal jurisdiction pursuant to § 302(a)(1): "(1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013). This is a "relatively permissive inquiry [that] requires only that at least one element of the claim arises from defendant's New York contacts." Mueller, 777 F. Supp. 3d at 335.

Molchonova cites documentary records and deposition testimony showing that FirstBank made repeated use of correspondent banks based in New York to send wires to Epstein, Epstein victims, and Epstein associates. See ECF No. 56, at 5. She also cites evidence of at least seven wire transfers involving Epstein, Epstein victims, and their families that passed through New York-based intermediary banks. Further, Molchonova points to correspondence between FirstBank and "New York-based principals and agents" like Darren Indyke, Richard Kahn, and Bella Klein. See id. at 4.

These facts suffice to establish personal jurisdiction for purposes of § 302(a)(1). To begin, "the repeated use of a correspondent account in New York on behalf of a client -- in

effect, a course of dealing -- can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum." Mueller, 777 F. Supp. 3d at 336; see Lelchook v. Societe Generale de Banque au Liban S.A.L., 147 F.4th 226, 240-41 (2d Cir. 2025), cert. denied, 224 L. Ed. 2d 526 (Apr. 27, 2026) (finding personal jurisdiction based on the "deliberate and recurring use of [a] correspondent bank"). Indeed, this kind of business conduct "is reasonably seen as a form of exploitation of a State's market, the paradigmatic example of purposeful availment." Lelchook, 147 F.4th at 241; see Al Rushaid v. Pictet & Cie, 28 N.Y.3d 316, 328 (2016) (holding that a "bank with a correspondent account [] that repeatedly approves deposits and the movement of funds through that account for the benefit of its customer is no less transacting business in New York because the customer, or a third party at the customer's direction, actually deposits or transfers the funds to New York").

While, more generally, New York law focuses on "the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test," Licci, 732 F.3d at 170, the sum of FirstBank's constant contacts with New York relating to Epstein matters suffices for jurisdiction in this case. These contacts likewise suffice to satisfy the requirements of due process. See Artists Rts. Enf't Corp. v.

Jones, 268 F. Supp. 3d 491, 494 (S.D.N.Y. 2017) ("Because CPLR 302 does not reach as far as the constitution permits, if a defendant is amenable to long-arm jurisdiction in New York, the constitutional standard is satisfied.").

Finally, the defendants contend that, even if jurisdiction is proper as to defendant FirstBank Puerto Rico, Molchonova has not established jurisdiction as to defendant First BanCorp. Molchonova alleges that FirstBank Puerto Rico is an alter ego of First BankCorp, and therefore, if jurisdiction is proper as to one, it is proper as to both. The Court agrees. See New England Tel. Co. v. Glob. NAPs. Inc., 624 F.3d 123, 138 (2d Cir. 2010). Accordingly, the Court's concludes that jurisdiction is proper as to both defendants.[5]

**B. Trafficking Victims Protection Act**

Molchonova brings two claims under the TVPA. First, she alleges that the defendants were knowing beneficiaries in a sex-trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2), 1595(a). See Compl. ¶¶ 264-85. This is known as "participant liability." Second, she alleges that the defendants obstructed enforcement of the TVPA, in violation of 18 U.S.C. § 1591(d).

---

[5] FirstBank argued that venue was improper in this District because the defendants are headquartered elsewhere. For much the same reasons that the Court concludes that personal jurisdiction is proper, it likewise concludes that venue is proper in this District.

See Compl. ¶¶ 286-305. For the reasons that follow, the Court denied FirstBank's motion to dismiss Molchonova's participation claim and granted its motion to dismiss her obstruction claim.

**1. Participant Liability**

As this Court recently explained, the TVPA imposes civil liability on any "person or entity that knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that defendant knew or should have known has engaged in an act in violation of the TVPA." Bank of Am., 819 F. Supp. at 326-27; see 18 U.S.C. §§ 1591(a)(2), 1595(a). Participant liability "involves three elements: first, that the defendant participated in a commercial sex trafficking venture; second, that the defendant knew or should have known that the venture either involved the perpetrator's use of force, the threat of force, fraud, or coercion to cause the victims to participate in sex or that the venture involved sex with victims who were under the age of 18; and third, that the defendant benefited from its participation in the venture." Id. The Court takes each in turn.

**i. Participation in a Commercial Sex Trafficking Venture**

To satisfy the first element required to allege participant liability, Molchonova must "make a showing that [FirstBank] took part in an enterprise or undertaking that involved elements of risk, potential gain, or both." Mueller v. Deutsche Bank

Aktiengesellschaft, 185 F.4th 307, 313 (2d Cir. 2026). Consistent with that construction, this Court has explained that "[p]articipation, for purposes of a claim under Section 1595(a), requires allegations of specific conduct that furthered the sex trafficking venture, that is, allegations of conduct that amounts to more than just passive facilitation and, instead, reaches some level of active engagement." Bank of America, 819 F. Supp. 3d at 327.

The Second Circuit has identified six factors that generally "will help to determine whether a TVPRA defendant's association with a venture rises to the level of participation" for purposes of the TVPA:

> (1) whether the defendant owned an interest in the venture;
> (2) whether the defendant acted with the purpose or desire to promote the venture's success;
> (3) whether the defendant and the venture otherwise acted with a common purpose;
> (4) whether the defendant maintained a continuous relationship with the venture;
> (5) whether the defendant exercised control over the venture's operations; and
> (6) whether the defendant's association with the venture went beyond a mere arm's-length transaction.

Id. at 314. Critically, though, these factors are not exhaustive and "each case will ultimately turn on its own facts." Id.

Relevant here, the Second Circuit also clarified that "an arm's-length business relationship between a bank and its customers, as well as the routine provision of ordinary,

nondifferentiated financial services" is insufficient to establish participation in a venture. Id. Put differently, "in the banking context, active engagement requires a financial institution to provide more than its routine services." Bank of America, 819 F. Supp. 3d at 327. Thus, for her participation claim to survive, Molchonova must allege more than that FirstBank provide routine banking services to the Epstein venture. The Court concludes that she has done so.

Molchonova has alleged an extensive, longstanding, and continuous relationship between FirstBank and Epstein. For more than two decades, FirstBank opened and maintained more than 30 accounts for Epstein and related entities. See Compl. ¶ 4. The Complaint alleges that these accounts were used to pay victims, see id. ¶¶ 200, 202, and circulate millions of dollars in funds between various Epstein-related entities and individuals, id. ¶¶ 204-05, 208-18. FirstBank processed millions of dollars in payments from Epstein's personal accounts to the FirstBank accounts of entities held by Epstein and his known associates. See id. ¶¶ 208-18. Several of these entities owned the properties where much of Epstein's trafficking and sexual abuse transpired, id. ¶¶ 209, 212-13, 215, while others made payments to victims of Epstein's abuse, id. ¶ 202.

While such extensive activity was more than "routine," what is crucial is that Molchonova has alleged with specificity that

FirstBank maintained this extensive and longstanding relationship with Epstein despite ever more extreme "red flags" that ultimately led every other bank to drop him as a client. Between 2007 and 2015, HSBC, Goldman Sachs, Bank of America, Merrill Lynch, JP Morgan Chase, UBS, and CitiBank all terminated their relationships with Epstein. Id. ¶¶ 224-25. But FirstBank simply took advantage of these closures to enhance its profitable banking relationship with Epstein. For example, in 2018, "both Fidelity Investments and Deutsche Bank closed its [sic] accounts with Epstein and sent funds from those closures to FirstBank." Id. ¶ 233.

At best, these allegations demonstrate an astonishing ignorance to the apparent consensus of the financial services industry not to provide banking services to someone whose grotesque misconduct was becoming ever more obvious. At worst, drawing all inferences in Molchonova's favor, the complaint alleges that FirstBank provided continuous and substantial financial services to Epstein and his associates despite knowing that these services were being used to further Epstein's sex trafficking venture. See Bank of Am., 819 F. Supp. 3d at 328 (finding that facilitating wire transfers constituted participation for purposes of the TVPA because the defendant "had every reason to know that [the plaintiff] had no ability to earn legitimate income in the United States and that Epstein,

who arranged the set-up of the account and was involved with the transfers, had already been convicted of sex crimes involving underage girls").

While any one of FirstBank's services to Epstein may be claimed to be "routine" (though in many instances even that is suspicious), together, the complaint alleges that FirstBank was deeply enmeshed in Epstein's misconduct for its own financial benefit.

By contrast, in Mueller, the plaintiffs failed to allege that the defendant bank "interacted with their allegedly ISIS-connected accountholders any more or differently than they would with their many other customers." Mueller v. Deutsche Bank Aktiengesellschaft, 777 F. Supp. 3d 329, 338 (S.D.N.Y. 2025), aff'd, 185 F.4th 307 (2d Cir. 2026) (emphasis added). Here, the gravamen of the complaint is precisely that FirstBank interacted with Epstein quite a bit more, and in very different ways, than it did for other customers. As Molchonova reasonably puts it, her allegations suggest that FirstBank "showed absolute loyalty to Epstein," Compl. ¶ 242, a quality that differentiates its services from those provided to a typical customer. At this

stage, these allegations suffice to plead participation for purposes of the TVPA.

**ii. Knowledge of the Sex Trafficking Venture**

Having concluded that Molchonova has alleged participation, the Court turns to the second element – whether Molchonova "adequately alleges that [FirstBank] either knew or should have known that Epstein's venture used force, the threat of force, fraud, coercion, or some combination of the same to cause its victims to submit to sex, or that the victims who submitted to sex were under the age of 18." Bank of Am., 819 F. Supp. 3d at 330. The Court concludes that she has.

As an initial matter, knowledge, for purposes of the TVPA, requires only that the defendant "'should have known' in the usual sense of negligence." Id. Further, and importantly, the TVPA "does not require that the defendant know or recklessly disregard the fact that the force, fraud, or coercion was used with respect to plaintiff herself."[6] Id. Molchonova's allegations easily survive this standard.

Molchonova's complaint alleges that, throughout its twenty-plus-year relationship with Epstein, FirstBank ignored considerable, publicly available information about Epstein and

---

[6] FirstBank asks the Court to reconsider its interpretation of the knowledge requirement under the TVPA. After careful consideration, the Court declines FirstBank's invitation.

his close associates. See Compl. ¶¶ 91-127. As this Court previously explained with respect to a different bank, "while [FirstBank] was not required to automatically credit" these sources of information about Epstein, "the amended complaint plausibly asserts that the bank turned a blind eye to these repeated, detailed allegations, some emanating from police reports widely circulated in the press, by utterly failing to engage in due diligence about them." Bank of Am., 819 F. Supp. 3d at 331.

Molchonova also alleges that there was significant FirstBank account activity that itself should have raised red flags. For instance, in 2018 – after years of media and law enforcement reports describing Epstein as a sexual abuser and sex trafficker –FirstBank opened a bank account for one of Epstein's victims using the same address in the U.S. Virgin Islands as Epstein and his other related accounts. Compl. ¶ 237. Likewise, Molchonova alleges with sufficient specificity that Epstein and his agents[7] owned a network of FirstBank accounts – including accounts for entities and properties that were publicly linked to Epstein's abuse and trafficking venture – that received millions of dollars in transfers from other of

[7] Molchonova alleges that FirstBank had actual knowledge that Darren Indyke and Richard Kahn, who were signatories on numerous accounts, were representatives of Epstein. See Compl. ¶¶ 131-39, 198.

Epstein's accounts. Id. ¶¶ 198, 208-18. And, as emphasized above, the complaint plausibly alleges that FirstBank should have been aware of the laundry list of other banks that cut ties with Epstein in the decade preceding his death in 2019.

Taken together, these allegations satisfy the knowledge element of Molchonova's participation claim.

**iii. Benefit from Participation**

The third element of a TVPA participation claim is that a defendant must have benefited from its participation in a sex trafficking venture. This element can be satisfied by "allegations that [FirstBank] knowingly received revenue from its participation in generally assisting a venture that it knew, or should have known, involved sex trafficking." Bank of Am., 819 F. Supp. 3d at 332. As this Court recently clarified, it is not necessary for Molchonova to allege "a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit." Id. Instead, all that is required is "that a defendant must knowingly benefit from participation in what it knew or should have known was a forbidden venture." Id.

Molchonova's allegations easily satisfy this standard. She alleges that "Epstein only offered his business to FirstBank because it was knowingly aiding Epstein's sex trafficking operation and the concealment thereof. FirstBank knew that if it

stopped aiding the operation, it would lose the Epstein-related accounts and the financial benefits attached to handling those accounts." Compl. ¶ 243. She also alleges that "FirstBank financially benefitted in the form of profits, high-net-worth clients, and other financial incentives, for its participation in the Epstein sex-trafficking venture." Compl. ¶ 245. These allegations plainly state that FirstBank profited from its longstanding and continuous relationship with Epstein, and plausibly proffer that Epstein would not have continued banking with FirstBank if it did not turn a blind eye to his use of FirstBank's services to facilitate his sex trafficking venture. See Bank of Am., 819 F. Supp. 3d at 332 (citing similar allegations to conclude that the plaintiff satisfied the benefit element). Accordingly, the Court concludes that Molchonova has satisfied the benefit element of her participation claim.

**iv. Conclusion**

In sum, the Court concludes that Molchonova has adequately pled all three elements of a participation claim against FirstBank. Accordingly, the Court denied FirstBank's motion to dismiss Count One of the complaint. See ECF No. 67.

**2. Obstruction Liability**

Turning to Count II, Molchonova alleges that FirstBank obstructed enforcement of the TVPA in violation of 18 U.S.C. §§ 1591(d) and 1595. "To assert a claim for obstruction under

the TVPA, a plaintiff must show that a defendant (1) knew of an effort to enforce the TVPA and (2) intentionally obstructed or attempted to obstruct that enforcement effort." Bank of Am., 819 F. Supp. 3d at 334. As this Court has previously concluded in a substantially similar case, "[b]ecause Congress enacted Section 1591(d) in 2008 and did not give that provision retroactive effect, the investigations that resulted in Epstein's 2006 guilty plea and his 2007 non-prosecution agreement there cannot support plaintiffs' claim for obstruction."[8] Id. at 335. Accordingly, the relevant inquiry for purposes of Molchonova's obstruction claim is whether she has alleged that FirstBank knew of a post-2008 effort to enforce the TVPA and intentionally obstructed, or attempted to obstruct, that enforcement effort. The Court concludes she has not.

The only relevant post-2008 TVPA enforcement action alleged in the complaint is the investigation and eventual arrest of Epstein in the Southern District of New York in July 2019. See Compl. ¶¶ 49, 222. Molchonova does not allege that FirstBank was aware of this investigation prior to Epstein's arrest on July 6, 2019. And critically, she has not alleged any acts constituting obstruction that post-date Epstein's arrest. To the contrary,

[8] Despite Molchonova's request, and after careful consideration of the arguments of counsel, the Court discerns no reason to revisit this holding.

Molchonova alleges that FirstBank filed a Suspicious Activity Report ("SAR") documenting suspicious transactions just eleven days after Epstein was arrested. Id. ¶ 222. This filing, less than two weeks after Epstein's arrest, "is inconsistent with the theory that [FirstBank] acted to intentionally obstruct the investigation of TVPA violations being conducted in the Southern District of New York even after that investigation became known." Bank of Am. 819 F. Supp. 3d at 335.

In sum, the Court concludes that Molchonova has failed to allege obstruction under the TVPA. The Court therefore grants FirstBank's motion to dismiss Count Two of the complaint.

**C. Gender-Motivated Violence Protection Act**

The Court concludes that Molchonova's complaint states a claim under the New York City Gender-Motivated Violence Protection Act ("GMVPA"). See N.Y.C. Admin. Code §§ 10-1101-1107. Accordingly, FirstBank's motion to dismiss the Count Three of Molchonova's complaint is denied.

"The GMVPA creates a cause of action for any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." Baldwin v. TMPL Lexington LLC, No. 23 CIV. 9899 (PAE), 2024 WL 3862150, at *11 (S.D.N.Y. Aug. 19, 2024); see N.Y.C. Admin. Code § 10-1104. To state a GMVPA claim, the complaint must allege that the defendants

"commit[ted], direct[ed], enable[d], participate[d] in, or conspire[d] in" the commission of a predicate crime, and that "(1) [the predicate crime] constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff's gender; (3) in part because of animus against plaintiff's gender; and (4) resulted in injury." Id. at *12.

There is little question that Molchonova was the victim of a predicate crime for purposes of the GMVPA. Nevertheless, FirstBank makes four arguments for dismissing this claim. First, FirstBank argues that the GMVPA does not reach FirstBank's alleged conduct because none of this conduct took place in New York City. Second, FirstBank argues that the complaint does not allege GMVPA liability, because it does not allege any active participation by FirstBank. Third, FirstBank argues that if it does apply, the GMVPA violates due process by creating an indefinite lookback period predating the statute itself. And finally, FirstBank argues that the GMVPA is preempted by New York State law. The Court takes each argument in turn.

**1. Extraterritoriality of the GMVPA**

FirstBank's principal position is that it cannot be liable under the New York City ordinance, because the complaint does not allege any FirstBank conduct occurring in New York City. The Court disagrees.

As an initial matter, there are ample allegations that

Molchonova was sexually abused in New York City, and that Epstein's trafficking operation took place in part in New York City. See Compl. ¶¶ 152-53, 56. Thus, the essence of the dispute between the parties is whether it suffices for purposes of alleging secondary liability by FirstBank that the underlying conduct took place in New York, even if none of FirstBank's own conduct directly relating to that abuse took place in New York.

New York courts have not squarely resolved this question. As FirstBank points out, several cases in this District have assumed that "the GMVPL applies only to conduct occurring in New York City." Doe 3 v. Indyke, 801 F. Supp. 3d 200, 208 (S.D.N.Y. 2025); see also Bensky v. Indyke, 743 F. Supp. 3d 586, 602 (S.D.N.Y. 2024) ("The parties appear to agree that New York City's Victim-Protection Law applies only to conduct occurring in New York City."); Kelly v. Combs, No. 24-CV-8024 (VEC), 2025 WL 2978058, *2 (S.D.N.Y. Oct. 22, 2025) ("The GMVPA, like all provisions of the New York Administrative Code, applies solely to conduct that occurs in New York City."). And N.Y.C. Admin. Code § 2-202 limits the "extent of [New York City's] jurisdiction and powers" to the territorial limits of the City. On FirstBank's account, this authority strictly limits the reach of the GMVPA to conduct that occurs within New York City.

However, New York courts have not embraced FirstBank's brightline rule. In M.H. v. S.A., the court read the term "crime

of violence" in the GMVPA to encompass "a continuum of acts of criminal violence motivated by gender," even if some of those acts occurred outside New York City. 2025 WL 3034263, at *7 (N.Y. Sup. Ct. Oct. 29, 2025). Likewise, in Doe v. Doe, the court found the GMVPA applicable based solely on a plaintiff's New York City residency, even though all the relevant conduct occurred outside the City. 213 N.Y.S.3d 875, 880-81 (N.Y. Sup. Ct. 2024). While these cases are not on all fours with the instant case, they reveal that there is no hard-and-fast requirement that the conduct giving rise to an GMVPA claim must take place in New York City.

Here, several factors support Molchonova's view that FirstBank's alleged conduct falls within the ambit of the GMVPA. First, as in Doe v. Doe, Molchonova alleges that she was a New York City resident at all relevant times. Compl. ¶ 17. Second, Molchonova alleges that she was the victim of a gender-motivated crime of violence in New York City. See Comp. ¶¶ 147-62. Third, FirstBank's alleged participation in the Epstein sex-trafficking venture was substantially directed towards New York City, because much of Epstein's enterprise was based in, and coordinated from, New York City.

In sum, where, as alleged here, a financial institution knowingly facilitates gender-motivated violence organized from, occurring within, and impacting residents of New York City, the

GMVPA provides victims with a remedy, even when that institution is located outside the City. Accordingly, the Court concludes that Molchonova's complaint alleges sufficient New York City conduct to state a claim under the GMVPA.

**2. Whether Molchonova Alleges Participation**

FirstBank next argues that, even if its out-of-city conduct could conceivably fall within the ambit of the GMVPA, the complaint fails to allege active participation by FirstBank in the Epstein trafficking scheme. Again, the Court disagrees.

The secondary liability component of the GMVPA is not defined in the statute and has not yet been given a definitive construction by New York courts. The Court need not, and does not, venture to do so here. Instead, for purposes of resolving the instant claim, it suffices to conclude that for substantially the same reasons that Molchonova's allegations satisfy the participation element of her TVPA claim, she has likewise alleged that FirstBank enabled or participated in a gender-motivated crime of violence under the GMVPA. See De Deus v. Indyke, 2026 WL 2081815, at *1 (N.Y. Sup. Ct. July 07, 2026) (finding that the plaintiff stated a GMVPA claim against defendants who "took part in financial and legal maneuvers on behalf of Epstein that enabled him to commit gender-motivated crimes of violence").

FirstBank argues that, because the secondary liability

component of the GMVPA is not defined in the statute, the Court should import the requirements of aiding and abetting liability. See ECF No. 43 at 21-23. Accordingly, secondary liability under the GMVPA requires a greater degree of awareness of and participation in the underlying conduct than is required for participant liability under the TVPA. The Court is unpersuaded.

"New York courts have long recognized the fundamental principle that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature." Liberty Ins. Corp. v. Hudson Excess Ins. Co., 147 F.4th 249, 266 (2d Cir. 2025). The text of the GMVPA, which is "the clearest indicator of legislative intent," Majewski v. Broadalbin-Perth Centr. Sch. Dist., 91 N.Y.2d 577, 583 (1998), closely tracks the language of the participant provision of the TVPA.[9] Moreover, as Molchonova points out, when amending the GMVPA to add the secondary liability provision, the City Council sought to make "unmistakably clear that institutions that enable abuse can be held accountable alongside individual perpetrators." Jan. 28, 2026 Comm. of Women & Gender Equity Tr. 5:2-4. Reading an amendment to the GMVPA — a "civil rights remedy" that was first

[9] It is true, as FirstBank points out, that the TVPA refers to "participation in a venture," while the GMVPA refers to participating in or enabling a gender-motivated crime of violence. The Court does not discern any import in this distinction.

enacted to fill a gap in federal protections for victims of gender-motivated violence — to provide less protection than a federal statute that was already on the books would run counter to that stated purpose. See Engelman v. Rofe, 144 N.Y.S.3d 20, 25-26 (1st Dept. 2021), holding modified by Police Benevolent Ass'n of City of New York, Inc. v. City of New York, 224 N.E.3d 522 (2023).

Thus, having concluded that Molchonova has alleged participation for purposes of the TVPA, it likewise concludes that she has alleged sufficient participation for purposes of the GMVPA.

**3. Due Process**

Next, FirstBank argues that the retroactive application of the GMVA to FirstBank's alleged conduct violates due process. While the Supreme Court has imposed a "presumption against statutory retroactivity," it has also observed that "the constitutional impediments to retroactive civil legislation are now modest." Landgraf v. USI Film Prods., 511 U.S. 244, 272 (1994). Where, as here, the legislature has expressly provided for retroactive effect for civil legislation, there is no constitutional obstacle to enforcing that effect. See Gottwald v. Sebert, 40 N.Y. 3d 240, 258 (2023). Accordingly, the Court

concludes that the GMVPA has no impermissible retroactive effect.

**4. Preemption**

The Court turns last to FirstBank's argument that the GMVPA is preempted by the New York State Adult Survivors Act. As this Court recently explained, "on January 9, 2022, the City Council amended the GMVPA to create a so-called revival window for certain time-barred claims." Rivers v. Combs, No. 25-CV-1726 (JSR), 2025 WL 2414117, at *8 (S.D.N.Y. Aug. 19, 2025), appeal dismissed (Oct. 22, 2025). However, "there is an open question as to whether the Revival Provision was preempted, under the New York Constitution, by the New York State legislature's subsequent enactment of the Adult Survivors Act." Id.

Courts in this District have reached divergent conclusions on this question. Compare Doe v. Black, No. 23 Civ. 6418, 2024 WL 4335453, at *1-7 (S.D.N.Y. Sept. 27, 2024) (holding that the GMVA is not preempted); De Deus v. Indyke, No. 151301/2026, 2026 WL 2081815 (N.Y. Sup. Ct. July 07, 2026) (same); with Parker v. Alexander, 779 F. Supp. 3d 361, 365-70 (S.D.N.Y. 2025) (holding that the GMVA is preempted by state law). The decisions in Doe v. Black and Parker v. Alexander were appealed to the Second Circuit, which certified the preemption question to the New York Court of Appeals. Parker v. Alexander, 171 F.4th 146, 150-52 (2d

Cir.), certified question accepted, 45 N.Y.3d 951, 278 N.E.3d 441 (2026).

In view of the pending decision in Parker, this Court recently explained, "ruling on what this Court considers to be a close question arising under the New York Constitution risks ruling at odds with the Second Circuit's decision and delaying resolution of the action further." Rivers, 2025 WL 2414117, at *9. For the same reason, the Court declines at this time to decide whether the GMVPA Revival Provision is preempted by the Adult Survivors Act. Thus, while the Court denied FirstBank's motion to dismiss Count Three, it specified that this decision was "without prejudice to defendants' renewing the motion [to dismiss Count Three] based on any decision" in Parker. See ECF No. 67 at 2 n.1.

**5. Conclusion**

Taken together, the Court concludes that Molchonova has stated a claim under the GMVPA and denies FirstBank's motion to dismiss Count Three of the complaint.

## IV. Conclusion

In sum, Molchonova has established personal jurisdiction and her complaint states a claim for participant liability under the TVPA and for a violation of the GMVPA. However, the complaint fails to state a claim for obstruction under the TVPA. Thus, for the foregoing reasons, the Court issued its September

25, 2026 "bottom-line" order dismissing Count Two of Molchonova's complaint and denying FirstBank's motion to dismiss in all other respects.

New York, NY
October 14, 2026

JED S. RAKOFF, U.S.D.J.